# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

1. STATE OF OKLAHOMA,

2. KEVIN STITT, in his official capacity as Governor of Oklahoma,

3. OKLAHOMA DEPARTMENT OF MINES,

4. OKLAHOMA CONSERVATION COMMISSION,

*Plaintiffs*,

v.

1. UNITED STATES DEPARTMENT OF THE INTERIOR,

2. DEBRA A. HAALAND, in her official capacity as Secretary of the Interior,

3. OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT,

4. GLENDA OWENS, in her official capacity as Acting Director of the Office of Surface Mining Reclamation and Enforcement,

*Defendants*.

Civil Action No: 21-cv-719-F

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND BRIEF IN SUPPORT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.............................................................................................iii

GLOSSARY ....................................................................................................................ix

INTRODUCTION ............................................................................................................ 1

STATEMENT OF FACTS ............................................................................................... 3

    I.    *McGirt v. Oklahoma.* ........................................................................................ 3

    II.    The Surface Mining Control and Reclamation Act ("SMCRA"). ...................... 5

    III.    Oklahoma's SMCRA Programs........................................................................... 6

        A. Oklahoma's Title V Regulatory Program........................................................ 6

        B. Oklahoma's Title IV AML Reclamation Program. ......................................... 8

    IV.    Procedural History. .......................................................................................... 10

    V.    Effects of Defendants' Notice of Decision. ...................................................... 11

PRELIMINARY INJUNCTION STANDARD ................................................................ 14

ARGUMENT................................................................................................................... 14

    I.    Plaintiffs are Likely to Succeed on the Merits of Their Claims. ...................... 14

        A. Plaintiffs are entitled to a declaratory judgment that *McGirt* does not affect Oklahoma's jurisdiction under SMCRA to regulate surface mining and reclamation on the historic lands of the Muscogee (Creek) Nation. ............. 15

            1. Fundamental principles of equity preclude Defendants from stripping Oklahoma of its long-exercised and unopposed jurisdiction over its SMCRA programs within the historic lands of the Muscogee (Creek) Nation.................................................................................................... 17

            *2.* SMCRA stripped the tribe of any inherent authority to regulate surface mining and reclamation, and there is no basis under that law to revoke Oklahoma's long-standing authority to administer State laws and regulations within the historic lands of the Muscogee (Creek) Nation. 21

i

    a.  Congress divested the tribes of inherent authority to regulate surface mining and reclamation to the extent it existed and shifted the authority to the States. ...................................................................... 22

    b.  Contrary to Defendants' assertion, OSMRE cannot revoke Oklahoma's authority on the ground that it has exclusive jurisdiction to administer SMCRA programs in the absence of a tribal program. ...................................................................................................... 24

  B.  Defendants' Actions Violated the APA. ....................................................... 28

    1.  The Notice of Decision and Grant Funding Denials are final agency actions. ............................................................................................ 29

    2.  Defendants' actions were not in accordance with law .......................... 30

    3.  Defendants' actions were arbitrary and capricious. .............................. 30

    4.  Defendants' actions also violated the APA's rulemaking procedures. . 33

  C.  Defendants' Notice of Decision Violates SMCRA. ...................................... 36

II.    Plaintiffs Have Suffered and Will Continue to Suffer Irreparable Harms........ 36

III.   The Balance of Equities Favors Plaintiffs, and a Preliminary Injunction Would Not Be Adverse to the Public Interest. ............................................................. 38

CONCLUSION ............................................................................................. 40

REQUEST FOR HEARING ............................................................................ 40

# TABLE OF AUTHORITIES

## Cases

*Awad v. Ziriax*,
670 F.3d 1111 (10th Cir. 2012),
*aff'd sub nom. Legacy Church, Inc. v. Collins*,
No. 20-2117, 2021 WL 3011927 (10th Cir. July 16, 2021) ................................... 38

*Bosse v. State*,
484 P.3d 286 (Okla. Crim. App. 2021) ................................................................. 38

*Bragg v. W. Va. Coal Ass'n*,
248 F.3d 275 (4th Cir. 2001) ............................................................................ 6, 23

*Canaan Res. X v. Calyx Energy III, LLC*,
No. CO-119245 (Okla. filed Dec. 8, 2020) ............................................................ 4

*Catholic Legal Immigr. Network, Inc. v. Exec. Office for Immigr. Rev.*,
No. 20–CV–03812 (APM), 2021 WL 184359 (D.D.C. Jan. 18, 2021) .......... 32, 33

*Cayuga Indian Nation of N.Y. v. Pataki*,
413 F.3d 266 (2d Cir. 2005) ................................................................................. 18

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984) ............................................................................................. 25

*City of Sherrill v. Oneida Indian Nation of N.Y.*,
544 U.S. 197 (2005) ......................................................................................*passim*

*Colo. Farm Bureau Fed'n v. U.S. Forest Serv.*,
220 F.3d 1171 (10th Cir. 2000) ........................................................................... 29

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020) ............................................................................28, 31, 33

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016) ......................................................................................... 31

*F.C.C. v. Fox Television Stations, Inc.*,
556 U.S. 502, 515 (2009) ..................................................................................... 36

*Fish v. Kobach*,
    840 F.3d 710 (10th Cir. 2016) ......................................................... 36, 37

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ............................................................................ 28

*Harmon v. City of Norman*,
    981 F.3d 1141 (10th Cir. 2020) ........................................................... 14

*Hooper v. City of Tulsa*, No. 21-cv-165
    (N.D. Okla. filed Apr. 9, 2021) ............................................................ 4

*Int'l Union, United Mine Workers v. Mine Safety & Health Admin.*,
    407 F.3d 1250 (D.C. Cir. 2005) ........................................................... 35

*Kansas v. United States*,
    249 F.3d 1213 (10th Cir. 2001) ........................................................... 37

*La. Mun. Police Emps.' Ret. Sys. v. Cont'l Res., Inc.*,
    886 F. Supp. 2d 1255 (W.D. Okla. 2012) ........................................... 40

*Legacy Church, Inc. v. Kunkel*,
    472 F. Supp. 3d 926 (D.N.M. 2020) *aff'd sub nom.*
    *Legacy Church, Inc. v. Collins*, No. 20-2117,
    2021 WL 3011927 (10th Cir. July 16, 2021) ...................................... 38

*McGirt v. Oklahoma*,
    140 S. Ct. 2452 (2020) ................................................................. *passim*

*Mendoza v. Perez*,
    754 F.3d 1002 (D.C. Cir. 2014) ........................................................... 34

*Michigan v. EPA*,
    268 F.3d 1075 (D.C. Cir. 2001) ........................................................... 30

*Michigan* v. *EPA*,
    576 U.S. 743 (2015) ..................................................................... 28, 33

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins*,
    463 U.S. 29 (1983) ............................................................................. 31

*Nat'l Union Fire Ins., v. Kozeny*,
    19 F. App'x 815 (10th Cir. 2001) ........................................................ 14

*Nevada v. Hicks*,
    533 U.S. 353 (2001) ............................................................................ 15

*NLRB v. SW Gen., Inc.*,
    137 S. Ct. 929 (2017) ......................................................................... 26

*N.M. Dep't of Game & Fish v. Dep't of the Interior*,
    854 F.3d 1236 (10th Cir. 2017) ............................................................. 37

*North Dakota v. EPA*,
    127 F. Supp. 3d 1047 (D.N.D. 2015) ....................................................... 37

*Ohio River Valley Envtl. Coal., Inc. v. Kempthorne*,
    473 F.3d 94 (4th Cir. 2006) ................................................................... 34

*Oneida Indian Nation of N.Y. v. City of Oneida*,
    617 F.3d 114 (2d Cir. 2010) ...................................................... 16, 17, 18, 19, 20

*Oneta Power, LLC v. Hodges*, No. CJ-2020-193
    (Wagoner Cty. Dist. Ct. filed Aug. 21, 2020) .......................................... 5

*Organized Vill. of Kake v. Egan*,
    369 U.S. 60 (1962) ............................................................................. 15

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) ............................................................................. 36

*Ramos v. Louisiana*,
    140 S. Ct. 1390 (2020) ....................................................................... 18

*RoDa Drilling Co. v. Siegal*,
    552 F.3d 1203 (10th Cir. 2009) ......................................................... 36, 37

*Shalala v. Guernsey Mem'l Hosp.*,
    514 U.S. 87 (1995) ............................................................................. 34

*Tenn. Hosp. Ass'n v. Azar*,
    908 F.3d 1029 (6th Cir. 2018) ............................................................. 35

*United States v. McBratney*,
    104 U.S. 621 (1881) ........................................................................... 16

*United States v. Kagama*,
   118 U.S. 375 (1886) ...................................................................... 22

*White Mountain Apache Tribe v. Bracker*,
   448 U.S. 136 (1980) ...................................................................... 16

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ...................................................................... 28

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.*,
   870 F.3d 1222 (10th Cir. 2017) ................................................. 31, 33

*Winnebago Tribe of Neb. v. Stovall*,
   216 F. Supp. 2d 1226 (D. Kan. 2002),
   *aff'd*, 341 F.3d 1202 (10th Cir. 2003) .......................................... 37

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .......................................................................... 14

*Zirkle Fruit Co. v. U.S. Dep't of Labor*,
   442 F. Supp. 3d 1366 (E.D. Wash. 2020) ...................................... 36

**Statutes**

Administrative Procedure Act

   5 U.S.C. § 551(4) .................................................................... 33, 34

   5 U.S.C. § 553(b) ......................................................................... 35

   5 U.S.C. § 553(c) ......................................................................... 35

   5 U.S.C. § 706(2)(A) .................................................................... 28

   5 U.S.C. § 706(2)(D) .................................................................... 28

Surface Mining Control and Reclamation Act

   30 U.S.C. § 1201(f) ............................................................... 5, 21, 23

   30 U.S.C. § 1202(d) ........................................................................ 5

   30 U.S.C. § 1202(f) ......................................................................... 5

30 U.S.C. § 1211(a) ................................................................................5

30 U.S.C. § 1211(c) ................................................................................5

30 U.S.C. §§ 1231–1244 .........................................................................5

30 U.S.C. § 1232(g) ................................................................................6

30 U.S.C. §§ 1235(b)–(e) ........................................................................6

30 U.S.C. § 1235(c) ................................................................................6

30 U.S.C. §§ 1251–1279 .........................................................................5

30 U.S.C. § 1253 ..................................................................................21

30 U.S.C. § 1253(a) ................................................................................6

30 U.S.C. § 1253(b) ................................................................................6

30 U.S.C. § 1254(c) ..............................................................................30

30 U.S.C. § 1254(g) ..............................................................................26

30 U.S.C. § 1255 .............................................................................21, 23

30 U.S.C. § 1255(a) ..............................................................................26

30 U.S.C. § 1276(a)(1) ..........................................................................36

30 U.S.C. § 1295 ....................................................................................6

30 U.S.C. § 1300 ..................................................................................24

30 U.S.C. § 1300(a)–(b) ........................................................................25

30 U.S.C. § 1300(a)–(j) .........................................................................28

30 U.S.C. § 1300(c)–(f) .........................................................................25

30 U.S.C. § 1300(d) ..............................................................................26

30 U.S.C. § 1300(j)(1)(A) ......................................................................24

## Regulations

30 C.F.R. § 732.17(h) ................................................................................ 30

30 C.F.R. § 733.13(d) ................................................................................ 30

30 C.F.R. Part 936 .................................................................................... 34

30 C.F.R. § 936.15 .....................................................................................7

30 C.F.R. § 936.30 .....................................................................................7

45 Fed. Reg. 67,361 (Oct. 10, 1980) ........................................................6, 7

46 Fed. Reg. 4,902 (Jan. 19, 1981) ...........................................................7

47 Fed. Reg. 2,989 (Jan. 21, 1982) ..........................................................8, 19

47 Fed. Reg. 14,152 (Apr. 2, 1982) ..........................................................7, 19

86 Fed. Reg. 26,941 (May 18, 2021) ...............................................24, 29, 31

## Other Authorities

H.R. REP. NO. 95-218 (1977) ...................................................21, 23, 24, 27

H.R. REP. NO. 95-493 (1977) ...............................................................23, 24

S. REP. NO. 402 (1973) ..........................................................................27, 28

Okla. Tax Comm'n, *Report of Potential Impact of McGirt v. Oklahoma*
(Sept. 30, 2020) ...............................................................................4, 5

Petition for a Writ of Certiorari, *State v. Bosse*, No. 21-186 (Aug. 10, 2021) ........ 2, 11, 39

## GLOSSARY

| | |
|---|---|
| AML | Abandoned Mine Lands |
| APA | Administrative Procedure Act |
| DOI | Department of Interior |
| ROE | Right-Of-Entry |
| MCA | Major Crimes Act |
| OCC | Oklahoma Conservation Commission |
| ODM | Oklahoma Department of Mines |
| OSMRE | Office of Surface Mining Reclamation and Enforcement |
| SMCRA | Surface Mining Control and Reclamation Act |

## INTRODUCTION

Last year, the U.S. Supreme Court decided in *McGirt v. Oklahoma* that for the purpose of prosecuting criminal offenses under the federal Major Crimes Act ("MCA"), the historic lands of the Muscogee (Creek) Nation in eastern Oklahoma constitute "Indian country." 140 S. Ct. 2452, 2460–82 (2020). As anyone who lives in Oklahoma knows, the decision has had a tremendous impact within the State. And as Chief Justice Roberts predicted in dissent, the case has "create[d] significant uncertainty for the State's continuing authority over any area that touches Indian affairs, ranging from zoning and taxation to family and environmental law" in eastern Oklahoma. *Id.* at 2500 (Roberts, C.J., dissenting).

This case concerns the federal government's unwarranted and improper effort to expand *McGirt*, beyond that case's express limitations, in this instance into the realm of environmental regulation. Since statehood in 1907, Oklahoma has regulated surface coal mining and reclamation within its borders nearly continuously. For the first 70 years, Oklahoma acted as the exclusive regulator under state law. After Congress enacted the federal Surface Mining Control and Reclamation Act ("SMCRA") in 1977, Oklahoma continued to act as the primary regulator by exercising "primacy," while relying heavily on federal grants to operate its programs. For over 100 years, Oklahoma has successfully regulated coal mining operations within its borders to protect the public health and safety of Oklahoma residents and to protect the land and environment.

Then, on May 18, 2021, Defendants with little explanation and without legal authority purported to strip Oklahoma of its jurisdiction to regulate surface coal mining

1

and reclamation operations within the historic lands of the Muscogee (Creek) Nation on the erroneous theory that the Supreme Court's decision in *McGirt* mandated that result. Defendants have also denied Oklahoma's entitlement to mandatory funding for its SMCRA programs.

Defendants are mistaken in their reliance on the Supreme Court's decision in *McGirt* as justification for their otherwise unexplained actions. As the State is currently arguing before the Supreme Court, *McGirt* was wrongly decided and Congress has, in fact, disestablished the Muscogee (Creek) Nation reservation. *See* Petition for a Writ of Certiorari, at 27, *State v. Bosse*, No. 21-186 (Aug. 10, 2021) ("*Bosse* Pet.") (asking the Supreme Court to overrule *McGirt*). Regardless, the holding in *McGirt* is, by its terms, for "purposes of federal criminal law" only, 140 S. Ct. at 2459, and simply does not support Defendants' expansion of that narrow decision into the regulatory actions at issue.

Moreover, in their haste to seize Oklahoma's sovereign authority, Defendants committed numerous other errors of law. Among other things, Defendants failed to follow the required process in taking their final agency actions, and their actions are arbitrary and capricious.

But while this case is proceeding, immense harms will occur. Defendants' actions are infringing on Oklahoma's sovereignty, damaging its economy and, if allowed to stand, threaten to embolden others to disrupt other areas of civil life in Oklahoma. With respect to SMCRA, Oklahoma will be forced to shut down its programs and lay off multiple employees. And Oklahoma's residents, land, and environment will suffer. Because of Defendants' actions, the State cannot enforce coal-mining permits, respond to

2

mining-related emergencies, inspect coal-mining sites to detect environmental pollution, institute enforcement actions, or remove dangerous hazards from private and public lands. Moreover, the federal government has made no showing that it is ready or even able to take on these vital tasks, and it is not in the public interest to ping-pong these vital SMCRA programs to the federal government and then back to Oklahoma when Defendants' decisions are overturned.

Perhaps most important, this case is only the beginning of the effort to exploit and expand *McGirt*. If the federal government is permitted to go forward here, even preliminarily during the pendency of this litigation, it will turn what it perceives as a crack in Oklahoma's sovereignty into a chasm. Indeed, the federal government has already done so, recently issuing separate decisions purporting to strip Oklahoma of its SMCRA authority on the historic lands of the Cherokee Nation of Oklahoma and Choctaw Nation of Oklahoma. A preliminary injunction is necessary here to prevent the aggressive expansion of *McGirt*, taking the Supreme Court at its word that its decision in *McGirt* is limited to "federal criminal law" only. Accordingly, Plaintiffs respectfully request a preliminary injunction to maintain the status quo while this case is litigated.

## STATEMENT OF FACTS

### I. *McGirt v. Oklahoma.*

On July 9, 2020, the U.S. Supreme Court issued its decision in *McGirt v. Oklahoma* on the question of whether Oklahoma state courts had jurisdiction to try McGirt, a citizen of the Seminole Nation, for certain criminal offenses. The Court concluded that for the purpose of prosecuting criminal offenses under the federal Major Crimes Act ("MCA"),

the historic lands of the Muscogee (Creek) Nation in eastern Oklahoma constituted "Indian country." 140 S. Ct. at 2460–82. As a result, the State of Oklahoma lacked jurisdiction to prosecute crimes committed by McGirt on those lands. *Id.*

By its terms, the holding of *McGirt* was for "purposes of federal criminal law" only. *Id.* at 2459. *McGirt* was not about SMCRA, and the Court did not address questions about Oklahoma's regulatory jurisdiction within the historic lands of the Muscogee (Creek) Nation. The Court specifically declined to apply its reservation ruling to Oklahoma's regulatory jurisdiction, stating that "[t]he only question before us . . . concerns the statutory definition of 'Indian country' as it applies in federal criminal law under the [MCA]," dismissing concerns about its decision being applied to "civil and regulatory law." *Id.* at 2480–81.

Nevertheless, some have attempted to expand *McGirt* beyond its express and narrow application to criminal law. In addition to Defendants attempting to expand *McGirt* to strip Oklahoma of its jurisdiction to regulate surface coal mining and reclamation operations within the historic lands of the Muscogee (Creek) Nation, the Cherokee Nation of Oklahoma, and the Choctaw Nation of Oklahoma, Oklahoma's power to regulate oil and gas matters has been challenged. *See Canaan Res. X v. Calyx Energy III, LLC,* No. CO-119245 (Okla. filed Dec. 8, 2020). Others have questioned the jurisdiction of non-Indian municipal courts in eastern Oklahoma under the Curtis Act, ch. 504, § 14, 30 Stat. 499-500 (1898). *See Hooper v. City of Tulsa*, No. 21-cv-165 (N.D. Okla. filed Apr. 9, 2021). Moreover, many business and individuals in eastern Oklahoma are refusing to pay income and sales taxes, and are seeking refunds of prior payments. *See* Okla. Tax Comm'n,

4

*Report of Potential Impact of McGirt v. Oklahoma,* at 2 (Sept. 30, 2020). Still others are attempting to expand *McGirt* to avoid state property taxes. *E.g., Oneta Power, LLC v. Hodges,* No. CJ-2020-193 (Wagoner Cty. Dist. Ct. filed Aug. 21, 2020). All of these attempts to expand the scope of *McGirt* beyond its narrow confines are improper, but the mere fact that they are occurring raises serious concerns and pose a threat to the State.

## II. The Surface Mining Control and Reclamation Act ("SMCRA").

Congress enacted SMCRA in 1977 to standardize coal mining and reclamation activities, to ensure, among other things, "that surface coal mining operations are so conducted as to protect the environment," and to balance the needs of environmental protection, agricultural productivity, and essential energy sources. 30 U.S.C. § 1202(d), (f). There are two major programs: (1) Title V, which ensures that surface coal mining operations are conducted and reclaimed in an environmentally sound manner, *id.* §§ 1251–1279; and (2) Title IV, an abandoned mine land ("AML") reclamation program to reclaim land and water resources adversely affected by coal mines abandoned before August 3, 1977, *id.* §§ 1231–1244 (together, the "SMCRA programs"). The Office of Surface Mining Reclamation and Enforcement ("OSMRE") was created within the Department of the Interior ("DOI") to administer specified aspects of SMCRA. *Id.* § 1211(a), (c).

But, "because of the diversity in terrain, climate, biologic, chemical, and other physical conditions in areas subject to mining operations," Congress recognized that States—not OSMRE—should have "the primary governmental responsibility for developing, authorizing, issuing, and enforcing regulations for surface mining and reclamation operations." *Id.* § 1201(f). Like many environmental statutes, therefore,

SMCRA sets forth a "cooperative federalism" regime, under which States may assume "primacy"—*i.e.*, primary responsibility for carrying out the regulation, subject to limited federal oversight from OSMRE.

To obtain primacy, a State must propose a Title V program demonstrating the State's legal authority and ability to enforce the regulation of surface coal mining and reclamation operations in accordance with SMCRA. *Id.* § 1253(a). The Secretary, through OSMRE, must review and approve or not approve that program. *Id.* § 1253(b). Once the State obtains primacy, the State has "exclusive jurisdiction over the regulation of surface coal mining within its borders." *Bragg v. W. Va. Coal Ass'n,* 248 F.3d 275, 288 (4th Cir. 2001). The State then becomes eligible for a Title IV AML program, 30 U.S.C. § 1235(c), and may submit a reclamation plan for approval, *id.* § 1235(b)–(e).

Congress authorized OSMRE to provide grants to States to develop, administer, and enforce Title V regulatory programs. *Id.* § 1295. It also mandated that OSMRE fund States with approved Title IV reclamation programs. *Id.* §§ 1232(g), 1235(c).

### III. Oklahoma's SMCRA Programs.

A.   Oklahoma's Title V Regulatory Program.

As soon as they were available, Oklahoma followed SMCRA's rulemaking procedures to establish a Title V regulatory program. On February 28, 1980, Oklahoma submitted to OSMRE a proposed Title V regulatory program. *See* 45 Fed. Reg. 67,361, 67,363 (Oct. 10, 1980). In turn, OSMRE published notice of the submission in the Federal Register and in newspapers throughout Oklahoma, setting a formal public comment period. *Id.* After a public hearing, Oklahoma submitted revisions to the program, and OSMRE

again gave notice in the Federal Register, took public comment, and held a public hearing. *Id*.  Based on this extensive record, the OSMRE Regional Director recommended that the program be approved.  *Id.*

OSMRE issued a "Final Rule" conditionally approving Oklahoma's Title V program on January 19, 1981.  46 Fed. Reg. 4,902 (Jan. 19, 1981).  The approval became permanent on April 2, 1982, following further public hearings and conferences between Oklahoma and OSMRE.  *See* 47 Fed. Reg. 14,152 (Apr. 2, 1982).  The program has been amended twenty-eight times and has always covered the historic lands of the Muscogee (Creek) Nation.  *See* 30 C.F.R. § 936.15.  Oklahoma and the federal government also entered into a cooperative agreement to allow the Oklahoma Department of Mines ("ODM") to regulate mining on federal lands and federally-owned mineral rights.  *See id.* § 936.30.

In carrying out the Title V program, ODM protects the public health and safety of Oklahoma residents, as well as the environment, by overseeing mining operations and their reclamation.  Declaration of Rhonda Dossett ¶ 14 ("Dossett Decl."), attached as **Exhibit 1**. ODM's oversight includes issuing mining operation permits, inspecting the operations, prosecuting permit violations, and overseeing reclamation activities.  *Id.*  To obtain a coal-mining permit, operators must submit a performance bond to ODM to cover the cost of reclamation once mining is complete.  *Id.* ¶ 19.  After reclamation, ODM releases the bond and allows the landowner to resume control of their land.  *Id.* ¶¶ 35–38.  Until this final release, landowners cannot utilize their land for any purpose, including farming, construction, leasing, cattle grazing, or any activity that alters the surface.  *Id.* ¶ 38.

Accordingly, it is critical that ODM ensures that reclamation activities proceed apace and bond releases are issued as soon as the reclamation requirements of the approved Title V program are met.  *See id.* ¶¶ 37–38.

ODM has issued 707 enforcement actions since 2001, and it has received and responded to 884 citizen complaints since 1987.  *Id.* ¶¶ 25–26.  There are currently fifty permitted operations within Oklahoma, including five within the historic lands of the Muscogee (Creek) Nation.  *Id.* ¶ 21.  Four of those five sites are in active reclamation.  *Id.* ¶ 29.

B.    Oklahoma's Title IV AML Reclamation Program.

While seeking approval for its Title V program, Oklahoma also followed SMCRA's rulemaking procedures to establish a Title IV AML Reclamation Program.  Oklahoma submitted its proposed plan to OSMRE on July 30, 1981.  *See* 47 Fed. Reg. 2,989 (Jan. 21, 1982).  OSMRE published notice in the Federal Register, requested public comments, and issued a "Final Rule" approving the plan on January 21, 1982.  *Id.*

The mission of the Oklahoma AML Reclamation Program, administered by the Oklahoma Conservation Commission ("OCC"), is to "reclaim surface and underground coal mine sites abandoned prior to August 3, 1977 to eliminate the significant threats they pose to residents' health and safety and to the land and environment."  Declaration of Robert Toole ¶ 6 ("Toole Decl."), attached as **Exhibit 2**.  These threats include, among other things, (1) steep highwalls (the vertical face remaining from a surface mining operation); (2) hazardous water that fills abandoned mining pits; and (3) subsidences, such as caving, potholes, and cracks caused by AML underground mine voids.  *Id.* ¶ 19.  Since

8

the 1970s, Oklahoma has recorded twenty-six tragic deaths from AML: twelve adults, nine teenagers, and five children.  *Id*. ¶ 20.

In its nearly 40 years running the AML Reclamation Program, OCC has developed substantial experience and made significant strides in protecting the public.  As of February 2021, OCC has successfully completed 186 projects, reclaiming approximately 5,450 acres of AML in Oklahoma.  *Id.* ¶ 44.  In total, OCC has eliminated 319,808 linear feet of dangerous highwall, 257 hazardous waterbodies, and 223 subsidence sites; removed 22 hazardous facility structures; and closed 397 openings to abandoned mines.  *Id.*  On the historic lands of the Muscogee (Creek) Nation, OCC has completed 24 reclamation projects totaling 1,255.4 acres.  *Id.*  Oklahoma still has a significant number of AML hazards not yet reclaimed, including on the historic lands of the Muscogee (Creek) Nation.  *Id.* ¶ 45.

OCC has many projects that would have to be transitioned to OSMRE if the Notice of Decision stands.  Currently, OCC has twenty-three active AML reclamation projects: three are under construction but still have hazards to public health and safety; seven are currently in vegetative maintenance and monitoring, which lasts for two years; and eleven are in the planning and design phase.  *Id.* ¶¶ 28–30.  OCC was preparing two projects to solicit construction bids but was forced to stop when OSMRE withdrew the necessary funding.  *Id.* ¶¶ 31, 60.  Both of these projects present hazards to the public—steep highwalls, hazardous waterbodies, frequent trespassing, and/or close proximity to the homes of young children.  *Id.* ¶ 32.

In addition to reclamation, OCC is responsible for promptly responding to AML emergencies.  *Id.* ¶ 33.  Most common are subsidence events in which an abandoned

underground mine collapses, leaving an open hole.  *Id.* ¶ 34.  With dedicated emergency staff on call 24/7, OCC immediately responds to and typically abates emergencies within a week of receiving the complaint.  *Id.* ¶ 35.  OCC has responded to 89 AML emergencies since February 1998 (an average of approximately 4 per year), including a dangerous subsidence on a school playground and another in a backyard.  *Id.* ¶¶ 35, 38.  The AML Reclamation Program is entirely funded by congressionally mandated grants.  *Id.* ¶ 46.

### IV.  Procedural History.

On April 2, 2021, OSMRE sent letters to ODM and OCC stating that, in light of *McGirt*, "OSMRE and the Secretary of the Interior lack the authority to confer on the State of Oklahoma jurisdiction over lands within the exterior boundaries of the Muscogee (Creek) Nation Reservation."  Complaint ¶ 40, ECF 1 ("Compl.").  Accordingly, OSMRE asserted, "the State of Oklahoma may no longer administer a SMCRA regulatory program on lands within the exterior boundaries of the Muscogee (Creek) Nation Reservation."  *Id.* Instead, it claimed "[f]or lands within the exterior boundaries of the Muscogee (Creek) Nation Reservation, OSMRE is now the SMCRA Title V regulatory authority," and "OSMRE will assume authority over Oklahoma's AML reclamation program."  *Id.*

The Oklahoma Attorney General responded on April 16, 2021, explaining that "OSMRE's assertion of sole and exclusive jurisdiction is not well-supported by the legal citations offered in your letters."  *Id.* ¶ 41.  He further explained that because OSMRE's "demand appears to have no adequate basis in law, I am advising that no state agency should comply with it without further discussion."  *Id.*  Before any response to this letter, OSMRE published on May 18, 2021, a one-page "Notice of Decision" in the Federal

Register stating that pursuant to *McGirt*, OSMRE "is assuming jurisdiction over the SMCRA Title IV reclamation and Title V regulatory programs." *Id.* ¶ 42.

Based on the same conclusory assertions as in its Notice of Decision, OSMRE proceeded to deny Oklahoma federal funding (the "Grant Funding Denials"). It informed ODM on June 29, 2021, that it will not authorize the distribution of ODM's remaining grant funds for calendar year 2021. *Id.* ¶ 43; *see* Declaration of Suzen Rodesney ¶ 7 ("Rodesney Decl."), attached as **Exhibit 3**. And, on July 8, OSMRE denied OCC's application for the FY2021 AML grant and the amendment request to add carry-over funding to the FY2020 AML grant, respectively. Compl. ¶ 44; Toole Decl. ¶ 59.

## V.  Effects of Defendants' Notice of Decision.

OSMRE's actions have already significantly impacted the State of Oklahoma, its employees, its residents, its land, and its environment.

**Impact of *McGirt*.** Defendants' erroneous expansion of *McGirt* has "create[d] significant uncertainty for the State's continuing authority over any area that touches Indian affairs . . . in eastern Oklahoma." *See Bosse* Pet. at 27. As described above, Oklahoma's civil and regulatory authority has been assailed in numerous contexts, including taxation and oil and gas regulation. *See supra*, at 4–5. Defendants' actions here represent another such assault on Oklahoma's sovereignty and proper regulatory authority.

**ODM and the Title V Regulatory Program.** Despite denying access to the remainder of its 2021 grant award, OSMRE has instructed ODM to continue performing inspections and enforcements at all of the sites on the lands within the historic Muscogee (Creek) Nation. Rodesney Decl. ¶ 9. But without the remainder of its grants, ODM will

11

run out of funds to pay employee salaries by September 1, 2021, and will be forced to terminate, at a minimum, seven employees who are paid exclusively from the federal grant funds, including mine inspectors, coal permit specialists, and the Coal Program Director. *Id.* ¶¶ 7–8. Without these employees, ODM will be unable to perform monthly inspections, process permit applications, permit revisions, and bond release applications, or issue violations, institute enforcement actions, or respond to citizen complaints. *Id.* ¶ 8

Moreover, OSMRE's actions have harmed permittees under Oklahoma's Title V program. OSMRE has asserted that ODM cannot release bonds for completed projects, but OSMRE has taken no action itself, which means the permittees and the landowners remain prohibited from using their land. Dossett Decl. ¶ 43. OSMRE has also failed to take action on multiple other requests from permittees, including requests for approval of reclamation work, to participate in site inspections, and for permit revisions. *Id.* ¶¶ 43–57.

OSMRE's actions are also harming the environment. It is critical that all mining sites are inspected monthly to monitor activity and minimize issues and that reclamation activities are completed as soon as possible once mining has ceased to prevent acidic mine water from leaving the site and contaminating adjacent properties. *Id.* ¶¶ 22, 26. As detailed in Dossett's Declaration, OSMRE's refusal to allow reclamation activities to proceed or to properly inspect and monitor the sites puts the environment at risk of harm. *See id.* ¶ 45.

**OCC and the AML Reclamation Program.** OSMRE stripped OCC of all prospective administrative funding as of July 1, 2021, and OCC's remaining administrative funds ran out on August 1, 2021. Toole Decl. ¶ 62. Without funding, the AML

Reclamation Program will end and multiple employees will lose their jobs.  *Id.* ¶¶ 62, 64–65.  In turn, there will be no staff to answer phones or oversee construction projects, vegetation, maintenance, or design planning.  *Id.*  And as a result, all reclamation work will stop.  *Id.* ¶¶ 62–63.  OCC also will no longer be able to respond to AML emergencies.  *Id.*

If the AML Reclamation Program ends, OCC must terminate all contracts with local contractors and Oklahoma Conservation Districts that support the AML Reclamation Program with services, including AML project designs, repairs, vegetative treatment, and maintenance.  *Id.* ¶¶ 66–67.  These local contractors and conservation districts will lose revenue, and OCC will incur contractual termination fees.  *Id.*  In addition, because many of the local contractors do not meet federal contracting requirements, it is uncertain that these experienced contractors could work for the federal government any time soon, if at all, even if OSMRE sought to retain them.  *Id.* ¶ 70.

OSMRE also faces significant obstacles in taking over the Oklahoma AML Reclamation Program.  For example, OCC has obtained Rights-Of-Entry ("ROEs") from private landowners that allow reclamation projects to proceed.  *Id.* ¶ 69.  OSMRE is not a party to the ROEs and thus has no authority to enter the sites to conduct reclamation work. *Id.*  OSMRE also will have to find contractors, but, as noted above, many local contractors do not meet federal requirements.  *Id.* ¶ 70.  These problems are exacerbated by the fact that despite its termination and funding decisions, OSMRE has not yet taken affirmative actions to regulate coal mining or reclamation in Oklahoma.  *Id.* ¶ 63.

For several weeks, counsel for Plaintiffs and counsel for Defendants attempted to reach an agreement to maintain a status quo that would prevent all these harms and be

13

satisfactory to the parties while this litigation was pending.  It has now become clear that such an agreement is not possible.   Accordingly, Plaintiffs now seek a preliminary injunction.

## PRELIMINARY INJUNCTION STANDARD

This Court should grant a preliminary injunction if Plaintiffs show (1) they "[are] likely to succeed on the merits," (2) they "[are] likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "[T]he primary function of a preliminary injunction is to preserve the status quo pending a final determination of the rights of the parties."  *Harmon v. City of Norman*, 981 F.3d 1141, 1151 (10th Cir. 2020).

## ARGUMENT

### I.  Plaintiffs are Likely to Succeed on the Merits of Their Claims.

To warrant a preliminary injunction, Plaintiffs need only "make a prima facie case showing a reasonable probability that [they] will ultimately be entitled to the relief sought." *Harmon*, 981 F.3d at 1146.  A "'[r]easonable probability' is . . . something less than 'preponderance of the evidence.'"  *Nat'l Union Fire Ins., v. Kozeny*, 19 F. App'x 815, 822 (10th Cir. 2001).  That standard is easily surpassed here, where it is clear that Defendants erroneously extended *McGirt*, and that their actions violated the Administrative Procedure Act ("APA") and SMCRA.

14

A. **Plaintiffs are entitled to a declaratory judgment that *McGirt* does not affect Oklahoma's jurisdiction under SMCRA to regulate surface mining and reclamation on the historic lands of the Muscogee (Creek) Nation.**

Plaintiffs are likely to succeed on their claim for a declaratory judgment because Defendants erroneously interpreted *McGirt* to affect Oklahoma's jurisdiction under SMCRA to regulate within the historic lands of the Muscogee (Creek) Nation. As the State is arguing at the Supreme Court, *McGirt* was wrongly decided and Congress has, in fact, disestablished the Muscogee (Creek) Nation reservation. But regardless, the holding in *McGirt* is, by its terms, for "purposes of federal criminal law" only. 140 S. Ct. at 2459. Even if Congress did not disestablish the reservation, the Court in *McGirt* explicitly declined to suggest that Oklahoma's civil or regulatory authority in those lands would be impacted. *Id.* at 2480–81. It does not follow that *McGirt*, simply by its existence, displaces Oklahoma's civil authority within the historic lands of the Muscogee (Creek) Nation.

Moreover, *McGirt*'s deliberately narrow ruling is consistent with the Supreme Court's previous acknowledgment that State civil and regulatory jurisdiction may continue in lands that, for federal criminal law purposes, qualify as "Indian country." *E.g. Organized Vill. of Kake v. Egan*, 369 U.S. 60, 72–75 (1962) (describing how "even on reservations state laws may be applied to Indians unless such application would interfere with reservation self-government or impair a right granted or reserved by federal law"). As the Court has said, reservations are "part of the territory of the State," *Nevada v. Hicks*, 533 U.S. 353, 362 (2001), and, where "state interests outside the reservation are implicated, States may regulate the activities even of tribe members on tribal land." *Id.* State authority on a reservation is even stronger where, as here, the State is attempting to regulate

15

non-Indians.  *See White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 144–45 (1980); *see also United States v. McBratney*, 104 U.S. 621, 623–24 (1881) (admission of a state into the Union gave it authority, exclusive of the federal government, over crimes involving only non-Indians).  There are at least two reasons why Oklahoma's regulatory jurisdiction here should continue.

First, the Supreme Court has previously recognized that "fundamental principles of equity" preclude disruptive incursions into long-exercised State authority over Indian lands.  *Oneida Indian Nation of N.Y. v. City of Oneida*, 617 F.3d 114, 128 (2d Cir. 2010) (citing *City of Sherrill v. Oneida Indian Nation of N.Y.*, 544 U.S. 197, 214 (2005)).  Here, those principles of equity prevent throwing aside Oklahoma's nearly continuous, century-long exercise of regulatory authority over surface mining and reclamation within the historic lands of the Muscogee (Creek) Nation.

Second, *McGirt's* limited ruling is also consistent with the Supreme Court's recognition that congressional actions can reduce or intrude on a tribe's authority to take certain actions on reservation land, without disestablishing a reservation.  140 S. Ct. at 2463–67.  The Court in *McGirt* acknowledged that such intrusions were plentiful on the lands of the historic Muscogee (Creek) Nation and provided several examples, including the abolition of the Muscogee (Creek) Nation's tribal courts and a law directing the Secretary of the Interior to assume control of tribal schools.  *Id.*  In carefully limiting its holding to the "purposes of federal criminal law" only, the Court recognized the critical difference between the existence of a reservation and the scope of a tribe's authority on that land, and that the latter requires careful case-by-case scrutiny of any relevant

16

congressional action.  Here, in enacting SMCRA, Congress intentionally removed from tribes, including the Muscogee (Creek) Nation, any extant authority to regulate coal mining and reclamation on Indian lands.

In light of these principles and for the reasons discussed below, *McGirt* does not affect Oklahoma's jurisdiction under SMCRA to regulate surface mining and reclamation activities within the historic lands of the Muscogee (Creek) Nation.  Accordingly, Defendants are likely to succeed on the merits of their claim for a declaratory judgment.

1.    *Fundamental principles of equity preclude Defendants from stripping Oklahoma of its long-exercised and unopposed jurisdiction over its SMCRA programs within the historic lands of the Muscogee (Creek) Nation.*

The Supreme Court has previously recognized that fundamental principles of equity preclude disruptive incursions into long-exercised state authority over Indian lands.  *See Sherrill*, 544 U.S. at 214; *see also Oneida*, 617 F.3d at 128.  In *Sherrill*, the Oneida Indian Nation claimed "present and future sovereign immunity from local taxation on parcels of land the Tribe purchased in the open market, properties that had been subject to state and local taxation for generations."  544 U.S. at 214.  Those generations of long-uncontested State regulation, however, created "justifiable expectations" that the Oneidas' requested relief would disrupt.  *Id.* at 215–17.  The Court held that the two centuries between the alleged injustice and the present, the Oneidas' delay in bringing their claim, and the changes in the properties during that time, "evoke the doctrines of laches, acquiescence, and impossibility, and render inequitable the piecemeal shift in governance this suit seeks unilaterally to initiate."  *Id.* at 221.

Notably, "*Sherrill* [] did not involve the application of a traditional laches defense

17

so much as an equitable defense that drew upon laches and other equitable doctrines but that derived from general principles of 'federal Indian law and federal equity practice.'" *Oneida*, 617 F.3d at 128 (quoting *Sherrill*, 544 U.S. at 213). And in *Cayuga Indian Nation of N.Y. v. Pataki*, the Second Circuit expressly held that the United States is subject to such defenses under circumstances like those in *Sherrill*. 413 F.3d 266, 279 (2d Cir. 2005); *see also Oneida*, 617 F.3d at 129. The Second Circuit further clarified that the United States is not exempt from the *Sherrill* defense even where, as here, the United States is "asserting its own interest in the vindication of a federal statute." *Oneida*, 617 F.3d at 129 n.7.

Here, these "fundamental principles of equity," *id.* at 128, preclude Defendants from using the limited decision in *McGirt* to strip Oklahoma of its long-unquestioned authority to regulate surface mining and reclamation on the historic lands of the Muscogee (Creek) Nation. Indeed, when addressing civil and regulatory issues, the Court in *McGirt* emphasized these very principles:

> Many other legal doctrines—procedural bars, res judicata, statutes of repose, and laches, to name a few—are designed to protect those who have reasonably labored under a mistaken understanding of the law. And it is precisely because those doctrines exist that we are "fre[e] to say what we know to be true . . . today, while leaving questions about . . . reliance interest[s] for later proceedings crafted to account for them."

140 S. Ct. at 2480 (quoting *Ramos v. Louisiana*, 140 S. Ct. 1390, 1047 (2020) (plurality opinion)). Thus, *McGirt* itself mandates the application of equitable principles to prevent upsetting long-exercised State jurisdiction, as contemplated in *Sherrill*.

Under *Sherrill*, "[w]hen a party belatedly asserts a right to present and future sovereign control over territory, longstanding observances and settled expectations are

prime considerations." 544 U.S. at 218. Specifically, the *Sherrill* equitable defense focuses on (1) the length of time between the injustice and the present; (2) the disruptiveness of the claims; and (3) "the degree to which these claims upset the justifiable expectations of individuals and entities far removed from the events giving rise to the plaintiffs' injury." *Oneida*, 617 F.3d at 127. All these factors are easily satisfied here.

*First*, Defendants' actions are barred "because of the long lapse of time[] during which [Oklahoma's] governance remained undisturbed." *Sherrill*, 544 U.S. at 215 n.9. Since statehood in 1907, Oklahoma has regulated surface coal mining and reclamation within its borders nearly continuously. For the first 70 years, Oklahoma acted as the exclusive regulator under state law. Shortly after SMCRA's enactment in 1977, OSMRE recognized Oklahoma's "exclusive" jurisdiction to continue regulating surface coal mining and reclamation within its borders, including on the historic lands of the Muscogee (Creek) Nation. *See* 47 Fed. Reg. at 14,152 (approving Title V program); 47 Fed. Reg. at 2,989 (approving Title IV program); *see also, e.g.*, Toole Decl. ¶ 44 (noting OCC's Title IV program successes). "[I]n light of th[is] long history," Defendants' attempt to now take over Oklahoma's SMCRA programs is inequitable. *Sherrill*, 544 U.S. at 214.

*Second*, Defendants' actions have caused and will continue to cause "disruptive practical consequences," *id.* at 219, for Oklahoma, its regulatory agencies, and the public. Despite cutting the agencies' funding, OSMRE has directed ODM to continue administering its program. Rodesney Decl. ¶ 9. Once ODM's current funds are exhausted, operations will cease and multiple jobs will be eliminated. *Id.* ¶¶ 7–8. With no one to administer the program, there will be fewer site inspections, permit issuances and revisions,

environmental monitoring, abandoned mine reclamation, and other critical tasks.  *Id.* ¶ 8; Dossett Decl. ¶ 58.  OCC faces similar issues due to the loss of funding, Toole Decl. ¶ 62, and, indeed, some projects have already ground to a halt, *id.* ¶ 77.  OSMRE's arbitrarily imposed thirty-day transition period expired on May 2, *see* Compl. Exs. 1–2, yet OSMRE continues to shirk its self-proclaimed authority and instead rely on ODM and OCC to continue operating Oklahoma's SMCRA programs with no additional funding to support them, *see* Rodesney Decl. ¶ 9; Toole Decl. ¶ 63.  And even if OSMRE attempts to assume these regulatory functions in the near future, it will inevitably face significant obstacles.  Those obstacles include, among other things, obtaining new landowner access agreements and finding contractors that meet federal requirements.  Toole Decl. ¶¶ 69–70.

*Third*, Defendants' actions indisputably will "upset the justifiable expectations" of numerous individuals and entities that have come to rely on Oklahoma's consistent, effective SMCRA programs administration.  *Oneida*, 617 F.3d at 127.  Among other serious consequences that flow from OSMRE's actions, OCC will be forced to terminate contracts with local contractors and Oklahoma Conservation Districts, Toole Decl. ¶¶ 66–67, and it will be unable to respond to AML emergencies, *id.* ¶¶ 33–39, 54.  ODM will be unable to act on necessary permit revisions and bond releases, which will harm the permittees and the landowners who will be unable to use their own land.  Dossett Decl. ¶¶ 37–38.  Oklahoma and the public's justifiable expectations are further frustrated by OSMRE's severe delay in taking action regarding the SMCRA programs, *see* Rodesney Decl. ¶ 9; Toole Decl. ¶ 63, and the numerous practical hurdles to OSMRE administration, once underway, *see, e.g.*, Toole Decl. ¶ 70.

20

The "shift in governance" Defendants "seek[] unilaterally to initiate," *Sherrill*, 544 U.S. at 221, over the Muscogee (Creek) Nation is not only premised on an erroneous reading of *McGirt* but also is patently inequitable under *Sherrill*. The Court should not agree to extend *McGirt* beyond its narrow holding in the face of these important equitable considerations.

> 2.   *SMCRA stripped the tribe of any inherent authority to regulate surface mining and reclamation, and there is no basis under that law to revoke Oklahoma's long-standing authority to administer State laws and regulations within the historic lands of the Muscogee (Creek) Nation.*

When Congress enacted SMCRA in 1977, it imposed "a set of national environmental performance standards" for surface mining and reclamation. H.R. REP. NO. 95–218, at 57 (1977). Congress, however, preserved existing State laws that were not inconsistent with SMCRA. *See* 30 U.S.C. § 1255. Moreover, instead of investing a federal agency with the exclusive authority to regulate all surface mining and reclamation in accordance with those national standards, Congress recognized that *States* should have "the primary governmental responsibility for developing, authorizing, issuing, and enforcing regulations for surface mining and reclamation operations." *Id.* § 1201(f). Accordingly, Congress developed a "cooperative federalism" regime, under which States, and only States, were encouraged to obtain primacy and act as the exclusive regulator with limited oversight from OSMRE. *See id.* § 1253; H.R. REP. NO. 95–218, at 167.

OSMRE approved Oklahoma's SMCRA programs forty years ago on the historic lands of the Muscogee (Creek) Nation, and there is no basis under the law for revoking the State's jurisdiction. Contrary to OSMRE's contention, the federal government does not

have exclusive regulatory authority on Indian lands where a tribe has not obtained primacy. SMCRA allows States to administer laws and regulations that are not inconsistent with SMCRA, including those that are more stringent than the federal standards, on Indian lands. There is absolutely nothing in the statute that makes OSMRE the exclusive regulator in the absence of a tribal program.

> a. Congress divested the tribes of inherent authority to regulate surface mining and reclamation to the extent it existed and shifted the authority to the States.

As the Supreme Court recognized, congressional actions can reduce or intrude on a tribe's authority to take certain actions on reservation land even if Congress does not entirely disestablish the reservation. *McGirt,* 140 S. Ct. at 2463–67 (describing instances of congressional intrusions on the historic lands of the Muscogee (Creek) Nation). Indeed, the MCA at issue in *McGirt* was itself an intrusion on the tribe's authority. *See United States v. Kagama*, 118 U.S. 375, 382–84 (1886). While the Court found that Congress had not disestablished the reservation, it did *not* conclude that the tribe retained authority to prosecute the crimes at issue. Instead, it held that Congress had taken for the *federal government* the authority to prosecute such crimes on the reservation.

Notably, the Court in *McGirt* conducted only a limited review of these congressional "intrusions" through the lens of whether they were enough to disestablish the Muscogee (Creek) Nation reservation as a whole for purposes of federal criminal jurisdiction by the time of statehood. The Court did not analyze all congressional actions or the resulting reduction or elimination of the Muscogee (Creek) Nation's various authorities, including the regulatory authority limited by SMCRA. Instead, the Court left for future cases, like

22

this one, the careful determination of the scope of the Muscogee (Creek) Nation's remaining civil and regulatory authority on that land.

Here, Congress in enacting SMCRA completely eliminated any extant tribal authority to regulate surface mining and reclamation on Indian lands.  Congress established national mining and reclamation standards, gave States primacy to implement and enforce those standards subject to federal approval and minimal oversight, and then eventually also allowed tribes the option to regulate under SMCRA.  *See* 30 U.S.C. § 1201(f); *see also* H.R. REP. NO. 95–218, at 167.  Congress also preserved existing State laws that were not inconsistent with SMCRA.  *See* 30 U.S.C. § 1255.  As the Supreme Court has often recognized, this sort of "cooperative federalism" regime creates an incentive for and even *prefers* local regulation.

Critically, SMCRA uniquely prefers *State* regulation over other regulatory bodies, including tribes and the federal government.  "[I]n contrast to other 'cooperative federalism' statutes, [such as the Clean Water Act and Clean Air Act], SMCRA exhibits extraordinary deference to the states."  *Bragg*, 248 F.3d at 293.  Indeed, at the time of SMCRA's enactment, Congress intentionally *did not* authorize or establish a process by which tribes could enact their own laws and have regulatory jurisdiction on Indian lands, thereby completely stripping tribes not only of authority, but also of any ability whatsoever to regulate in this space.  Instead, Congress only required a study of the regulation of surface mining on Indian lands.  *See* H.R. REP. NO. 95-493, at 114 (1977) (when the Senate proposed that tribes be treated the same as States, "[t]he Conferees rejected this Senate approach, agreeing instead to the House bill in requiring that a study be carried out by the

Secretary and that operations on Indian lands comply with the performance standards of the act."); H.R. REP. NO. 95-218, at 134–35 ("This section provides for a study of the issues involved in implementing a full regulatory program on Indian lands rather than adopting a regulatory scheme which could be implemented by the tribe under the approved provision."). But in the meantime, it permitted OSMRE to approve State primacy over all State lands. Congress also did not prohibit States from enforcing federal environmental protection standards, or more stringent State laws and regulations, on Indian lands. *See infra*, at 26.

That is precisely what happened here. Oklahoma obtained primacy in 1982 and has been successfully administering its SMCRA regulatory and AML programs for nearly forty years within the State's borders, including within the historic lands of the Muscogee (Creek) Nation. Even if the Muscogee (Creek) Nation reservation was not disestablished, Oklahoma retains authority under SMCRA to enforce its State laws and regulations on Indian lands.[1]

> b. Contrary to Defendants' assertion, OSMRE cannot revoke Oklahoma's authority on the ground that it has exclusive jurisdiction to administer SMCRA programs in the absence of a tribal program.

OSMRE asserts that "SMCRA designates OSMRE as the regulatory authority over surface coal mining and reclamation operations on Indian lands where a tribe has not obtained primacy." *See* 86 Fed. Reg. 26,941 (May 18, 2021) (citing 30 U.S.C. § 1300).

---

[1] Although Congress amended SMCRA in 2006 to give tribes a pathway to obtain primacy by creating a SMCRA regulatory program and applying for OSMRE approval, *see* 30 U.S.C. § 1300(j)(1)(A), to date, no tribe, including the Muscogee (Creek) Nation, has done so. And the fundamental principles of equity outlined in *Sherrill* bar it from doing so now.

But nothing in the statute says as much.  SMCRA does not forbid States from enforcing federal environmental protection standards, or more stringent State laws and regulations, on Indian lands.  Accordingly, OSMRE cannot lawfully revoke Oklahoma's primacy over the historic lands of the Muscogee (Creek) Nation on the ground that it is the *only* regulatory authority allowed on Indian lands.

As a threshold matter, SMCRA does not give the federal government exclusive authority to regulate on Indian lands.  Congress explicitly limited the Secretary's role with respect to Indian lands in SMCRA, 30 U.S.C. § 1300.  There, Congress empowered the Secretary to do only two things with respect to Indian lands:  (1) study the question of the regulation of surface mining on Indian lands and submit a study report to Congress, 30 U.S.C. § 1300(a)–(b), and (2) incorporate and enforce SMCRA's requirements for only coal *leases* issued on Indian lands, *id.* § 1300(c)–(f).  Beyond these tasks, Section 1300 gives no authority to OSMRE to regulate surface mining and reclamation activities on Indian lands.

OSMRE has attempted to re-characterize this lack of statutory authority as ambiguity, and thereby derive its proclaimed power from self-serving regulations, internal guidance, and memoranda of understanding with other federal agencies.  But there is no ambiguity.  Ambiguity under *Chevron* exists only if the statute fails to speak to the specific question.  *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984).  The question here is the scope of federal authority, and the statute speaks specifically to that issue by assigning OSMRE certain limited tasks.  Under ordinary

principles of statutory interpretation, that identification of specific tasks implies the exclusion of all others. *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 940 (2017).

In any event, even if OSMRE *may* regulate on Indian lands, the statute does not prohibit States from doing so. Section 1300 requires that with respect to Indian lands, at a minimum, "all surface coal mining operations on Indian lands shall comply with requirements *at least* as stringent as those imposed by [SMCRA]," 30 U.S.C. § 1300(d) (emphasis added), but says nothing of who shall enforce those requirements. Nothing in SMCRA prohibits Oklahoma from enforcing them.

Further, SCMRA allows States to administer State laws that are not inconsistent with SMCRA, including laws and regulations that may be more stringent than the federal environmental protection standards required by Section 1300(d). *Id.* §§ 1254(g), 1255(a). Section 1300 created a floor by requiring minimum standards on Indian lands; Oklahoma's State laws and regulations satisfy these minimums and far exceed them.

For the last forty years, Oklahoma has enforced State laws and regulations that are consistent with, and more stringent than, SMCRA, and approved by OSMRE, on the historic lands of the Muscogee (Creek) Nation. This is fully consistent with the text of SMCRA, and Defendants have no basis to stop Oklahoma from continuing in this role on the historic lands of the Muscogee (Creek) Nation.

In addition to the explicit language of the Act itself, Congress's intent that States serve as the primary regulators under SMCRA is reflected in the legislative history that describes frequently and in detail the Act's cooperative nature. In the House Report on the bill that became SMCRA, Congress explained that SMCRA "provide[s] for a cooperative

26

surface coal mining regulatory program with responsibility for implementation being shared between the States and the Secretary of the Interior." H.R. REP. No. 95-218, at 56. To do this, the bill proposed to "enact a set of national environmental performance standards to be applied to all coal mining operations and to be enforced by the State with backup authority in the Department of the Interior." *Id.* at 57. Congress further explained that

> H.R. 2 will implement a national system of coal mining regulation by… (2) Establishing administrative, environmental, and enforcement standards for regulatory programs *to be administered by the States on non-Federal lands*; (3) Providing authority for a Federal regulatory program to augment State programs if necessary on non-Federal lands; (4) *Applying Federal standards to operations on Indian lands* and undertaking a study to develop a program under which Indian tribes may elect to assume full regulatory authority of coal mining operations on Indian lands[.]

*Id.* at 57–58 (emphasis added).

Notably, Congress omits any reference to "non-Indian lands" when identifying where States shall administer SMCRA regulatory programs. *Id.* With respect to Indian lands, Congress only specified the standards that must apply and the requirement to undertake a study to develop an optional regulatory program for tribes. *Id.* Congress did not mention OSMRE. And the choice to *not* specify OSMRE as the regulator for Indian lands was deliberate. The original version of the bill, developed several years before the bill that became SMCRA, initially directed the Secretary to regulate surface mining on Indian lands, as well as Federal lands. *See* S. REP. No. 402, at 74 (1973). But Congress struck this provision from the bill, including instead requirements for Congress to conduct a study of Indian lands and for the Secretary to incorporate SMCRA's requirements in

leases.  *Id.*  This limited Secretarial authority is what appears in the enacted version of SMCRA.  *See* 30 U.S.C. § 1300(a)–(j).

This legislative history confirms that Congress never intended OSMRE to have exclusive, or even primary, responsibility for regulating surface mining and reclamation activities on Indian lands.  Defendants' attempt to read the limiting language of Section 1300 as a textual commitment of authority to OSMRE to regulate Indian lands is unavailing.  After all, Congress does not "hide elephants in mouseholes."  *See Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 468–69 (2001).  At the very least, States have concurrent power with OSMRE to regulate surface mining and reclamation on the historic lands of the Muscogee (Creek) Nation.

Accordingly, Plaintiffs are likely to succeed on the merits of their request for a declaratory judgment affirming Oklahoma's continued jurisdiction under SMCRA within the historic lands of the Muscogee (Creek) Nation.

B.     Defendants' Actions Violated the APA.

"The APA 'sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts.'"  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)).  It requires agencies to engage in "reasoned decisionmaking," *Michigan* v. *EPA*, 576 U.S. 743, 750 (2015), and directs that final agency actions be "[held] unlawful and set aside" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or if they are made "without observance of procedure required by law," *id*. § 706(2)(D).

Here, the Notice of Decision and Grant Funding Denials are final agency actions that are not in accordance with law, including because they erroneously rely on *McGirt*, and are arbitrary and capricious. Moreover, Defendants failed to follow the APA's rulemaking procedures before issuing the Notice of Decision.

    1.    *The Notice of Decision and Grant Funding Denials are final agency actions.*

The Notice of Decision and Grant Funding Denials are final because they have "direct and immediate" impact, "mark the consummation of the agency's decisionmaking process," and are actions by which "rights or obligations have been determined, or from which legal consequences will flow." *Colo. Farm Bureau Fed'n v. U.S. Forest Serv.*, 220 F.3d 1171, 1173–74 (10th Cir. 2000) (internal citations and quotation marks omitted). *First*, the Notice of Decision's impact is direct and immediate because as of the publication date (May 18, 2021), OSMRE purported to transfer Oklahoma's SMCRA programs to Federal control. *See* 86 Fed. Reg. at 26,941. Similarly, the impact of the Grant Funding Denials was direct and immediate because as of the date of the denials, OSMRE cut off additional funding to ODM and OCC. *Second*, all of the actions "mark the consummation of the agency's decisionmaking process" because the decisions provided no opportunity for response or appeal within the agency, and took immediate effect. *Finally*, these are plainly actions by which "rights or obligations have been determined" and "from which legal consequences flow." The Notice of Decision purported to strip Oklahoma of its jurisdiction over part of its lands, while the Grant Funding Denials cut off congressionally mandated funding for Oklahoma's SMCRA programs.

2.    *Defendants' actions were not in accordance with law.*

Defendants' actions were not in accordance with law in several independent ways.

*First*, as described above, Defendants erroneously interpreted *McGirt* to affect Oklahoma's jurisdiction under SMCRA to regulate within the historic lands of the Muscogee (Creek) Nation.  *See supra*, at 15–28.

*Second*, Congress established numerous processes for evaluating, amending, disapproving, or otherwise changing a State program, and all require notice and comment. *See* 30 U.S.C. § 1254(c); 30 C.F.R. §§ 732.17(h), 733.13(d).  OSMRE did not follow any of these statutorily prescribed processes by simply issuing a one-page Notice of Decision with no process whatsoever.  *Cf. Michigan v. EPA*, 268 F.3d 1075, 1087–89 (D.C. Cir. 2001) (holding that EPA's failure to use notice-and-comment rulemaking when determining a State's jurisdiction to operate a State program under the Clean Air Act was contrary to law).

*Third*, Defendants' actions are not in accordance with law because, as described above, OSMRE has no statutory authority to exercise jurisdiction over lands within the historic Muscogee (Creek) Nation, even assuming those lands constitute Indian lands under SMCRA.  *See supra*, at 24–28.

3.    *Defendants' actions were arbitrary and capricious.*

Agency action is arbitrary and capricious if an agency (1) "entirely failed to consider an important aspect of the problem," (2) "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," (3) "failed to base its decision on consideration of the relevant factors," or (4) made "a clear error of judgment."

30

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222, 1233 (10th Cir. 2017). And courts may "not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins*, 463 U.S. 29, 43 (1983).

Moreover, "[w]hen an agency changes course, [] it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Dep't of Homeland Sec.*, 140 S. Ct. at 1913 (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016)). Even if the change is ostensibly to conform with the law, it is arbitrary and capricious not to consider such interests. *See id.* at 1915.

The one-page Notice of Decision, which purports to strip Oklahoma of the SMCRA programs Oklahoma has successfully administered for roughly 40 years, contains no reasoned explanation, much less one that adequately addresses the relevant factors and evidence before the agency. The sum total of the reasoning in the notice is that

> [the Court's decision in *McGirt*], which legally recognized the on-going existence of the historic Muscogee (Creek) Nation Reservation in the State of Oklahoma, necessarily forecloses the State of Oklahoma's authority to implement [SMCRA] on Indian Lands within the exterior boundaries of the Muscogee (Creek) Nation Reservation. SMCRA designates OSMRE as the regulatory authority over surface coal mining and reclamation operations on Indian lands where a tribe has not obtained primacy. OSMRE has thus determined that Oklahoma cannot exercise its State program regulatory authority over surface coal mining and reclamation operations within the exterior boundaries of the Muscogee (Creek) Nation Reservation.

86 Fed. Reg. at 26,941. Defendants provide no justification for their conclusion that *McGirt* "necessarily" requires their action. That utter failure to explain is alone reversible error.

31

What is more, the Notice of Decision does not address contrary evidence before the agency.  In its April 16 letter, Oklahoma disputed Defendants' expansion of *McGirt* beyond the context of federal criminal law.  *See* Compl., Ex. 3.  The State explained in detail why that position has "no adequate basis in law."  *Id*.  But the Notice of Decision does not even acknowledge Oklahoma's opposition.  This, too, is an APA violation.

For their part, the Grant Funding Denials contain even less information.  They simply state that funding is denied, with no factual or legal support whatsoever.  This absence of reasoning is made worse by the fact that the Grant Funding Denials stripped Oklahoma of funding for the entirety of its programs, not just the funding related to the lands within the historic Muscogee (Creek) Nation.  The Grant Funding Denials are, accordingly, also arbitrary and capricious.

Further, in taking both sets of actions, Defendants failed to consider or even recognize the many serious practical implications of stripping Oklahoma of its SMCRA programs on the lands within the historic Muscogee (Creek) Nation.  Although the Notice of Decision contains a section entitled "Potential Implications of Substitution of Federal Authority," the substance does not match the title.  *Id*. ¶ 74.  The short section consists of two paragraphs describing the purposes of Title IV and V of SMCRA.  *Id*.  It does not mention any potential consequence of Defendants' actions, including any of the harms Defendants' actions will cause to the State, its residents, the land, and the environment.  *See, e.g., Catholic Legal Immigr. Network, Inc. v. Exec. Office for Immigr. Rev.*, No. 20–CV–03812 (APM), 2021 WL 184359, at *12 (D.D.C. Jan. 18, 2021) (Executive Office for Immigration Review "utterly failed to consider an important aspect of the problem . . .

when it ignored the impact that the Final Rule would have on legal service providers and their capacity to provide representation."); *see also Michigan*, 576 U.S. at 753 (noting agencies are required to "pay[ ] attention to the advantages *and* the disadvantages of agency decisions").  Because Defendants thus "entirely failed to consider an important aspect of the problem," their actions are arbitrary and capricious.  *WildEarth*, 870 F.3d at 1233.

Finally, Defendants failed to consider the "serious reliance interests" of Oklahoma and the public.  *Dep't of Homeland Sec.*, 140 S. Ct. at 1913.  Defendants' decision to upend Oklahoma's programmatic operations will adversely affect not only the State but also: (1) mine operators who rely on Oklahoma's SMCRA programs to conduct their operations; (2) local contractors employed by Oklahoma for AML projects; (3) conservation districts, who are employed by and work collaboratively with OCC to eliminate AML threats; and (4) the public, who rely on Oklahoma to ensure that coal mining is conducted safely and that AML that pose a threat to public health and safety are eliminated.  Failing to consider these "serious reliance interests" makes Defendants' actions arbitrary and capricious.

4.    *Defendants' actions also violated the APA's rulemaking procedures.*

The APA defines a "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4).  In short, an agency creates a rule when it seeks to "implement, interpret, or prescribe law or policy."  *Id.*  Thus, agency action is a "rule" if it "supplements a statute, adopts a new position inconsistent with existing regulations, or otherwise effects

a substantive change in existing law or policy." *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014); *see also Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995).

The Notice of Decision is a "rule."  It is a statement of "particular applicability and future effect" which is "designed to implement, interpret, or prescribe" OSMRE's position on Oklahoma's SMCRA programs.  5 U.S.C. § 551(4).  It also clearly "adopts a new position inconsistent with existing regulations" regarding the Oklahoma SMCRA programs, 30 C.F.R. pt. 936 (Oklahoma SMCRA program approvals), and thereby "effects a substantive change in existing law or policy," *Mendoza*, 754 F.3d at 1021.

The Fourth Circuit's decision in *Ohio River Valley Environmental Coalition, Inc. v. Kempthorne*, 473 F.3d 94 (4th Cir. 2006), is instructive.  In *Kempthorne*, environmental groups alleged that the Secretary's decision to approve an amendment to West Virginia's Title V SMCRA program violated the APA and SMCRA because the decision was arbitrary and capricious.  *Id.* at 97.  The Secretary argued that the decision to approve a state program amendment "does not constitute rulemaking for purposes of judicial review because it does not involve the promulgation of national rules and regulations." *Id.* at 101. The Fourth Circuit disagreed, finding that the APA's definition of "rulemaking" "compels the conclusion that rulemaking within the meaning of [§ 553] is not limited to the promulgation of national standards." *Id.* at 102.  The Court also explained that OSMRE followed a process including notice and comment when issuing its decision to approve the state program amendment. *Id*.  Accordingly, the Court held that the decision to approve a state program amendment constitutes rulemaking under the APA, 5 U.S.C. § 553. *Id.*  The

34

same must be true here, where Defendants' action disapproves part of Oklahoma's State program and imposes a Federal program in its place.

Because the Notice of Decision is a rule, OSMRE was required to follow the APA's rulemaking processes, just as it did in *Kempthorne*. That process requires that an agency publish in the Federal Register a notice of a proposed rulemaking that includes the rule's effective date, the legal authority for the rule, and the substance of the rule. 5 U.S.C. § 553(b). The agency must solicit public comments on the rule. *Id.* § 553(c). And finally, the agency must consider all submitted comments and include a "general statement of [the rule's] basis and purpose." *Id.* These requirements safeguard regulated parties from unfair and unlawful agency action. *See, e.g.*, *Int'l Union, United Mine Workers v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005). But OSMRE did not take these steps here, rendering the Notice of Decision unlawful. *See Tenn. Hosp. Ass'n v. Azar*, 908 F.3d 1029, 1042 (6th Cir. 2018) ("If an agency attempts to issue a legislative rule without abiding by the APA's procedural requirements, the rule is invalid.").

Were there any doubt as to the applicability of the rulemaking requirements, it is dispelled by the fact that Defendants followed notice-and-comment rulemaking to approve Oklahoma's SMCRA programs in the first place. *Supra,* at 7–8. They published notices of the proposed programs in the Federal Register, invited and accepted public comments, and held public hearings. *Supra,* at 7–8. They then based their decisions to approve the programs on a full administrative record that included the public comments, transcripts of hearings, exhibits, presentations, and other documents. *Supra,* at 7–8. And the programs

35

were ultimately approved in "Final Rules" published in the Federal Register.  *Supra,* at 7–8.

It is well-settled that the APA "mandate[s] that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance."  *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) (the APA "make[s] no distinction . . . between initial agency action and subsequent agency action undoing or revising that action") (citing *F.C.C. v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009)); *see also Zirkle Fruit Co. v. Dep't of Labor,* 442 F. Supp. 3d 1366, 1375 (E.D. Wash. 2020) ("An agency may not amend or revoke a legislative rule without public notice and comment.").  A rule promulgated through notice-and-comment rulemaking thus must also be revised or rescinded with notice and comment.  For this reason as well, Defendants' failure to comply with the rulemaking process renders the Notice of Decision unlawful.

C.    Defendants' Notice of Decision Violates SMCRA.

Plaintiffs also are likely to prevail on their claim under SMCRA.  The Notice of Decision is an action to disapprove a State program or to prepare a Federal program under 30 U.S.C. § 1276(a)(1) and, accordingly, must be set aside if it is "arbitrary, capricious, or otherwise inconsistent with law."  30 U.S.C. § 1276(a)(1).  As set forth above, the Notice of Decision is unlawful in each of those ways for many independent reasons.

## II.    Plaintiffs Have Suffered and Will Continue to Suffer Irreparable Harms.

"To show a threat of irreparable harm, a plaintiff must demonstrate 'a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages.'"  *Fish v. Kobach*, 840 F.3d 710, 751 (10th Cir. 2016) (quoting *RoDa Drilling*

*Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009)).  "Irreparable harm also occurs if the district court cannot remedy [the injury] following a final determination on the merits."  *Id.*

Defendants' decision to strip Oklahoma of control over surface mining and reclamation will bruise Oklahoma's economy and batter its sovereignty.  Indeed, Plaintiffs have already sustained severe economic losses, as OSMRE has denied funding to ODM and OCC, and has refused to allow the State agencies to access grant funds that OSMRE already approved.  Rodesney Decl. ¶¶ 7, 9; Toole Decl. ¶¶ 59–60.  Without funding, ODM and OCC will be forced to shut down their programs and lay off multiple employees.  Rodesney Decl. ¶¶ 7–8; Toole Decl. ¶ 62.  OCC will also be forced to terminate contracts with third parties and will incur substantial fees associated with early termination.  Toole Decl. ¶ 66.  These unrecoverable economic losses are more than sufficient to establish irreparable harm.  *See North Dakota v. EPA*, 127 F. Supp. 3d 1047, 1058–59 (D.N.D. 2015).

But "[t]his case is not only about economics, it is about sovereignty."  *Winnebago Tribe of Neb. v. Stovall*, 216 F. Supp. 2d 1226, 1234 (D. Kan. 2002), *aff'd*, 341 F.3d 1202 (10th Cir. 2003).  Defendants are infringing on Oklahoma's sovereignty by purporting to strip the State of its regulatory authority over the historic lands of the Muscogee (Creek) Nation.  Such jurisdictional ransacking, which "interfere[s] with [Plaintiffs'] core governmental functions," also constitutes irreparable harm.  *N.M. Dep't of Game & Fish v. Dep't of the Interior*, 854 F.3d 1236, 1255 (10th Cir. 2017); *see also Kansas v. United States*, 249 F.3d 1213, 1227–28 (10th Cir. 2001) (holding that a potential violation of State sovereignty constitutes irreparable harm for purposes of a preliminary injunction).  If left

unchecked, the effects of Defendants' conduct risk reverberating far beyond the scope of SMCRA and the State's regulatory jurisdiction over mines.

### III. The Balance of Equities Favors Plaintiffs, and a Preliminary Injunction Would Not Be Adverse to the Public Interest.

Finally, the "threatened injury [to Plaintiffs] outweighs any injury to [Defendants] caused by granting the injunction," *Legacy Church, Inc. v. Kunkel*, 472 F. Supp. 3d 926, 1062 (D.N.M. 2020) (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012)), *aff'd sub nom. Legacy Church, Inc. v. Collins*, No. 20-2117, 2021 WL 3011927 (10th Cir. July 16, 2021). Defendants "will suffer no harm if [their final agency actions are delayed] until the case is adjudicated on the merits," *id.*, particularly because the Notice of Decision and Grant Funding Denials seek to upend the status quo, *see Awad*, 670 F.3d at 1132 ("Delayed implementation of a measure that does not appear to address any immediate problem will generally not cause material harm, even if the measure were eventually found [] enforceable."). In addition, any delay of Defendants' actions cannot harm Defendants given that OSMRE has not yet started to actually assume responsibility, instead asking the State agencies to continue to regulate. *See supra*, at 12, 13.

Conversely, substantial evidence demonstrates that Defendants' actions are having and will continue to have devastating impacts not only to the State but also to the public interest. The decision in *McGirt* is "a hugely destabilizing force to public safety in eastern Oklahoma." *Bosse v. State,* 484 P.3d 286, 300 (Okla. Crim. App. 2021) (Hudson, J., concurring). Indeed, Chief Justice Roberts anticipated that the "burdens" of that decision would be "extraordinary." *McGirt*, 140 S. Ct. at 2500 (Roberts, C.J., dissenting). And

they are.  *See Bosse* Pet. at 23–27 (describing disastrous ramifications of the decision in *McGirt* on Oklahoma's criminal-justice system).  But *McGirt* has done more than just turn criminal law in eastern Oklahoma on its head.  As Chief Justice Roberts predicted, *McGirt* "has 'create[d] significant uncertainty for the State's continuing authority over any area that touches Indian affairs, ranging from zoning and taxation to family and environmental law' in eastern Oklahoma."  *Id*. at 27 (quoting *McGirt*, 140 S. Ct. at 2500 (Roberts, C.J., dissenting)).  As described above, the State's non-criminal authority is under assault in numerous contexts, including taxation, oil and gas regulation, and the jurisdiction of its courts.  *See supra*, at 4–5.  This case represents yet another significant threat to Oklahoma's sovereignty and proper regulatory authority.

Allowing Defendants' incursion to go forward without a preliminary injunction will harm the State by inviting further efforts, like those described above, to expand *McGirt* beyond its narrow and express limitations.  This harm is already being realized.  Defendants recently acted, under the guise of *McGirt*, to strip Oklahoma of its jurisdiction to regulate surface mining and reclamation activities on the historic lands of the Cherokee Nation of Oklahoma and the Choctaw Nation of Oklahoma.  Without a preliminary injunction, further unlawful applications of *McGirt* are inevitable.  It is in the public interest to maintain the status quo while these issues are litigated.

Further, Plaintiffs have a proven track record of successfully carrying out the State SMCRA programs for nearly forty years.  The needless replacement of experienced Oklahoma coal regulators with OSMRE, which has never regulated these approved programs in Oklahoma, would leave a large vacuum that threatens lasting environmental

damage, endangerment to public safety and health, and adverse energy, economic, and employment consequences. *See supra*, at 6–13.

Allowing OSMRE to assume jurisdiction over the lands at issue during the pendency of this litigation will only require a second transition of jurisdiction back to Oklahoma when Plaintiffs are successful on the merits of their claims. This disruptive back-and-forth is plainly contrary to the public interest and can be easily avoided by maintaining the status quo. That is reason enough to grant the preliminary injunction. *See La. Mun. Police Emps.' Ret. Sys. v. Cont'l Res., Inc.,* 886 F. Supp. 2d 1255, 1270 (W.D. Okla. 2012) ("A party seeking a preliminary injunction" need only "show the issuance of the injunction would not be adverse to the public interest") (internal citation omitted).

## CONCLUSION

This Court should issue an order preliminarily enjoining the Notice of Decision and the Grant Funding Denials.

## REQUEST FOR HEARING

Plaintiffs respectfully request a hearing on the motion for preliminary injunction given the importance of the issues for the sovereignty of the State of Oklahoma, the future of surface mining and reclamation regulation in the State, the public welfare, and the environment. A hearing would be helpful for the Court to resolve the numerous issues presented.

Dated August 23, 2021                    Respectfully submitted,

s/ Mithun Mansinghani
Mithun Mansinghani
  *Solicitor General*
Bryan Cleveland
  *Assistant Solicitor General*
Jennifer Lewis
  *Assistant Attorney General*
OKLAHOMA OFFICE OF THE ATTORNEY
GENERAL
313 NE 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Mithun.mansinghani@oag.ok.gov

Elbert Lin (*Pro Hac Vice*)
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Building
951 East Byrd Street
Richmond, VA 23219
Phone: (804) 788-7202
elin@HuntonAK.com

Matthew Z. Leopold (*Pro Hac Vice*)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Avenue NW
Washington, DC 20037
Phone: (808) 955-1500
mleopold@HuntonAK.com

David C. McSweeney
(OK Bar No. 31320)
(*Pro Hac Vice*)
HUNTON ANDREWS KURTH LLP
60 State Street, Suite 2400
Boston, MA 02109
Phone: (617) 648-2800
dmcsweeney@HuntonAK.com

Lauren A. Bachtel (*Pro Hac Vice*)
HUNTON ANDREWS KURTH LLP
200 Park Avenue
New York, NY 10166
Phone: (212) 309-1000
lbachtel@HuntonAK.com

*Counsel for Plaintiffs*