# **EXHIBIT 1**

Declaration of Rhonda Dossett
August 23, 2021

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

1. STATE OF OKLAHOMA,

2. KEVIN STITT, in his official capacity
   as Governor of Oklahoma,

3. OKLAHOMA DEPARTMENT OF
   MINES,

4. OKLAHOMA CONSERVATION
   COMMISSION,

                              *Plaintiffs*,

v.

1. UNITED STATES DEPARTMENT OF
   THE INTERIOR,

2. DEBRA A. HAALAND, in her official
   capacity as Secretary of the Interior,

3. OFFICE OF SURFACE MINING
   RECLAMATION AND
   ENFORCEMENT,

4. GLENDA OWENS, in her official
   capacity as Acting Director of the
   Office of Surface Mining Reclamation
   and Enforcement,

                              *Defendants*.

Civil Action No: CIV-21-719-F

## DECLARATION OF RHONDA DOSSETT

I, Rhonda Dossett, hereby declare as follows:

       1.     I am the Coal Program Director for the Oklahoma Department of Mines

(ODM). My responsibilities include overseeing the permitting, compliance, and

enforcement activities of the Oklahoma surface coal mining and reclamation program administered by the ODM. I have been employed with ODM since July 16, 1984. I held the positions of Reclamation Inspector (I, II, and III), Assessment Conference Officer, and Chief of Reclamation and Enforcement, before becoming Coal Program Director in 1998.

2.      I am over 18 years of age, competent to testify in this case, and have personal knowledge of the matters discussed in this declaration.

*History of Coal Mining and Reclamation in Oklahoma*

3.      The extraction or mining of minerals occurs in every county of the state. Minerals mined in Oklahoma include coal, limestone, sand and gravel, gypsum, clay and shale, granite, volcanic ash, tripoli, salt, bentonite, iron ore, asphalt, copper and chat. Coal mining occurs only in the eastern part of the state.

4.      Before Oklahoma statehood, the Office of the Territorial Mine Inspector was created for the safe operation of mines and miners. The territorial years were noted for the many mining disasters.

5.      Over the years, major revisions in mining health and safety laws and the increase in surface mining versus underground mining helped to decrease mining fatalities.

6.      The Oklahoma Constitution created the Office of the Chief Inspector of Mines, Oil, and Gas, which later became ODM, and charged it with implementing and enforcing all mining laws adopted by the State Legislature. The Constitution also instructed the State Legislature to divide the state into mining districts under the control of Assistant Inspectors who reported to the Chief Inspector. The Constitution further applied and extended mining laws enacted by Congress with respect to the Oklahoma Territory

(Western Oklahoma) and the Indian Territory (Eastern Oklahoma) and extended them to the entire newly-formed state, substituting the words "Governor of the State" for the words "Governor of such organized territory" and for "Secretary of the Interior" when they appeared in those Congressional mining acts.

7.     The State's first reclamation law applicable to coal mining, "The Open Cut Land Reclamation Act," became effective January 1, 1967. The 1967 Act required operators to obtain a permit from ODM before beginning any new surface mining, including surface coal mining.  The 1967 Act prescribed certain mining practices designed to prevent uncontrolled erosion and acid runoff, and required the operator to post a performance bond payable to the Director of ODM.  The Act further authorized ODM inspectors to enter onto mine sites, issue violations and penalties, and to release performance bonds once reclamation was complete. The 1967 Act was revised by "the Mining Lands Reclamation Act of 1971," which Oklahoma used to regulate coal mining until the enactment of SMCRA. The 1971 Act supplemented the powers and authority granted to ODM under the 1967 Act, extended similar requirements to underground mining operations, and required operators to submit maps showing pit locations and reclamation progress.

8.     The Surface Mining Control and Reclamation Act of 1977 (SMCRA) was created by Congress with the passage of Public Law 95-87. Subsequently, the State of Oklahoma enacted further legislation to equal the enforcement ability of the federal government. The Coal Reclamation Act of 1978 enabled Oklahoma to operate the interim

program law and regulations (Section 715, CFR 30) under P. L. 95-87. It was followed by permanent standards adopted in 1979.

9.    The United States Department of the Interior, Office of Surface Mining Reclamation and Enforcement (OSMRE) is the federal agency charged with administering SMCRA, including overseeing the implementation of State programs.

10.    Under SMCRA, states may assume primary responsibility for the regulation of surface coal mining and reclamation within their borders, subject only to very limited oversight from OSMRE.  This primary responsibility is commonly referred to as "primacy."

11.    ODM achieved conditional "primacy" to administer Oklahoma's regulatory program under Title V of SMCRA in 1981 and full authority in 1982.

12.    In 1989, Oklahoma and the federal government entered into a cooperative agreement to allow ODM to regulate mining on federal lands. *See* 30 C.F.R. § 936.30. While ODM generally regulates alone on state permits, we coordinate with OSMRE for federal permits subject to our 1989 cooperative agreement. In Oklahoma, the term "federal lands" applies to those lands that contain federally owned coal regardless of the private ownership of the surface.

*ODM's Implementation of its Approved SMCRA Regulatory Program*

13.    All of Oklahoma's coal resources are located on the eastern side of the state. To the best of my knowledge, all current and future coal mines would be located in areas within the historic lands of the Muscogee (Creek) Nation, the Cherokee Nation, and the Choctaw Nation.

14.     ODM protects the public health and safety of Oklahomans and protects our environment by overseeing mining operations and making sure that mine sites get reclaimed when the mining is completed. The process entails permitting, inspection, and enforcement actions.

15.     Currently, ODM employs seven specialized staff members that implement the state program, with additional staff members that support the program. ODM's staff have expertise in the areas of hydrology, geology, reclamation bonds, permitting, inspecting, and records management.

16.     For permitting and revision review, ODM must have a hydrologist, a geologist, someone with mining engineering expertise who can calculate reclamation bonds, a permit officer, and a records manager.

17.     Inspection duties are split between one full-time coal inspector and three part-time coal inspectors. Multiple inspectors are needed to respond to citizen complaints in a timely manner. A part-time violation assessment officer is required, along with a conference officer. Support from the legal division is needed for administrative hearings.

18.     Beyond permitting and inspection staff, ODM also requires financial and human resource staff to handle financial matters and grant administration.

19.     Before commencement of mining operations, a permit must be obtained from ODM. A permit is issued when a mine operator submits a permit application in accordance with the regulatory requirements and posts a bond adequate to cover reclamation costs. 45 O.S. § 745.1; 45 O.S. § 745.6; *see also* 30 U.S.C. § 1243. The employees of the mining

operation must also be trained and certified in accordance with state and federal safety regulations.

20.     Once a permit is issued, the permitted operation is added to ODM's coal inspectable units list (IUL). Currently, there are fifty permitted operations on ODM's IUL.

21.     ODM's IUL identifies five surface coal mining permits located within historic lands of the Muscogee (Creek) Nation and forty-five permits located within the historic lands of the Cherokee Nation or the Choctaw Nation. All of the federal permits subject to the 1989 cooperative agreement are in the historic lands of either the Cherokee Nation or the Choctaw Nation.

22.     Approximately once per month, ODM personnel inspect each IUL facility for compliance with regulatory requirements and permit conditions. Besides identifying violations, monthly inspections are important to monitor production activity, deviations from approved mine permit plans, and whether simultaneous reclamation is occurring in a timely fashion.  On occasion, an operator facing financial ruin has rapidly excavated more land and created more reclamation liability than its posted performance bond will cover, only to close down and declare bankruptcy without doing any reclamation.  In those instances, the reclamation bonds were insufficient to cover the considerable work that needed to be done, and left ODM and Oklahoma landowners with a big mess.

23.     Additional inspections occur as needed in response to actions such as citizen complaints, bond release requests, enforcement action checks, and OSMRE oversight inspections. In some cases, inspections may reveal the need for a permit revision. Citizen complaints are received from landowners, adjacent landowners, and the general public.

Often the complaints concern roads, dust, noise, blasting vibrations, and water issues. The complaints range from serious – flyrock from blasting leave the permit area and endangering people and property – to minor annoyances such as potholes in the county roads.

24.    ODM responds to both written and verbal complaints. It is our policy to make contact with the complainant within two days, and conduct an inspection within five days depending on, among other things, weather and seriousness of the issue. The complainant is invited to attend the field inspection. A written report of the inspection is provided to the complainant at the end of the process. ODM may take enforcement action against the permittee to ensure resolution of the problem.

25.    Since 1987, ODM has responded to 884 complaints.

26.    To address noncompliance issues, ODM issues enforcement actions. ODM has exercised state enforcement authority since before SMCRA was enacted, and now operates under the authority provided in SMCRA. Since the beginning of 2001 to present, ODM has issued more than 707 enforcement actions or violations to permittees. Such enforcement actions are vital to prevent catastrophic environmental and property damage both on and off the permit sites, and to downstream landowners. Unabated violations may result in catastrophic erosion and loss of topsoil, which will make it practically impossible to achieve the approved post-mining land use required by the permit. Unabated violations may also result in pollution of the soils and waters both on and off the mining site, and may create public safety and attractive nuisance hazards.

27.     As mining progresses at each site, ODM must make revisions to permits to address unforeseen environmental circumstances, changes in mining plans, or to accommodate landowner desires. Sometimes the results of enforcement actions require a revision to the permit in order to abate the non-compliance situation. To request a revision, the permittee submits a revision application to ODM. The revision application is logged in and assigned a number. The application is given to ODM Technical Services for review. A back and forth discussion between Technical Services then occurs (i.e., deficiencies are sent to the applicant and deficiency responses returned to Technical Services). For significant revisions, a newspaper advertisement is run in a local paper and the public is given an opportunity to comment. Landowner comments are required for most revisions. Additional bonding may be needed. There are fees for revisions. Minor revisions can be evaluated within two to four weeks. Major revisions may take multiple months. Once ODM issues the revision, the permittee may implement it.

28.     Once a company stops mining at a site, they are required to start reclamation. It is critical to start the process of preparing and revegetating the site as soon as possible. This helps prevent uncontrolled erosion and acid mine drainage, which could lead to pollution and violations of the Clean Water Act.

29.     Most of the mines in Oklahoma are in the process of reclamation. Of the fifty sites on Oklahoma's IUL, forty-eight have no mining occurring and are in some phase of reclamation, including four of the five sites within the historic lands of the Muscogee (Creek) Nation.

30.     There are three phases of reclamation. Phase I is the process of backfilling the mine pit with spoil and grading the area to the approved postmining contours. Topsoil may be replaced at this stage. Phase II establishes the proper vegetation over the re-spread topsoil, and phase III covers a period of five years during which time the proper vegetation must survive.

31.     As noted above, performance bonds are obtained when ODM issues a permit. The bonds are needed to ensure that there is funding for completing reclamation. Only ODM can collect on the bonds associated with non-federal lands under Oklahoma's program because ODM is listed as the payee. ODM is the payee on approximately $19,225,019 in posted bonds.  ODM and OSM are listed as a co-payees on $7,935,582.52 in bonds involving federal coal rights, with ODM as sole payee on the remainder.

32.     Reclamation is most quickly accomplished when a mine operator performs the reclamation themselves, as they are already familiar with the land involved. Whenever possible, ODM attempts to negotiate mutually beneficial solutions with the operator and/or surety company with the goal of avoiding costly and lengthy litigation from bond forfeiture proceedings that ultimately delay reclamation of a mine and increase the total reclamation costs beyond the surety company's maximum liability (posted bond).

33.     It is important to remember that currently the US demand for Oklahoma coal is very low. Unless they have a foreign market for Oklahoma coal, mines in Oklahoma are not producing and operators are short on capital.  When operators cannot fund reclamation, often surety companies have the option under SMCRA to perform the reclamation in place of the operator.  Surety companies will not perform reclamation that costs more than the

performance bond they are obligated on.   Sureties will not commit large sums of money to reclamation until agreements are reached, which requires a regulatory authority that can timely review and respond to negotiations for those agreements. In the absence of a reclamation agreement with a surety company, an operator without the available capital to complete the approved reclamation plan will likely be forced to declare bankruptcy absent some drastic change in the coal market or a willing operator to buy and take over the mine. Bankruptcy puts the performance bonds at risk of being frozen or being taken or reduced by the operator's creditors.  Even if a particular bond is not subject to bankruptcy proceedings, a regulatory authority often will face years of litigation with the surety company; first in an attempt to declare the bond forfeit, and second attempting to collect the funds from the surety.  If the same surety company is obligated for multiple coal operators or mines, sometimes the surety company goes bankrupt itself.

34.     Certain steps of the reclamation process need to be coordinated with Oklahoma's seasonal weather patterns. For instance, the draining of water from the mine pit, backfilling the pit with spoil, and grading need to be done when it is dry, which is primarily at the end of summer in Oklahoma. Successful planting of vegetation needs to be done in the spring for warm-season plants and in the fall for cool-season plants. Additionally, the longer an operator waits to conduct reclamation activities, the harder and more expensive it becomes. Water continues to fill the mine pit, potentially polluted water continues to migrate offsite, vegetation continues to grow, and animals (including protected species) may begin to settle at the site and must be relocated. Any delay to starting

reclamation activities thus harms the operator, whose bonds may not cover increased costs, and the environment.

35.     Permittees apply to ODM for bond releases after various stages of reclamation work are completed. ODM will notify OSMRE and landowners of the bond release request, and will hold an inspection before deciding whether to release an operator from their performance bond obligations associated with a certain mining location.  Bond release inspections are to ensure that the reclamation work has been performed correctly.

36.     Partial bond releases may occur at the completion of each of reclamation phases I, II and III.

37.     Bond releases are important to the coal companies that have put up the money for the bond and the surety companies that guarantee them. Companies perform the reclamation work in a timely manner with the expectation that ODM will also give them timely decisions on when reclamation is complete.

38.     Bond releases also impact the landowners, who cannot take control of their land until reclamation is completed and the bonds are released. Use of their land is severely limited and can only be allowed with the permission of the permittee. The landowner can sell the property but the permit conditions remain and prevent new owners from utilizing the property as they see fit until bond release. Landowners on permitted areas cannot build houses, farm the land, construct roads, or alter the surface configuration in any way. They can't lease their land for oil and gas drilling. If the approved land use is pasture, it must remain pasture until final bond release or until a revision submitted by the permittee is

approved by ODM.  Any delay in conducting reclamation work thus harms the landowners, who cannot use their land until the final bond release is obtained.

*Current Status of Oklahoma's Approved SMCRA Regulatory Program*

39.     Each year OSMRE conducts an annual review of each primacy state. Oklahoma's program review is drafted by OSMRE in the months of July-October for the previous year's work. Various national concern topics are covered in all primacy review reports, with additional subjects added that are specific to a particular state. These topics are planned for in the annual performance agreement between OSMRE and Oklahoma. An accounting of inspections conducted, violations issued, acres of land disturbed, acres of land reclaimed, and number of off-site impacts are included. ODM works with OSMRE to track this information using ODM's databases.

40.     OSMRE has completed its annual review of ODM's program for the time period beginning July 1, 2019 and ending June 30, 2020. OSMRE did not find any issues during the annual review.  It did request that OSMRE be listed as a payee on federal permit reclamation bonds and a copy of a draft reclamation agreement.

41.     In late November and December of 2020, I was informed of rumors about OSMRE reconsidering our regulatory program in light of the Supreme Court's decision in *McGirt v. Oklahoma*, and I made inquiries to the OSMRE Director at the time, Mr. Lanny Erdos. Director Erdos emailed me that he, "…had no desire for OSM to assume authority in OK. There is a process that ultimately we will be forced to advance, but OK will have every opportunity to present it[s] case.  I am hopeful that we can continue w/the status quo[.]"

42.    Despite Director Erdos's assurances, OSMRE has still not given ODM any opportunity to present its case, but has gone ahead and severely disrupted the status quo.

43.    Because of OSMRE's actions, permittees are caught between two masters. Revision applications are being submitted to ODM for review with no confidence by permittee that ODM can actually issue those needed revisions without interference from OSMRE. The same problem is occurring with bond release applications. OSMRE has asserted that ODM cannot approve bond releases, yet OSMRE has no discernable ability at this time to provide the same services to permittees.

44.    OSMRE is currently causing delays in much needed permitting and reclamation work.

45.    Four federal sites we oversee (4262F, 4275F, 4285F, and 4293F) and five additional non-federal sites (4268, 4272, 4274, 4279, 4280) are sites operated by the Farrell Cooper Mining Company that needed reclamation work to start this spring and summer for the reasons discussed in paragraph 32 above. OSMRE was provided with a draft reclamation agreement between ODM, the company, and its surety on February 23, 2021 that covered three of the four federal sites (4275F, 4285F, and 4293F) and four of the five non-federal sites (4268, 4274, 4279, 4280). The permittee has been working with their surety company to fund the reclamation with the permittee doing the field work. The surety has proposed a reclamation agreement to deal with a global timeframe for all the permits and the reclamation timeframes. This agreement has been reviewed by ODM and we believe it would ensure the mostly expeditious environmental reclamation of the permits and the earliest return of the properties to the surface landowners. The bar to the

13

implementation of this reclamation agreement is that the surety needs/desires not only ODM's signature on the document but OSMRE's. The surety doesn't want to commit millions to the project with no idea of who will make the decisions on final bond release after the permits are reclaimed. The surety has told ODM that they may walk away from the projects and instead litigate the bond forfeitures. ODM will be able to collect the bond and have a third-party conduct the reclamation, but the process could take up to ten years or more to complete. Meanwhile the landowners will not have use of their properties. OSMRE has failed to accept, reject, modify, or comment on the agreement in any form.

46.    OSMRE has delayed a Phase III bond release for more than seven months on land associated with a permit (4262F) despite having signed a settlement agreement with the operator after years of litigation.  The operator is waiting for OSMRE to agree to a plan for the off-site work, but the operator reports OSMRE has ceased discussions on the matter. Currently, OSMRE has on file a notice of "non-concurrence" with ODM for the bond release application and has failed to pursue any agreement with the operator to resolve the situation off the permit area. The landowner of the area within the permit is being left in limbo. The landowner outside the permit area is not receiving any additional reclamation mediation work while this impasse continues.

47.    OSMRE has communicated to another operator, Phoenix Coal Company, Inc., that it will not recognize any decision that ODM takes on bond release applications filed for permits 4264 and 4276. ODM, not OSMRE, is the designee on the bonds.  ODM staff invited OSMRE to participate in the bond release inspections on July 26, 2021, but OSMRE canceled the day of the inspection without explanation. Despite this, OSMRE has

warned the permittee that OSMRE has sole jurisdiction over their permit and they should deal directly with them. They haven't told the permittee how OSMRE will implement the program or how they will approve release of bonds currently held by ODM. If the operator cannot have confidence that bond releases will be honored, those assets will be tied up and prevent it from accessing financial resources needed to complete additional reclamation on other coal sites, or prevent it from investing in new mining operations that would benefit the local economy, or from investing those assets in the local economy in some other non-mining related activity.

48.     Earlier this summer, two other Phoenix bond release inspections were conducted with OSM present. (OSM did not provide ODM with copies of the federal inspection reports but they offered no verbal objections to the reclamation work to the ODM inspector during the inspections). Those bond release inspections are still pending, eligible for release now. Ultimately, in this economic situation, if permittees who reclaim their permits, can't get timely bond release, many will be forced to just walk away from their permits. Reclamation will be dependent on bond forfeiture and third-party reclamation.

49.     Georges Colliers, Inc., an operator in charge of permit 4243F, has sought a permit revision to change the post-reclamation land use from pastureland to industrial/commercial use. The land use change is important because the operator has found a willing buyer who would like to put the existing dedicated power sources and buildings currently on the permit site to use immediately. If the land use change is not approved, these valuable improvements and structures will have to be removed in order complete

15

reclamation and close down the site, ironically reducing the land to a less valuable and useful state than currently exists.

50.     Another permit revision is being sought for Permit 4272, held by Eastern Oklahoma Quarries and operated by Farrell Cooper. The revision is for the sole purpose of addressing acid mine drainage discovered on site. The water treatment impoundments proposed as part of the revision were ordered by an ODM enforcement action, and are necessary to prevent off-site environmental damage.

51.     OSMRE opposed an uncontested bond forfeiture completed by ODM in June of 2021 in connection with state permit 4105, previously operated by Georges Colliers, Inc. (GCI). That site was taken over by GCI 25 years ago from another operator after acid mine drainage had been discovered on the premises. Because the acid mine drainage increased the reclamation liability by a significant amount, GCI was initially unable to post a bond sufficient to cover that liability. Rather than having an abandoned mine site with uncontrolled acid mine drainage persist for decades, ODM created an "build-a-bond" agreement whereby GCI would impound and treat the on-site drainage while gradually contributing to a cash bond bank account over time until the bond was sufficient to reclaim the mine site and perpetually treat the acid mine runoff. Despite vehement opposition to the ODM-GCI build-a-bond agreement from OSMRE, ODM and GCI successfully built the bond over twenty-five years to approximately $600,000 – an amount sufficient for complete reclamation and perpetual treatment required. When GCI informed ODM that it had lost its sole coal customer and had to close its business, GCI and ODM jointly acted to have the cash bond surrendered to ODM so that it could hire contractors to perform the

needed reclamation.   When OSMRE learned of the bond forfeiture, it sent angry interrogatories to ODM and threatening letters to GCI demanding that the cash bond be reinstated.

52.    OSMRE was invited by ODM and attended inspections of all five IUL sites located within the historic lands of the Muskogee (Creek) nation on April 27, 28, and 30, 2021. Since that time, ODM has no knowledge of any further inspections or visits conducted by OSMRE on those sites, although ODM has continued its own monthly inspections.

53.    Love Coal Company has an undisturbed permit in Southeastern Oklahoma located in an area federally designated as an economic "Opportunity Zone." (This permit is not in the Muscogee/Creek historical reservation area). The company plans to go forward with an underground coal mine operation at that location. But, with the uncertainty concerning jurisdiction, that permit will probably continue to remain undisturbed and potential jobs (forty to fifty) will be lost. Funding and the coal markets, both national and international, are watching what is happening in Oklahoma. Permittees report that this jurisdictional battle is adversely affecting the permittees' funding and ability to sell the product. Buyers are hesitant to commit to contracts with mines that may not be able to produce due to regulatory barriers.

54.    OURO Mining Company has been test drilling for a large underground mine operation in Southeastern Oklahoma near the Arkansas line. They are an Australian-backed domestic company and are very interested in proceeding with the multimillion dollar mine in Oklahoma. They purchased two previous surface mines and have indicated they plan to

17

submit a permit revision to ODM this month to provide the underground mining plan. If ODM cannot process those revisions, then this project will at best be delayed, and at worst OURO will go elsewhere to mine, taking forty to fifty potential jobs with them.

55.    Joshua Coal Company is a permit located in the Muscogee-Creek reservation area. ODM conducted one joint inspection with OSMRE after OSMRE's declaration that they had jurisdiction in that area of Oklahoma. To the best of our knowledge, despite declaring they were the regulatory authority over that permit, they have made no additional inspections of the permit on their own. The owner of the small company is rightfully confused who has jurisdiction over his project.

56.    As you can see, the harms that flow from OSMRE abruptly removing "primacy" from the State of Oklahoma (ODM) are numerous. ODM has an established Title V Program with systems in place to implement the SMCRA requirements for permitting, water monitoring tracking, inspections, bonding, and enforcement for coal mining in Oklahoma. This is why that even though OSMRE is claiming sole jurisdiction, they have instructed ODM to continue reviewing permits, doing inspections, and issuing enforcement actions.

57.    OSMRE does not appear prepared to assume the daily workload. OSMRE will have to develop their own processes for administering Oklahoma's permits and that will take time that the Oklahoma permittees don't have. The coal industry is dying in Oklahoma. This takeover by OSMRE may very well be the end of those few permittees left mining or conducting reclamation. The majority of the permittees who remain are

trying to reclaim their permits and obtain bond release. They are already being prevented from timely consideration of their bond release applications because of OSMRE's actions.

58.    Without ODM continuing to implement the program, all surface coal mining regulatory processes will likely cease. Without the rest of the previously awarded grant, ODM will be forced to shutter its coal program.

59.    Furthermore, for both state and federal coal permits in the state, operators and surety companies have expressed their desire to continue working with ODM, whose approved program has been consistently applied for decades and whose inspectors have been on the ground at all 50 IUL sites on a monthly basis.

I declare under penalty of perjury that the above statements are true and correct to the best of my knowledge. Executed this 23rd day of August, 2021 in Tulsa, Oklahoma.


Rhonda Dossett