IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

_____

STATE OF OKLAHOMA, *et al.*,          )
                                      )
                Plaintiffs,           )
                                      )
        v.                            )
                                      )   Case No. CIV-21-0719-F
                                      )
UNITED STATES DEPARTMENT OF           )
THE INTERIOR, *et al.*,               )
                                      )
                Defendants.           )
_____)

## FEDERAL DEFENDANTS' MOTION FOR PRELIMINARY INJUNCTION AND BRIEF IN SUPPORT

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................ 1

BACKGROUND ........................................................................................ 2

I.    OSMRE is the SMCRA authority within the Reservations following *McGirt*, *Hogner*, and *Sizemore* ...................................................... 2

II.    Oklahoma has refused to transition regulatory authority to OSMRE and is continuing to purport to regulate on lands within the Reservations ......................................................................... 4

    A.    Bond releases, reductions, and forfeitures ......................... 5

    B.    Inspections and enforcement actions ................................. 8

    C.    Refusal to turn over records ............................................... 8

STANDARD OF REVIEW ...................................................................... 9

ARGUMENT .............................................................................................. 9

I.    The United States is likely to succeed on the merits.................... 10

    A.    Only OSMRE may exercise SMCRA jurisdiction on lands within the exterior boundaries of the Reservations.......................... 10

    B.    SMCRA preempts Oklahoma's purported application of its SMCRA programs to Indian lands .................................... 11

        1.    SMCRA expressly preempts Oklahoma's regulation of surface coal mining on the Reservations.............................. 12

        2.    Oklahoma's application of its SMCRA programs to Indian lands conflicts with SMCRA and so is preempted .... 14

II.    A preliminary injunction is necessary to prevent irreparable harm ............ 17

    A.    Enforcement of a preempted law constitutes irreparable harm........ 17

    B.    Oklahoma's *ultra vires* actions are irreparably harming OSMRE, the public, and the environment ....................................... 18

III.    The balance of equities and the public interest favor an injunction............ 23

CONCLUSION .......................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Altria Grp., Inc. v. Good*,
  555 U.S. 70 (2008)..................................................................................................... 12

*Arizona v. United States*,
  567 U.S. 387 (2012)............................................................................................... 14, 15

*Brewer v. Zawrotny*,
  978 F.2d 1204 (10th Cir. 1992) ................................................................................. 16

*Chamber of Com. of the U.S. v. Henry*,
  No. CIV-08-109-C, 2008 WL 2329164 (W.D. Okla. June 4, 2008) ............................ 18

*Colorado v. U.S. EPA*,
  989 F.3d 874 (10th Cir. 2021) ................................................................................... 21

*Fish v. Kobach*,
  840 F.3d 710 (10th Cir. 2016) ............................................................................... 17, 23

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
  505 U.S. 88 (1992)..................................................................................................... 15

*Greater Yellowstone Coal. v. Flowers*,
  321 F.3d 1250 (10th Cir. 2003) ................................................................................. 17

*Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*,
  452 U.S. 264 (1981)................................................................................................... 13

*Hogner v. Oklahoma*,
  No. F-2018-138, 2021 WL 958412 (Okla. Crim. App. Mar. 11, 2021)............... 1, 3, 11

*Homans v. City of Albuquerque*,
  264 F.3d 1240 (10th Cir. 2001) ................................................................................. 23

*Int'l Paper Co. v. Ouellette*,
  479 U.S. 481 (1987)............................................................................................... 15, 17

*Jones v. Rath Packing Co.*,
  430 U.S. 519 (1977)................................................................................................... 12

*McGirt v. Oklahoma*,
  140 S. Ct. 2452 (2020)............................................................................................. 1, 3

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996)................................................................................................... 12

*Montana v. Clark*,
    749 F.2d 740 (D.C. Cir. 1984) .................................................................. 13

*N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*,
    854 F.3d 1236 (10th Cir. 2017) ............................................................... 22

*Nken v. Holder*,
    556 U.S. 418 (2009) ......................................................................... 9, 23

*Printz v. United States*,
    521 U.S. 898 (1997) ............................................................................. 13

*Sizemore v. Oklahoma*,
    485 P.3d 867 (Okla. Crim. App. 2021) ............................................ 1, 3, 11

*Trans World Airlines, Inc. v. Mattox*,
    897 F.2d 773 (5th Cir. 1990) .................................................................. 18

*U.S. Dep't of the Interior*,
    820 F.2d 441 (D.C. Cir. 1987) ............................................................ 3, 13

*United States v. Arizona*,
    641 F.3d 339 (9th Cir. 2011) .................................................................. 18

*United States v. City & Cnty. of Denver*,
    100 F.3d 1509 (10th Cir. 1996) ............................................................. 12

*United States v. Navajo Nation*,
    556 U.S. 287 (2009) ............................................................................. 12

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................... 9

*Wis. Pub. Intervenor v. Mortier*,
    501 U.S. 597 (1991) ............................................................................. 12

*Wyeth v. Levine*,
    555 U.S. 555 (2009) ............................................................................. 12

**Statutes**

29 U.S.C. § 667(b) ...................................................................................... 15

30 U.S.C. § 1201(c) .................................................................................... 22

30 U.S.C. § 1201(d)-(e) .............................................................................. 22

30 U.S.C. § 1202(a) .................................................................................... 18

30 U.S.C. § 1232(g)(1)(A) ............................................................................ 3

30 U.S.C. § 1232(g)(3)(C) ............................................................................ 3

30 U.S.C. § 1235 ....................................................................................... 3

30 U.S.C. § 1235(b), (k) ......................................................................... 13

30 U.S.C. § 1235(k) ................................................................................. 14

30 U.S.C. § 1253 ....................................................................................... 3

30 U.S.C. § 1253(b), (k) ........................................................................... 3

30 U.S.C. § 1254(b) ................................................................................. 14

30 U.S.C. § 1254(g) ................................................................................. 14

30 U.S.C. § 1255(a) ................................................................................. 13

30 U.S.C. § 1258 ..................................................................................... 18

30 U.S.C. § 1259(a) ............................................................................ 5, 19

30 U.S.C. § 1259(a)-(d) ............................................................................ 5

30 U.S.C. § 1259(b) ................................................................................... 6

30 U.S.C. § 1259(e) ................................................................................... 6

30 U.S.C. § 1265 ..................................................................................... 18

30 U.S.C. § 1271(b) ................................................................................. 14

30 U.S.C. § 1271(c) ................................................................................. 22

30 U.S.C. § 1273(c) ................................................................................... 3

30 U.S.C. § 1291(11), (25) ........................................................................ 3

30 U.S.C. § 1291(25) ............................................................................... 13

30 U.S.C. § 1291(4) ................................................................................... 3

30 U.S.C. § 1291(6), (11) ........................................................................ 14

30 U.S.C. § 1300(c)-(d) ........................................................................... 14

30 U.S.C. § 1300(j) ................................................................................. 14

31 U.S.C. 1301 ........................................................................................ 19

Okla. Stat. tit. 45, § 740 ........................................................................... 3

**Rules**

Fed. R. Civ. P. 65(a) .................................................................................. 9

**Regulations**

30 C.F.R. § 700.11(d)(1)(ii) ................................................................... 6, 22

30 C.F.R. § 700.11(d)(2) ........................................................................ 6, 22

30 C.F.R. § 750.1 ......................................................................................... 3

30 C.F.R. § 750.12 ..................................................................................... 18

30 C.F.R. § 750.16 ..................................................................................... 18

30 C.F.R. § 750.18(d) ................................................................................ 24

30 C.F.R. § 750.18(f) ................................................................................. 24

30 C.F.R. § 750.6 ......................................................................................... 3

30 C.F.R. § 750.6(a)(4) ............................................................................. 24

30 C.F.R. § 750.6(a)(6) ............................................................................. 16

30 C.F.R. § 750.6(d) .................................................................................. 24

30 C.F.R. § 75017 ...................................................................................... 16

30 C.F.R. § 800.11 ................................................................................. 5, 19

30 C.F.R. § 800.12 ....................................................................................... 5

30 C.F.R. § 800.13 ....................................................................................... 6

30 C.F.R. § 800.15 ....................................................................................... 6

30 C.F.R. § 800.16(b) ................................................................................ 16

30 C.F.R. § 847.16 ..................................................................................... 22

30 C.F.R. § 936.30 ................................................................................. 3, 16

30 C.F.R. pt. 780 ........................................................................................ 18

Okla. Admin. Code §§ 460:20-1-1 ............................................................. 3

Okla. Admin. Code §§ 460:20-3-5 ............................................................. 3

**Other Authorities**

70 Fed. Reg. 16,941 (Apr. 4, 2005) ...................................................................... 3

70 Fed. Reg. 60,483 (Oct. 18, 2005) .................................................................... 3

86 Fed. Reg. 26,941-01 (May 18, 2021) .............................................................. 5

86 Fed. Reg. 57,854-01 (Oct. 19, 2021) .............................................................. 5

U.S. Const., art. VI, cl. 2 ..................................................................................... 11

## TABLE OF EXHIBITS

| Exhibit | Description |
|---|---|
| 1 | Supplemental Declaration of Joseph Maki & Exhibit A |
| 2 | GCI Am. Application for Review & Temp. Relief & Stay |
| 3 | Declaration of Paul T. Behum |
| 4 | Declaration of Allison Travers |
| 5 | Nov. 23, 2021 Letter to ODM |
| 6 | Nov. 23, 2021 Letter to OCC |

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| AML | Abandoned Mine Land |
| OCC | Oklahoma Conservation Commission |
| OCRA | Oklahoma Coal Reclamation Acts of 1978-79 |
| ODM | Oklahoma Department of Mines |
| OSMRE | Office of Surface Mining Reclamation and Enforcement |
| SMCRA | Surface Mining Control and Reclamation Act of 1977 |

## INTRODUCTION

In a series of recent cases, the Supreme Court and the Oklahoma Court of Criminal Appeals held that the reservations of the Muscogee (Creek) Nation, the Cherokee Nation, and the Choctaw Nation of Oklahoma remain intact.[1] *McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020); *Hogner v. Oklahoma*, No. F-2018-138, 2021 WL 958412, at *6 (Okla. Crim. App. Mar. 11, 2021) (Cherokee Nation); *Sizemore v. Oklahoma*, 485 P.3d 867, 870–71 (Okla. Crim. App. 2021) (Choctaw Nation of Oklahoma), *pet. for cert. docketed,* No. 21-326 (U.S. Sept. 1, 2021). All lands within the exterior boundaries of the Reservations thus constitute "Indian lands" as defined by the Surface Mining Control and Reclamation Act of 1977 (SMCRA). SMCRA and Federal regulations unambiguously assign exclusive jurisdiction to the Office of Surface Mining Reclamation and Enforcement (OSMRE) to regulate surface coal mining and reclamation operations, and to administer an Abandoned Mine Land (AML) program, on Indian lands in the absence of a tribal program. As a result of those decisions, Oklahoma has no SMCRA authority on lands within the Reservations.

Despite its clear lack of authority, Oklahoma continues to purport to exercise jurisdiction over surface coal mining operations on lands within the Reservations. It is purporting to conduct inspections, approve permit revisions, and approve bond releases and forfeitures—the last of which deprives OSMRE of the primary tool necessary to ensure that mining companies complete the reclamation of mining sites as required by SMCRA.

---

[1] Federal Defendants refer to all three reservations herein collectively as "the Reservations" and to the individual reservations as the "Muscogee Reservation," "Cherokee Reservation," and "Choctaw Reservation."

This not only interferes with OSMRE's duty to regulate surface coal mining operations on lands within the Reservations but also is causing irreparable harm to OSMRE, operators, tribes, the public, and the environment.

Because Plaintiffs refuse to voluntarily cease these activities despite numerous requests by OSMRE, the United States respectfully requests that the Court enjoin the State of Oklahoma, including its officers, employees, and agents, from implementing, applying, or enforcing Oklahoma's approved Title V State program or Title IV State reclamation program[2] on lands within the exterior boundaries of the Reservations, including by purporting to approve releases, reductions, and forfeitures of any bonds covering surface coal mining operations on lands within the Reservations.[3]

## BACKGROUND

### I.  OSMRE is the SMCRA authority within the Reservations following *McGirt*, *Hogner*, and *Sizemore*

As explained in Federal Defendants' opposition to Plaintiffs' motion for a preliminary injunction, ECF No. 34 ("Defs.' PI Opp'n"), SMCRA establishes three separate regimes for the regulation of surface coal mining, depending on the status of the land—that is, on Indian lands, Federal lands, or lands within a State. *See* Defs.' PI Opp'n

---

[2] Except where indicated, Federal Defendants use the phrases "surface coal mining" and "surface coal mining operations" to encompass both surface coal mining and reclamation operations under Title V and AML reclamation projects under Title IV. Likewise, except where indicated, Federal Defendants use the phrase "SMCRA programs" to encompass both SMCRA's Title V State program and Title IV reclamation program.

[3] Federal Defendants do not intend this motion to delay the Court's consideration of, or decision on, Plaintiffs' motion for a preliminary injunction, ECF No. 17.

at 2–6, 18–24. SMCRA allows a State to obtain primacy and thereby regulate surface coal mining operations on lands within that State. *See id.* at 4–6.[4] By their own terms, Oklahoma's SMCRA programs, which were approved by the Secretary of the Interior, do not extend to Indian lands.[5] *See id.* at 4–6, 18–24.[6] Similarly, the cooperative agreement under which Oklahoma may regulate surface coal mining on Federal lands within the State applies only to "Federal lands" and does not, by its own terms and by definition, include "Indian lands." *See* 30 C.F.R. § 936.30; 30 U.S.C. §§ 1273(c) and 1291(4) . Instead, only OSMRE may regulate surface coal mining operations on Indian lands in the absence of a tribal program. *See* Defs.' PI Opp'n at 5–6; 18–24.[7]

On July 9, 2020, the Supreme Court held that "Congress has never withdrawn the promised reservation" of the Muscogee (Creek) Nation, thereby rendering the Muscogee Reservation "Indian country" under the Major Crimes Act. *McGirt*, 140 S. Ct. at 2482. Applying the same reasoning, the Oklahoma Court of Criminal Appeals reached the same conclusion as to the reservations of the Cherokee Nation and Choctaw Nation of Oklahoma. *See Hogner*, 2021 WL 958412, at *6; *Sizemore*, 485 P.3d at 870–71. By

---

[4] *See also* 30 U.S.C. §§ 1232(g)(1)(A), 1235, 1253, 1273(c), 1291(11) & (25).

[5] Oklahoma's SMCRA programs are codified in the Oklahoma Coal Reclamation Acts of 1978-79 (OCRA). Okla. Stat. tit. 45, §§ 740 *et seq*. Oklahoma has also promulgated regulations to implement its Title V State program. *See* Okla. Admin. Code §§ 460:20-1-1 *et seq*.

[6] *See also* Okla. Admin. Code §§ 460:20-3-5, 20-15-3, 20-3-6; Okla. Regulatory Program, 70 Fed. Reg. 60,481-01, 60,483 (Oct. 18, 2005); Okla. Abandoned Mine Land Reclamation Plan, 70 Fed. Reg. 16,941, 16,944 (Apr. 4, 2005).

[7] *See also* 30 U.S.C. §§ 1232(g)(3)(C), 1235, 1253(b) & (k), 1291(11) & (25), 1300; 30 C.F.R. §§ 750.1, 750.6; *New Mexico ex rel. Energy & Mins. Dep't, Mining & Mins. Div. v. U.S. Dep't of the Interior*, 820 F.2d 441, 445 (D.C. Cir. 1987).

recognizing the continued establishment of these Reservations for purposes of the Major Crimes Act, the decisions in *McGirt*, *Hogner*, and *Sizemore* rendered the Reservations "Indian lands" under SMCRA. *See* Defs.' PI Opp'n at 8–9, 15–18. Because none of the three tribes currently have a tribal SMCRA program and SMCRA identifies OSMRE as the exclusive regulatory authority on "Indian lands" in the absence of such a program, OSMRE is now the sole SMCRA regulatory and reclamation authority for lands within the exterior boundaries of the Reservations.

To avoid repetition, Federal Defendants incorporate by reference the detailed explanation of SMCRA, Oklahoma's SMCRA programs, the implications of *McGirt* and its progeny, and the correspondence between OSMRE and Oklahoma contained in their brief in opposition to Plaintiffs' motion for a preliminary injunction, *see* Defs.' PI Opp'n at 2–13, and focus this background section on new information not included in that brief.

## II. Oklahoma has refused to transition regulatory authority to OSMRE and is continuing to purport to regulate on lands within the Reservations

On April 2, 2021, OSMRE informed the State agencies that administer Oklahoma's SMCRA programs—the Oklahoma Department of Mines (ODM) and the Oklahoma Conservation Commission (OCC)—that OSMRE is the sole regulatory authority on the Muscogee Reservation by operation of law in light of *McGirt*. Defs.' PI Opp'n at 9–10; Apr. 2, 2021 ODM & OCC Letters, ECF Nos. 1-1, 1-2. On June 17, 2021, OSMRE sent similar letters regarding the Cherokee and Choctaw Reservations. Defs.' PI Opp'n at 9–10 & n.3; June 17, 2021 ODM & OCC Letters, ECF Nos. 34-1, 34-2. In both sets of letters, OSMRE told ODM and OCC that they must begin transitioning their SMCRA programs

within the Reservations to OSMRE and cautioned the agencies not to take any actions with irreversible or irreparable adverse consequences for OSMRE's ability to administer SMCRA. *See* Defs.' PI Opp'n at 9–10. OSMRE published notices in the *Federal Register* explaining its SMCRA jurisdiction within the Muscogee Reservation in light of *McGirt* on May 18, 2021, 86 Fed. Reg. 26,941-01 (May 18, 2021), and within the Cherokee and Choctaw Reservations in light of *Hogner* and *Sizemore*, respectively, on October 19, 2021, 86 Fed. Reg. 57,854-01 (Oct. 19, 2021).

Despite those notifications and additional communications with OSMRE, Oklahoma has not transitioned its regulatory responsibilities to OSMRE. In fact, Oklahoma's Attorney General has specifically instructed ODM and OCC not to comply with OSMRE's directions for transition. Defs.' PI Opp'n at 10, 12 n.4; Apr. 16, 2021 Okla. AG Letter, ECF No. 1-3; Sept. 10, 2021 Okla. AG Letter, ECF No. 34-11. ODM has purported to continue to regulate operations within the Reservations well beyond the transition periods set forth in OSMRE's April 2, 2021 and June 17, 2021 letters, and has shown no willingness to voluntarily cease those actions.

### A.    Bond releases, reductions, and forfeitures

As explained in prior briefing, SMCRA requires reclamation of surface coal mining sites after mining operations cease. Defs.' PI Opp'n at 36 n.17. To ensure that adequate funds are available if the operator fails to complete the required reclamation, operators must obtain a performance bond in an amount "sufficient to assure the completion of the reclamation plan if the work had to be performed by the regulatory authority in the event of forfeiture" before any permit for surface coal mining can issue. 30 U.S.C. § 1259(a);

30 C.F.R. § 800.11. Bonds can take several forms, 30 U.S.C. § 1259(a)-(d); 30 C.F.R. § 800.12, and bond amounts are adjusted by the regulatory authority over time to account for changes in the amount of reclamation liability, 30 U.S.C. § 1259(e); 30 C.F.R. § 800.15. The obligation to maintain a bond lasts through the life of the operation until required reclamation is complete. 30 U.S.C. § 1259(b); 30 C.F.R. § 800.13. A regulatory authority may terminate SMCRA jurisdiction over a reclaimed surface coal mining site after releasing the bond in full. 30 C.F.R. § 700.11(d)(1)(ii). Once jurisdiction has terminated, a regulatory authority can reassert jurisdiction over a site only "if it is demonstrated that the bond release . . . was based upon fraud, collusion, or misrepresentation of a material fact." *Id.* § 700.11(d)(2) .

As of June 30, 2021, ODM held approximately $19,225,019 in SMCRA Title V bonds. Maki Decl. ¶ 41, ECF No. 34-4. Approximately $7,935,582 of that amount covered Federal lands permits where OSMRE is a co-payee on the bonds, and approximately $11,289,436 covered non-Federal lands permits where ODM is the sole payee. *Id.* In recent months, ODM has released approximately $250,830 in bonds on non-Federal lands within the Cherokee Reservation, and forfeited $599,761 to the State treasury, leaving approximately $10,438,845 in reclamation obligations on lands within the Reservations that are not covered by bonds payable to the United States. *Id.*; Supp. Maki Decl. ¶ 25, attached as Ex. 1. For bonds where OSMRE is not a payee, OSMRE has no rights under the bond instruments entered into between ODM and the permittee and no ability to prevent ODM's reduction, release, or forfeiture of the bond. Supp. Maki Decl. ¶ 18–19.

Despite its lack of regulatory authority, ODM continues to purport to accept and

process applications for bond releases and forfeitures for operations on Indian lands. For example, ODM recently purported to let an operator forfeit $599,761 in performance bonds—plus the interest they had accrued for a total of $601,049.38—for an operation on lands within the Choctaw Reservation, and "deposited [the money] with the State Treasurer's office for safekeeping." June 1, 2021 ODM Email, ECF No. 64-3; GCI Am. Application for Review & Temp. Relief & Stay ¶ 31, attached as Ex. 2 ("GCI Am. App."); Dossett Decl. ¶ 51, ECF No. 17-1. ODM agreed to the forfeiture even though this mine has been discharging tens of thousands of gallons of acid mine drainage into a nearby stream daily since at least November 2020. *See* Maki Decl. ¶¶ 32–33; Supp. Maki Decl. ¶ 6. OSMRE issued a cessation order against the operator on August 26, 2021, but the operator appealed that notice, inaccurately claiming that it no longer has responsibility for the site because its forfeiture agreement with ODM shifted any reclamation responsibility to ODM. GCI Am. App. ¶¶ 38–39. To date, the acid mine drainage continues to discharge. Supp. Maki Decl. ¶ 6; *see also* Behum Decl. ¶¶ 6–7, attached as Ex. 3.

Additionally, since August 25, 2021, ODM has purported to release approximately $250,830 in bonds on non-Federal lands within the exterior boundaries of the Cherokee Reservation. Maki Decl. ¶¶ 37, 41; Supp. Maki Decl. ¶ 25. For example, on August 25, 2021, ODM purported to approve a partial bond release for $152,280 on Phoenix Coal Permit No. 4287, and, on September 9, 2021, ODM purported to approve a bond release for $98,550 on Phoenix Coal Permit No. 4270. Maki Decl. ¶ 37. On or about November 2, 2021, ODM purported to approve final bond releases for two additional permits, and thereby terminate SMCRA jurisdiction, for Phoenix Coal Permit Nos. 4276 and 4264.

*Supp. Maki Decl.* ¶ 20; *see also* Dossett Decl. ¶ 47. ODM is currently purporting to process numerous other bond release applications. Supp. Maki Decl. ¶¶ 21–24.

**B.      Inspections and enforcement actions**

Oklahoma's continued interference in OSMRE's regulation on the Reservations is not limited to bond releases and forfeitures. OSMRE conducts required inspections and takes enforcement actions within the Reservations. Supp. Maki Decl. ¶ 5–8. But since the end of the 30-day transition periods set forth in OSMRE's April 2 and June 17, 2021 letters, ODM has purported to conduct over 120 unauthorized complete or partial inspections at permitted sites on lands within the Reservations. Travers Decl. ¶¶ 7–8, attached as Ex. 4. ODM has also purported to take enforcement actions within the Choctaw Reservation. It has purported to terminate multiple notices of violation and extend the time for operators to abate violations. *Id.* ¶ 9. ODM also purports to process permit revisions for operations within the Choctaw Reservation that allow significant new construction. *Id.* ¶ 10.

**C.      Refusal to turn over records**

Finally, OSMRE has repeatedly requested that ODM and OCC provide records and documentation associated with their SMCRA programs—which OSMRE has a right to access regardless of *McGirt*—including permits, inspection reports, water-monitoring reports, and notices of violation. *See* Apr. 2, 2021 ODM & OCC Letters, ECF Nos. 1-1, 1-2; June 17, 2021 ODM & OCC Letters, ECF Nos. 34-1, 34-2; Maki Decl. ¶ 14; Decl. of Alfred Clayborne ¶ 35, ECF No. 34-6. To date, ODM and OCC have provided only copies of certain records for sites located within the Muscogee Reservation and have declined to certify that this set of records is complete. Supp. Maki Decl. ¶ 13. Neither OCC nor ODM

have provided OSMRE access to any electronic databases or other monitoring or tracking systems developed by Oklahoma for the purposes of SMCRA implementation. *Id.* ¶¶ 14–16. Only after OSMRE sent letters to OCC and ODM on November 23, 2021, reminding them of their obligation to preserve records and provide those records to OSMRE, did Oklahoma offer to make records available to OSMRE. *Id.* ¶¶ 10–12; *see also* Nov. 23, 2021 ODM & OCC Letters, attached as Exs. 5 and 6.

## STANDARD OF REVIEW

A court may enter a preliminary injunction as a means of preventing harm to the movant before the court can fully adjudicate the claims in dispute. Fed. R. Civ. P. 65(a). To obtain a preliminary injunction, the movant must establish the familiar four factors: "that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When the Federal Government is a party, the last two factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

The United States satisfies the requirements necessary to obtain a preliminary injunction in this case. It is likely to succeed on the merits of its claims because SMCRA dictates that only OSMRE, and not Oklahoma, may exercise SMCRA jurisdiction on lands within the exterior boundaries of the Reservations in the absence of a tribal program. And because SMCRA preempts state regulation of surface coal mining on Indian lands, Oklahoma's continued purported application of its SMCRA programs on lands within the

9

Reservations violates the Supremacy Clause. Oklahoma's continued unauthorized application of its SMCRA programs impedes OSMRE from fulfilling its statutorily mandated regulatory responsibilities and causes further irreparable harm to mine operators, the public, and the environment. Finally, the balance of equities and the public interest weigh firmly in favor of an injunction that ensures compliance with Congress' clear intent and prevents further harm from inadequate reclamation.

## I.   The United States is likely to succeed on the merits

Federal Defendants are likely to succeed on their first counterclaim for all of the reasons set forth in their opposition to Plaintiffs' preliminary injunction motion. Federal Defendants are also likely to succeed on their second claim, contending that Oklahoma's continued operation of its SMCRA programs on Indian lands is preempted by federal law, because the State's purported regulation on those lands directly conflicts with SMCRA and prevents OSMRE from performing its Congressionally mandated duties.

### A.   Only OSMRE may exercise SMCRA jurisdiction on lands within the exterior boundaries of the Reservations

Federal Defendants are likely to succeed on their first claim seeking declaratory judgment that Oklahoma does not have SMCRA jurisdiction within the Reservations because, as thoroughly explained in Federal Defendants' opposition to Plaintiffs' preliminary injunction motion, in the absence of a tribal program, OSMRE alone may exercise SMCRA authority on Indian lands. As Federal Defendants have explained, the Supreme Court's holding in *McGirt* that the Muscogee Reservation remains intact was not limited to the criminal context and necessitates the conclusion that the Muscogee

Reservation constitutes "Indian lands" under SMCRA, over which only OSMRE has jurisdiction until an Indian tribe seeks primacy. *See* Defs.' PI Opp'n at 15–24.

The same argument holds true for the Cherokee and Choctaw Reservations. The Oklahoma Court of Criminal Appeals in *Hogner* and *Sizemore* held that those reservations remain intact and are "Indian country" for purposes of the Major Crimes Act. *See Hogner*, 2021 WL 958412, at *6; *Sizemore*, 485 P.3d at 870–71. As with the Muscogee Reservation and *McGirt*, the same conclusion necessarily follows: the Cherokee and Choctaw Reservations are "Indian lands" under SMCRA, and only OSMRE is authorized to administer SMCRA programs within their exterior boundaries.

Rather than repeating them here, Federal Defendants incorporate by reference their arguments as to why OSMRE alone may regulate SMCRA programs within the Reservations. *See* Defs.' PI Opp'n at 15–26. Although framed in the context of the Muscogee Reservation, they equally support OSMRE's exercise—and Oklahoma's lack—of SMCRA jurisdiction within the Cherokee and Choctaw Reservations.

## B.    SMCRA preempts Oklahoma's purported application of its SMCRA programs to Indian lands

The United States is also likely to succeed on its second claim because SMCRA preempts Oklahoma's administration of SMCRA programs on lands within the Reservations. The doctrine of preemption derives from the Supremacy Clause of the United States Constitution, which provides that "the Laws of the United States . . . shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. It thus "invalidates state laws that

'interfere with, or are contrary to the laws of [C]ongress, made in pursuance of the [C]onstitution.'" *United States v. City & Cnty. of Denver*, 100 F.3d 1509, 1512 (10th Cir. 1996) (quoting *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 604 (1991)). A state law may be preempted on its face or as applied to a specific circumstance. *See Jones v. Rath Packing Co.*, 430 U.S. 519, 526 (1977) (holding preemption "inquiry requires us to consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written").

"Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). Whether or not the statute contains expressly preemptive language, preemptive intent may be "inferred if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law." *Id.* at 76–77. In determining whether a federal statute preempts state law, "the purpose of Congress is the ultimate touchstone." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).

1.     **SMCRA expressly preempts Oklahoma's regulation of surface coal mining on the Reservations**

SMCRA's structure and framework evince Congress's clear intent to preempt state regulation of surface coal mining operations outside of a State program approved by the Secretary of the Interior. Congress designed SMCRA as a "comprehensive statute that regulates *all* surface coal mining operations" in the United States. *United States v. Navajo Nation*, 556 U.S. 287, 300 (2009) (emphasis added). It "establishes a program of

12

cooperative federalism that allows the States . . . to enact and administer their own regulatory programs" within the limits of the statute. *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 289 (1981). Its complexity and its establishment of separate regulatory schemes for different types of lands and jurisdictional circumstances reflect Congress's deliberate intent to carefully apportion regulatory authority. Outside of SMCRA's explicit allowances for state and tribal regulation via programs approved by the Secretary, surface coal mining is an "otherwise pre-empted field." *Printz v. United States*, 521 U.S. 898, 926 (1997) (citing *Hodel*, 452 U.S. at 288).

Most important to this action, SMCRA expressly excludes Indian lands from state jurisdiction and limits such jurisdiction only to OSMRE or tribes with approved programs. *See* Defs.' PI Opp'n at 18–24. Because the statute is explicit that a "State program" may only apply to "lands within such State," 30 U.S.C. § 1291(25), and "lands within such State" does not include Indian lands, *id.* § 1291(11), SMCRA expressly prohibits the application of a Title V State program to Indian lands. *See also New Mexico*, 820 F.2d at 445. SMCRA likewise allows a State to operate a Title IV State Reclamation program on only non-Indian lands. *See* 30 U.S.C. §§ 1235(b), (k); *Montana v. Clark*, 749 F.2d 740, 747–48 (D.C. Cir. 1984). The application of Oklahoma's SMCRA programs to the Reservations therefore exceeds the authority granted by SMCRA to states and is preempted.[8] *See Printz*, 521 U.S. at 926.

---

[8] To the extent Oklahoma argues that 30 U.S.C. §§ 1254(g) and 1255 permit State SMCRA regulation within Indian lands, it is incorrect. Section 1255 states that no state law or regulation "shall be superseded by any provision" of SMCRA or its implementing

2.    **Oklahoma's application of its SMCRA programs to Indian lands conflicts with SMCRA and so is preempted**

Oklahoma's application of its SMCRA programs to the Reservations is also preempted because it directly conflicts with SMCRA. Conflict preemption has two forms. The first occurs when "the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona v. United States*, 567 U.S. 387, 399 (2012) (citation omitted). The second occurs when "compliance with both federal and state regulations is a physical impossibility." *Id.* (citation omitted). Oklahoma's regulation of surface coal mining on lands within the Reservations is preempted under both types of conflict preemption.

First, Oklahoma's application of its SMCRA programs on lands within the Reservations "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* SMCRA limits State regulation of surface coal mining to approved State programs, which explicitly exclude Indian lands. It requires OSMRE to ensure that surface coal mining operations on Indian lands comply with federal standards and regulations. *See* 30 U.S.C. § 1300(c)-(d). And it affords tribes an opportunity to regulate surface coal mining within their reservations through an approved tribal

---

regulations unless the state law or regulation is "inconsistent" with SMCRA. 30 U.S.C. § 1255(a). Because OCRA and its regulations exclude state regulation on Indian lands, they are not inconsistent with SMCRA on their face. However, Oklahoma's *application* of its SMCRA programs to Indian lands is inconsistent with SMCRA and state law. Section 1254(g) is also inapposite. It applies only when a Federal program is promulgated for a state. The Secretary has not promulgated such a program for Oklahoma. *See* Defs.' PI Opp'n at 31 n.14. Nor could it for lands within the Reservations—a Federal program is promulgated in place of a State program "on lands within a State," that is, non-Federal and non-Indian lands. *See id.* at 4; 30 U.S.C. §§ 1254(b), 1271(b) , 1291(6), (11).

program. *See* 30 U.S.C. §§ 1235(k), 1300(j) . State regulation of surface coal mining on Indian lands is therefore an obstacle to the execution of the purpose of the statute by introducing an additional regulator that Congress plainly sought to preclude.

The Supreme Court has found state regulations preempted in circumstances similar to this one. For example, like SMCRA, the Occupational Safety and Health Act (OSHA) permits States to "assume responsibility for development and enforcement" of occupational safety and health standards via a federally approved program. 29 U.S.C. § 667(b). Based on OSHA's structure, the Court held that the statute preempted state regulation outside of an approved program—regardless of whether the state regulation directly conflicts with federal law. *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98–99 (1992); *see also id.* at 103–04. Similarly, the Supreme Court relied on the "all-encompassing program of water pollution regulation" in the Clean Water Act to conclude that it preempts state laws imposing different standards. *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987) (citation omitted). Though the Clean Water Act contained no express preemption clause, the Court held that its "delineation of authority represents Congress' considered judgment as to the best method of serving the public interest and reconciling the often competing concerns of those affected by the pollution." *Id.* at 497. There, as here, "[i]t would be extraordinary for Congress, after devising an elaborate permit system that sets clear standards, to tolerate" state law and regulation that has "the potential to undermine this regulatory structure." *Id.*

The second form of conflict preemption occurs when "compliance with both federal and state regulations is a physical impossibility . . . ." *Arizona*, 567 U.S. at 399 (citations

15

omitted). Compliance with both federal and state regulations may be physically impossible when, for example, each would dictate a mutually incompatible result. *See Brewer v. Zawrotny*, 978 F.2d 1204, 1206–07 (10th Cir. 1992) (state law preempted where it would result in life insurance paid to another beneficiary than dictated by federal law). That is the case here. Oklahoma's continued purported application of its SMCRA programs on Indian lands makes OSMRE's enforcement of a Federal Indian lands program on those same lands, and an operator's compliance with such a program, an "impossibility" in many circumstances. For example, a bond for a non-Federal lands permit issued under a State program is payable only to the State, while a bond for a Federal Indian lands permit is payable only to OSMRE. 30 C.F.R. §§ 750.6(a)(6), 750.17, 800.16(b); Travers Decl. ¶¶ 4–5. Thus, if an operator proceeds with bonding under state requirements, it may not be able to *also* comply with federal bonding requirements because, for example, it cannot obtain a second bond or a surety company may not provide a duplicative bond. Even for Federal lands permits, where OSMRE and Oklahoma are both listed as the payees, OSMRE currently cannot make any changes to a bond without concurrence from ODM—even though those operations now fall within Indian lands, for which OSMRE is the exclusive regulatory authority. *See* 30 C.F.R. § 936.30, art. IX. As another example, if OSMRE issued a notice of violation to an operator under the Federal Indian lands program and ODM purported to issue a notice for the same violation under state law, a single penalty would not satisfy both the State of Oklahoma and OSMRE. And appeals of such citations go to different tribunals—the Department of the Interior's Office of Hearings and Appeals and Oklahoma's hearing authority—which could lead to inconsistent judgments.

Finally, it is irrelevant that Oklahoma's laws and regulations, which by their terms do not apply to Indian lands, may purport to share the same objectives as SMCRA. "[I]t is not enough to say that the ultimate goal of both federal and state law" is the same. *Int'l Paper*, 479 U.S. at 494. "A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal." *Id*. In SMCRA, Congress has established a complex program for the regulation of surface coal mining nationwide that balances the interests of operators, landowners, the public, states, and Indian tribes. Oklahoma's continued unlawful regulation of surface mining on Indian lands "upset[s] the balance of public and private interests so carefully addressed by the Act," including Congress's statutory scheme of exclusive OSMRE enforcement on Indian lands, and prevents OSMRE from fulfilling its statutory duties under SMCRA. *Id.* SMCRA thus preempts any application of Oklahoma's SMCRA programs to the Reservations.

## II.    A preliminary injunction is necessary to prevent irreparable harm

Oklahoma's continued purported regulation of surface coal mining on lands within the Reservations is causing irreparable harm to OSMRE, operators, tribes, the environment, and the general public. There is "a significant risk" of these harms occurring, which "cannot be compensated after the fact by money damages," *Fish v. Kobach*, 840 F.3d 710, 751–52 (10th Cir. 2016) (internal citation omitted), and the harms are "likely to occur before the district court rules on the merits," *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1260 (10th Cir. 2003).

### A.    Enforcement of a preempted law constitutes irreparable harm

As an initial matter, "an alleged constitutional infringement will often alone

17

constitute irreparable harm." *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011) (citation omitted), *rev'd in part on other grounds*, 567 U.S. 387 (2012). This includes state regulation in violation of the Supremacy Clause. *See Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990). Here, SMCRA establishes that, absent a tribal program, only OSMRE may regulate on lands within the Reservations. Oklahoma's purported efforts to regulate in that preempted field deprive the public, the tribes, and operators of the benefit of SMCRA's careful allocation of authority within the Reservations. *See id.* And "no method of compensation can remedy" the harm of being "forced to comply with" a preempted law. *Chamber of Com. of the U.S. v. Henry*, No. CIV-08-109-C, 2008 WL 2329164, at *8 (W.D. Okla. June 4, 2008), *aff'd in part, rev'd in part sub nom. Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742 (10th Cir. 2010).

### B.    Oklahoma's *ultra vires* actions are irreparably harming OSMRE, the public, and the environment

OSMRE, the environment, and the general public—including Oklahomans who live, work, or recreate near mining sites—will also be irreparably harmed absent an injunction. SMCRA and federal regulations require regulated entities to operate in a manner that will "protect society and the environment from the adverse effects of surface coal mining operations," follow environmental protection performance standards, and fully reclaim the land on which surface coal mining operations are conducted in a manner approved by the regulatory authority. *See* 30 U.S.C. §§ 1202(a), 1265, 1258.[9] As explained

---

[9] *See also* 30 C.F.R. §§ 750.12 (Indian lands permit requirements), 750.16 (Indian lands environmental performance standards); 30 C.F.R. pt. 780 (requirements for reclamation and operations plans), 816 (environmental performance standards).

above, to ensure that this reclamation is completed, operators are required to post bonds "sufficient to assure the completion of the reclamation plan if the work had to be performed by the regulatory authority in the event of forfeiture." *Supra* at 5–6; 30 U.S.C. § 1259(a); 30 C.F.R. §§ 800.11, 750.17. Adequate bonding is a linchpin of SMCRA's environmental safeguards, and no permit can be issued until an adequate bond is provided. 30 U.S.C. § 1259(a). OSMRE has no authority to use funds other than those collected via forfeited bonds for the reclamation of mining sites. *See* 31 U.S.C. § 1301.

ODM's treatment of bonds since April 2021 presents an imminent and irreparable threat to OSMRE's ability to require operators to conduct adequate reclamation or to conduct that reclamation itself. Over the past few months, ODM has purported to release and forfeit numerous bonds for operations on lands within the Reservations. Within the Cherokee Reservation, on November 2, 2021, ODM purported to approve applications for final bond release for two mines and, on August 25 and September 9, 2021, ODM purported to approve partial releases for bonds covering two other mines. Maki Decl. ¶ 37; Supp. Maki Decl. ¶ 20. ODM's purported bond releases harm OSMRE and the environment by releasing an existing financial assurance that could be used for reclamation or to negotiate with a surety company to fund or perform reclamation in lieu of forfeiture.

As explained above, in June 2021, ODM further purported to collect $601,049.38 in performance bonds for a mining operation located on lands within the Choctaw Reservation via a so-called "friendly forfeiture" agreement between ODM and the permittee. *Supra* at 6–7. The "friendly forfeiture" effectively allowed the permittee to continue to discharge almost 23,000 gallons of acidic water per day off the mine site and

into a nearby stream for months without the operator incurring any violation or penalty.[10] Supp. Maki Decl. ¶ 6 & Ex. A. Despite an imminent harm cessation order issued to the permittee in August 2021 by OSMRE, that discharge remains. *Id.* ¶ 6. Because the bond proceeds are now in ODM's possession, OSMRE cannot access them to remediate the acid mine drainage. Meanwhile, ODM lacks any authority under SMCRA to enter into or reclaim permitted sites within the Reservations. The mine drainage remains unaddressed.

In addition to releasing and forfeiting bonds, ODM continues to hold bonds currently payable only to ODM for operations on lands within the exterior boundaries of the Reservations. To date, at least $10,438,845 in reclamation obligations for sites on lands within the Reservations are covered by bonds payable only to the State. Supp. Maki Decl. ¶ 25. OSMRE currently cannot access those bonds, even in the event of an environmental or public safety emergency. And operators, unable to be released from the bonds held by Oklahoma, and with no way to transfer those bonds to the United States without Oklahoma's consent, may be unable to acquire a second, duplicate bond payable to the United States. This creates an immediate threat to OSMRE's ability to carry out its statutory obligations under SMCRA to ensure that federal environmental and health and safety standards are met, violations of those standards are remedied quickly, and land is reclaimed if an operator fails to complete reclamation and, thus, creates an imminent threat to the environment and people who live, work, or recreate near mining sites.

---

[10] The discharge has a pH of approximately 3.5, similar that of soda or vinegar, and is flowing into a stream at a rate of 15.85 gallons per minute. Behum Decl. ¶¶ 3, 9–10, 14. At that rate, this site would fill an Olympic swimming pool each month.

Furthermore, because operators continue to submit their bond release or permit revisions to ODM and not OSMRE, OSMRE lacks real-time information about the status of permits, and operators may make costly, and potentially environmentally damaging, decisions in reliance on a purported ODM-issued revision or bond release that OSMRE will have to later reverse. *See* Supp. Maki Decl. ¶ 17. Oklahoma's delay in sharing permit files and records with OSMRE despite legal requirements to do so exacerbates this problem. Moreover, ODM's continued purported issuance of notices of violations, cessation orders, and repeated extensions of abatement deadlines thwarts OSMRE's ability to exercise its exclusive regulatory authority on Indian lands, hampers OSMRE's ability to ensure that SMCRA violations are corrected within a reasonable time on Indian lands, and creates confusion among regulated parties.

The harm here is not exclusively or even primarily economic: serious, real, and imminent environmental, health, and safety harms flow from Oklahoma's release of bonds for operations that are not fully reclaimed. Unreclaimed and inadequately reclaimed mines often contain environmental hazards, such as dangerous trenches, large mounds of mine spoil, and untreated discharges. For example, as discussed above, ODM's recent "friendly forfeiture" agreement was for a bond covering an operation that continues to discharge acid mine drainage into a nearby stream without treatment. Supp. Maki Decl. ¶ 6. Such "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Colorado v. U.S. EPA*, 989 F.3d 874, 889 (10th Cir. 2021) (citation omitted). SMCRA is expressly designed to prevent such harms, *see* 30 U.S.C. §§ 1201(c), 1202(d)-(e) , and by releasing,

reducing, or forfeiting bonds, Oklahoma prevents OSMRE from accessing the funds needed to satisfy that statutory obligation and curtail those harms.

Even if the harm were primarily economic, economic harm *is* irreparable when the movant "demonstrate[s] a significant risk that" the loss "cannot be compensated after the fact . . . ." *N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1250 (10th Cir. 2017). That is the case here. Once a bond is purportedly released by ODM, it may result in termination of SMCRA jurisdiction over a site, 30 C.F.R. § 700.11(d)(1)(ii), thereby preventing OSMRE from obtaining full reclamation to federal standards. While OSMRE could reassert SMCRA jurisdiction and require the operator to obtain a new bond, to do so after bond release, OSMRE may be required to show that the release was based on fraud, collusion, or misrepresentation of a material fact. 30 C.F.R. § 700.11(d)(2). And, even if OSMRE were able to reassert jurisdiction, an operator may not be able to post a new bond. As Oklahoma's declarants have acknowledged, many operators in the State are insolvent. *See* Dossett Decl. ¶ 33; GCI Am. App. ¶¶ 14–15, 22 (alleging insolvency as a purported defense to OSMRE enforcement action).[11]

It is true that OSMRE can ask the Attorney General to sue individual permittees to force reclamation. *See* 30 U.S.C. § 1271(c); 30 C.F.R. § 847.16. But individual lawsuits take significant time, during which the environmental and public health and safety harms would be ongoing. And such lawsuits may not be successful in securing reclamation of the

---

[11] Nor is there path for OSMRE to recover released bond funds from the State itself after the fact. Once Oklahoma releases a bond, it no longer has any claim to that money and SMCRA provides no cause of action for recovering released or forfeited bond funds from a State as damages or in any other form.

site and the abatement of violations if the permittees are deceased or insolvent. Therefore, in the absence of an injunction preventing Oklahoma from reducing, releasing, or forfeiting bonds, OSMRE, the environment, and the public face irreparable harm.

## III.   The balance of equities and the public interest favor an injunction

The final two factors—the balance of equities and the public interest—merge where the federal government is a party. *Nken*, 556 U.S. at 435. Here, these factors support an injunction. First, the public interest favors compliance with the law. *See Homans v. City of Albuquerque*, 264 F.3d 1240, 1244 (10th Cir. 2001) (per curiam). Oklahoma's continued purported regulation of surface coal mining on Indian lands is contrary to the Supreme Court's decision in *McGirt*, and the Oklahoma Court of Criminal Appeals' decisions in *Hogner* and *Sizemore*, as well as Congress's policy choices in SMCRA. It also weakens the public's trust in our system of laws and undermines the trust of the public, tribes, and operators in OSMRE's authority. *See Fish*, 840 F.3d at 755–56 (Congress's judgment in statute reflects the public interest).

Second, securing OSMRE's ability to ensure adequate reclamation on Indian lands in Oklahoma serves the public interest. As noted above, inadequate or delayed reclamation can have, and is having, serious environmental and health consequences, particularly for members of the public who live, work, or recreate near mining sites. Oklahoma has allowed acid mine drainage to continue on at least one site for a period of over a year. And, of 50 surface coal mining and reclamation sites managed by ODM, 26 are currently abandoned without sufficient funds for complete reclamation. Maki Decl. ¶ 5. An injunction would protect OSMRE's ability to act quickly, with accurate information, to address

environmental and potential health and safety hazards.

Third, the Muscogee, Cherokee, and Choctaw Nations have a strong interest in OSMRE's unimpeded SMCRA regulation on lands within the Reservations. Federal regulations require that tribes be consulted about certain regulatory actions on Indian lands. *See, e.g.*, 30 C.F.R. §§ 750.18(d) (inspections), 750.18(f) (civil penalty hearings), 750.6(a)(4) (protection of non-coal resources), 750.6(d) (permitting and bonds). Because it does not apply to Indian lands, Oklahoma's State program contains no such requirement. ODM's continued purported regulation within the Reservations deprives the tribes of these procedures required by the Federal regulatory process.

Fourth, regulated entities, tribes, and the public have a strong interest in certainty about the appropriate regulatory authority on lands within the Reservations. As long as Oklahoma continues to purport to assert unauthorized jurisdiction, operators may believe they are subject to enforcement and oversight from two competing authorities, landowners will not know who has a right of access, tribes will not be consulted on critical permitting decisions, and citizens will not know who to contact in the event of an emergency or to file a complaint. The competing regulation has already led at least one operator to seek relief from the Department of the Interior's Office of Hearings and Appeals. *See* GCI Am. App. Furthermore, Oklahoma's continued purported inspections—which are subjecting operators to double the amount of inspections—are disruptive and confusing to operators at active mining sites and reclamation projects.

These interests clearly outweigh those that Oklahoma has raised in support of its continued regulation on lands within the Reservations. As Federal Defendants have already

24

explained, Oklahoma's asserted sovereignty interests do not outweigh the public's interest in the law being enforced as written. *See* Defs.' PI Opp'n at 32–37.

## CONCLUSION

For the foregoing reasons, Federal Defendants respectfully request that the Court enjoin Plaintiffs, including their officers, employees, and agents, from (a) regulating, in whole or in part, surface coal mining and reclamation operations and completing reclamation projects, such as by implementing or enforcing Oklahoma's SMCRA programs, on lands within the exterior boundaries of the Reservations; and (b) engaging in any further releases, reductions, or forfeitures of any bonds covering surface coal mining operations located on lands within the exterior boundaries of the Reservations. And so that OSMRE may exercise the jurisdiction SMCRA requires within the Reservations to prevent further harm to the environment and to public health and safety, Federal Defendants further request that the Court require Plaintiffs to secure original or complete copies of all digital and hard-copy records relating to surface coal mining on lands within the exterior boundaries of the Reservations and provide them to OSMRE within a reasonable time.[12]

---

[12] Although ODM and OCC have provided certain records for SMCRA operations on the Muscogee Reservation and have indicated an intent to provide records for the Cherokee and Choctaw Reservations, *see* Supp. Maki Decl. ¶¶ 10–13, Federal Defendants nevertheless seek this relief to ensure timely access to information critical to the operation of OSMRE's Federal Indian lands program, particularly in light of the State's delay in providing these records; the lack of clarity about access to electronic databases, *see id.* ¶¶ 14–16; and the impending reductions in State operations, *see* Second Supp. Rodesney Decl. ¶¶ 5–7, ECF No. 63.

DATE: December 13, 2021                    Respectfully submitted,

                                           JEAN E. WILLIAMS
                                           Deputy Assistant Attorney General
                                           United States Department of Justice
                                           Environment and Natural Resources Div.

                                            /s/ Arwyn Carroll
                                           ARWYN CARROLL
                                           Trial Attorney, Natural Resources Section
                                           Massachusetts Bar No. 675926
                                           P.O. Box 7611
                                           Washington, D.C. 20044-7611
                                           Phone: 202-305-0465
                                           Fax: 202-305-0506
                                           arwyn.carroll@usdoj.gov

                                           CLARE BORONOW
                                           Trial Attorney, Natural Resources Section
                                           Admitted to Maryland Bar
                                           999 18th St.
                                           South Terrace, Suite 370
                                           Denver, CO 80202
                                           Phone: 303-844-1362
                                           Fax: 303-844-1350
                                           clare.boronow@usdoj.gov

                                           *Counsel for Federal Defendants*