# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| STATE OF OKLAHOMA, et al., | ) |
| | ) |
| *Plaintiffs,* | ) |
| | ) |
| v. | ) Case No. CIV-21-719-F |
| | ) |
| UNITED STATES DEPARTMENT | ) |
| OF THE INTERIOR, et al., | ) |
| | ) |
| *Defendants.* | ) |

## **ORDER**

## **I. INTRODUCTION**

The Supreme Court handed down its decision in *McGirt v. Oklahoma*, ___ U.S. ___, 140 S.Ct. 2452 (2020) on July 9, 2020, putting the State of Oklahoma, and millions of its citizens, in a uniquely disadvantaged position as compared to the other forty-nine states. Core functions of state government, relied upon by *all* Oklahomans for over a hundred years, are called into question even though only a very small portion of the land within the newly-recognized reservation is owned by tribes or individuals with a tribal affiliation. The result the court reaches in this order is a prime example of the havoc flowing from the *McGirt* decision. But the result the court reaches here is a legally unavoidable consequence of the application of federal statutory law in light of that decision.

After the Supreme Court held in *McGirt* that the Muscogee (Creek) Nation's reservation in eastern Oklahoma had not been disestablished, the Department of the Interior and the Office of Surface Mining and Enforcement informed Oklahoma that it could no longer regulate surface mining on the Nation's Reservation. Contending

that *McGirt's* impact is limited to federal criminal jurisdiction under the Major Crimes Act, Oklahoma filed this action challenging defendants' actions.

Now pending before the court is Plaintiffs' Motion for Preliminary Injunction, filed August 23, 2021 (doc. no. 17), seeking to enjoin defendants from enforcing their decision to strip Oklahoma of its regulatory authority over surface mining on the Creek Reservation. Defendants filed a response in opposition (doc. no. 34) and Oklahoma filed a reply (doc. no. 42). Following a hearing in which the parties presented oral argument,[1] Oklahoma submitted a supplemental brief (doc. no. 70) and defendants submitted a supplemental response (doc. no. 72). As explained below, Oklahoma has not shown a likelihood of success on the merits of its claims, and it is therefore not entitled to preliminary relief.

## II. BACKGROUND

Before turning to what this case is about, it is worth emphasizing what this is *not* about. This case is not about whether *McGirt* was correctly decided. This case is not about whether inhabitants of the newly confirmed Creek Reservation should enjoy immunity from local regulation. And this case is not about whether *McGirt's* holding should apply generally in the civil context. Instead, this case turns on a much narrower issue: the interpretation and application of a federal statute. As will be seen, the contentions advanced by Oklahoma in this case collide directly with the plain language of federal legislation governing surface mining on the newly-recognized Creek Reservation.

The federal statute at the heart of this matter is the Surface Mining Control and Reclamation Act, 30 U.S.C. §§ 1201, *et seq.* (SMCRA). SMCRA "is a comprehensive statute that regulates all surface coal mining operations." *United States v. Navajo Nation*, 556 U.S. 287, 300 (2009). The Secretary of the Interior,

---

[1] The parties did not present additional evidence at the hearing.

acting through the Office of Surface Mining Reclamation and Enforcement (OSMRE), "is charged with primary responsibility for administering and implementing the Act by promulgating regulations and enforcing its provisions." *Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 268–69 (1981).

To achieve its purposes, SMCRA relies on two major programs: Title V, 30 U.S.C. §§ 1251-1279, which regulates ongoing surface mining operations, and Title IV, 30 U.S.C. §§ 1231-1244, which administers a fund to reclaim land and water resources adversely affected by mining that occurred prior to SMCRA's enactment. SMCRA implements these programs through a system of "'cooperative federalism,' in which responsibility for the regulation of surface coal mining in the United States is shared between the U.S. Secretary of the Interior and State regulatory authorities." *Bragg v. West Virginia Coal Ass'n*, 248 F.3d 275, 288 (4th Cir. 2001) (citation omitted). Under this scheme, states may "submit proposed regulatory programs to the Secretary of the Interior for approval." *Farrell-Cooper Min. Co. v. U.S. Dep't. of the Interior*, 728 F.3d 1229, 1232 (10th Cir. 2013); 30 U.S.C. § 1253(a). If the Secretary approves the state regulatory program, the state "is said to have achieved 'primacy.'" *Id.* Primacy states have "'exclusive jurisdiction over the regulation of surface coal mining and reclamation operations' within their borders," *id.* (quoting 30 U.S.C. § 1253(a)), although OSMRE retains oversight of the program. 30 U.S.C. § 1254; *National Min. Ass'n v. U.S. Dep't. of Interior*, 70 F.3d 1345, 1347 (D.C. Cir. 1995).

Oklahoma is a primacy state that has an approved Title V state regulatory program.[2] 47 Fed. Reg. 14,152 (April 2, 1982). Under the approved program,

---

[2] The relevant facts are largely undisputed by the parties. The following facts comprise the factual findings required by Fed.R.Civ.P. 52(a)(2).

Oklahoma may monitor "coal exploration and surface coal mining and reclamation operations on non-Indian and non-Federal lands within Oklahoma." *Id.*; *see also* Okla. Admin. Code 460:20-3-5 (defining Oklahoma's "state program" to include "non-Indian and non-Federal lands within that State"). Oklahoma also has an approved Title IV reclamation program that allows it to obtain federal funding for the reclamation of abandoned mining areas. 47 Fed. Reg. 2989 (Jan. 21, 1982). Like its Title V program, Oklahoma's reclamation program does not apply to Indian land. 70 Fed. Reg. 16941-01. However, as a practical matter, Oklahoma's Title V regulatory program and Title IV reclamation program have historically operated on land that falls within the borders of the Creek Reservation without objection from OSMRE (or, for that matter, the Creek Nation). Pls. Br., Ex. 1, ¶¶ 21, 29.

But then came *McGirt*. In *McGirt*, 140 S.Ct. at 2481, the Supreme Court held that the Creek Reservation had not been disestablished and therefore met the definition of "Indian Country" for purposes of the Major Crimes Act. Relying on *McGirt,* OSMRE determined that Oklahoma could no longer operate its state regulatory program on the (newly confirmed) Creek Reservation because it qualifies as "Indian land" under SMCRA. On April 2, 2021, OSMRE sent letters to the Oklahoma Department of Mines, which oversees the Title V regulatory program, and the Oklahoma Conservation Commission, which oversees the Title IV reclamation program, notifying them of this decision. More specifically, OSMRE's April 2nd letters explained that "the State of Oklahoma may no longer administer a SMCRA regulatory program on lands within the exterior boundaries of the Muscogee (Creek) Nation Reservation," "OSMRE is now the SMCRA Title V regulatory authority," and that "OSMRE will assume authority over Oklahoma's AML reclamation program." Compl., Ex. 1, 2. The letters requested that Oklahoma coordinate with OSMRE to transfer all SMCRA regulatory and reclamation authority within the boundaries of the Creek Reservation to OSMRE within

approximately thirty days. *Id.* The letters also instructed Oklahoma to maintain its routine regulatory and reclamation tasks, but to avoid "any action with irreversible or irreparable adverse consequences for OSMRE's abilities to administer SMCRA." *Id.*

Oklahoma responded to OSMRE on April 16, 2021 by challenging OSMRE's decision as having "no adequate basis in law" and advising OSMRE that Oklahoma's state agencies would not comply. Compl., Ex. 3. OSMRE then published a "Notice of decision" in the Federal Register advising the public that *McGirt's* recognition of the Creek Reservation "forecloses" Oklahoma's SMCRA authority over the land and that "[a]s of April 2, 2021, OSMRE initiated transfer of SMCRA Title IV and Title V program responsibilities within the exterior boundaries of the Muscogee (Creek) Nation Reservation." 86 Fed. Reg. 26941-01 (May 18, 2021). Then, on June 29, 2021, OSMRE advised Oklahoma that it was unable to release any remaining federal funds for the Title V program. Pls. Br., Ex. 3 ¶ 7; Defs. Br., Ex. 8 ¶¶ 25-27. Finally, on July 8, 2021, OSMRE rejected Oklahoma's grant request for its Title IV program. Pls. Br., Ex. 2 ¶ 59. This lawsuit followed.

Oklahoma asserts six claims in its Complaint, but only relies on the following five claims in seeking preliminary injunctive relief: In count one, Oklahoma seeks a declaratory judgment that *McGirt* does not apply to surface coal mining and that Oklahoma has jurisdiction under SMCRA to regulate surface coal mining on the Creek Reservation. In counts two and three, Oklahoma asserts that OSMRE's decision to disapprove its regulatory program and deny reclamation grant funding was arbitrary and capricious in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. In count four, Oklahoma claims that OSMRE's decision was arbitrary and capricious in violation of § 1276(a) of SMCRA. Last, in count five, Oklahoma argues that OSMRE's decision failed to follow the APA's requirements for rulemaking, 5 U.S.C. § 553.

5

Oklahoma now seeks an order "preliminarily enjoining the Notice of Decision and the Grant Funding Denials." It argues that it is likely to succeed on the merits of some, if not all, of its claims and that it will suffer irreparable harm if forced to wait for a trial on the merits. In response, OSMRE contends that, following *McGirt's* conclusion that the Creek Reservation has not been disestablished, the plain language of SMCRA mandates its decision and that Oklahoma's APA claims are untimely.

### III. STANDARD OF DECISION

A preliminary injunction is "the exception rather than the rule." *United States ex rel. Citizen Band Potawatomi Indian Tribe v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888 (10th Cir. 1989). Because it is "an extraordinary remedy, the right to relief must be clear and unequivocal." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1261 (10th Cir. 2004) (internal quotation marks and citation omitted). To obtain a preliminary injunction, the movant bears the burden of establishing four factors: "(1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm if the injunction is not granted; (3) the balance of equities is in the moving party's favor; and (4) the preliminary injunction is in the public interest." *Republican Party of New Mexico v. King*, 741 F.3d 1089, 1092 (10th Cir. 2013). Where a movant fails to establish a likelihood of success on the merits, it is unnecessary to address the remaining requirements for a preliminary injunction. *Warner v. Gross*, 776 F.3d 721, 736 (10th Cir. 2015). For that reason, the likelihood of success on the merits will be discussed first.

## IV. DISCUSSION

### A. Likelihood of Success on the Merits

#### 1. Declaratory Judgment Claim

Oklahoma argues that it is likely to succeed on its declaratory judgment claim because SMCRA does not give OSMRE exclusive jurisdiction over Indian land in the absence of a tribal regulatory program. Because the plain language of SMCRA says otherwise, the court disagrees.

##### a. Text of SMCRA

The task of resolving whether Oklahoma may exercise regulatory authority under SMCRA "begins where all such inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989). Importantly, where "the statute's language is plain, the sole function of the courts is to enforce it according to its terms." *Id.* (internal quotation marks omitted). Here, SMCRA plainly precludes a state from administering either a Title IV reclamation program or a Title V regulatory program on Indian land.

Begin with Title IV, which provides that "[e]ach State having within its borders coal mined lands eligible for reclamation under this subchapter, may submit to the Secretary a State Reclamation Plan and annual projects to carry out the purposes of this subchapter." 30 U.S.C. § 1235(b). A "Reclamation Plan" is defined as "a plan submitted by an applicant for a permit under a State program or Federal program," 30 U.S.C. § 1291(21). A "State Program" is then defined as a Title V program "to regulate surface coal mining and reclamation operations, on lands within such State." *Id.* at § 1291(25). Finally, and crucially, "lands within such State" is defined as "all lands within a State *other than Federal lands and Indian lands*." *Id.* at § 1291(11) (emphasis added). Reading these provisions together, then, Title IV authorizes a State to submit a reclamation plan pursuant to an approved State Program, which by definition excludes Indian lands.

7

A separate provision of Title IV addressing how federal funds should be allocated for reclamation activities supports this conclusion. Section 1232(g) provides that "50 percent of the reclamation fees collected annually in any State (other than fees collected with respect to Indian lands) shall be allocated annually by the Secretary to the State" subject to the state having an "approved abandoned mine reclamation program pursuant to section 1235." 30 U.S.C. § 1232(g)(1)(A).[3] An approved reclamation program is contingent on having obtained a Title V regulatory program, which, pursuant to SMCRA's definitions, includes only "lands within a State other than…Indian lands." 30 U.S.C. §§ 1291(11), 1291(25). Thus, "the Act unambiguously denies the state the power to administer funds on any Indian lands, on or off the reservation." *State of Mont. v. Clark*, 749 F.2d 740, 747 (D.C. Cir. 1984).

Like Title IV, the text of Title V, when read in conjunction with SMCRA's definitions, precludes state regulation of surface mining on Indian land. Section 1253 permits "[e]ach State in which there are or may be conducted surface coal mining operations on non-Federal lands" to submit a "State program" to the Secretary for approval. But, as previously explained, SMCRA specifically excludes Indian lands from the definition of a State program. 30 U.S.C. § 1291(25). In the absence of a State program, SMCRA provides that the Secretary shall prepare a "Federal program for a State." *Id.* at § 1254. Because the plain language of SMCRA excludes Indian lands from state regulatory and reclamation programs, Oklahoma lacks the authority to regulate surface mining or reclamation activities on Indian land, even in the absence of a tribal regulatory program.

---

[3] Section 1232(g) further provides that fees collected on Indian lands shall be allocated to the appropriate Indian tribe.

This conclusion is bolstered by the fact that SCMRA equates Indian tribes with states and permits Indian tribes to promulgate their own regulatory and reclamation programs. For example, § 1300, which is titled "Indian lands," provides that "[f]or purposes of this subsection and the implementation and administration of a tribal program under subchapter V, any reference to a 'State' in this chapter shall be considered to be a reference to a 'tribe.'" 30 U.S.C. § 1253(a). Title IV similarly provides that "Indian tribes having within their jurisdiction eligible lands…shall be considered as a 'State.'" *Id.* at § 1235(k). Because SMCRA treats Indian tribes as equivalent to states, there is no reason to think that a state may operate its own regulatory program on Indian land.

Moreover, § 1300 permits Indian tribes to submit a Title V program regulating "surface coal mining and reclamation operations on reservation land under the jurisdiction of the Indian tribe using the procedures of section 1254(e)." *Id.* at § 1300(j)(1)(A). Section 1254(e) provides for submission of a state program after implementation of a federal program. By relying on § 1254(e) with respect to a tribe's ability to develop a regulatory program, § 1300 contemplates the existence of a federal program – not a state program – in the absence of a tribal program on Indian land. Several cases interpreting SMCRA in other contexts have similarly concluded that states are not the appropriate regulatory authority on Indian land. *See Bragg,* 248 F.3d at 289 (explaining that "SMCRA provides for either State regulation of surface coal mining within its borders or federal regulation, but not both."); *New Mexico ex rel. Energy & Mins. Dep't, Min. & Mins. Div. v. U.S. Dep't of Interior,* 820 F.2d 441, 445 (D.C. Cir. 1987) (explaining that if the reservation status of the lands at issue was resolved in favor of the Indian tribe, the land would be "off limits to New Mexico under the Surface Mining Act."); *Clark*, 749 F.2d at 747 (finding that "the Act unambiguously denies the state the power to administer funds on any Indian lands, on or off the reservation.").

SMCRA's exclusion of Indian land from a State program establishes that Oklahoma is not likely to succeed on the merits of its declaratory judgment claim. But to the extent one could argue that the statute is ambiguous as to the appropriate regulatory authority for Indian lands, SCMRA's implementing regulations eliminate any confusion. These regulations provide that "OSM shall: (1) Be the regulatory authority on Indian lands" and that OSMRE is authorized to carry out reclamation projects on Indian lands. 30 C.F.R. §§ 750.6(a), 886.27. Oklahoma does not seriously challenge the validity of these federal regulations, which were implemented following notice and comment procedures and have been in force for decades.[4] *See* 49 Fed. Reg. 38462-01. It is also telling that Oklahoma's state laws implementing its state SMCRA program specifically exclude Indian land from its regulatory jurisdiction. *See* Okla. Admin. Code §§ 460:20-3-5; 460:20-3-6(d).

Seeking to avoid the clear command of SMCRA and its federal regulations, Oklahoma argues that it may regulate surface mining on the Creek Reservation because the land is not actually "Indian land" at all. SMCRA defines "Indian land" as

> all lands, including mineral interests, within the exterior boundaries of any Federal Indian reservation, notwithstanding the issuance of any patent, and including rights-of-way, and all lands including mineral interests held in trust for or supervised by an Indian tribe.

30 U.S.C. § 1291(9). A "Federal Indian reservation" is not further defined in SMCRA, but Oklahoma argues that the Creek Reservation does not qualify as one because the land is not held in trust by the federal government. The source of this argument is a statement from the "Frequently Asked Questions" page of the Bureau of Indian Affairs website that describes a "federal Indian reservation" as "an area of

---

[4] Moreover, any challenge to these regulations would be both untimely and brought in the improper venue. *See* 30 U.S.C. § 1276(a)(1).

land reserved for a tribe or tribes under treaty…and where the federal government holds title to the land in trust on behalf of the tribe." U.S. Department of the Interior – Indian Affairs, "Frequently Asked Question," https://www.bia.gov/frequently-asked-questions. This argument fails for several independent reasons.

First, Oklahoma fails to persuasively explain why an out-of-context statement from the BIA's website should inform the court's interpretation of SMCRA. Second, SMCRA's definition of Indian lands plainly encompasses land not held in trust because the definition includes fee-patented land within a reservation's borders. 30 U.S.C. § 1291(9). Last, *McGirt's* holding that the land at issue meets the definition of "Indian Country" under the Major Crimes Act compels a finding that the land also meets the definition of "Indian lands" under SMCRA. *McGirt*, 140 S.Ct. at 2480. The Major Crimes Act defines "Indian Country" to include "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation." 18 U.S.C.A. § 1151. If the land at issue qualifies as a "reservation under the jurisdiction of the United States" for purposes of the MCA, then it also qualifies as a "Federal Indian reservation" for purposes of SMCRA. *See Cayuga Nation v. Tanner*, 6 F.4th 361, 379 (2d Cir. 2021) ("Given that the MCA's definition of Indian country is largely identical to IGRA's definition of Indian lands, we can only conclude that IGRA applies to the Cayuga Reservation.").

### b.  Oklahoma's Equitable Defenses

Likely cognizant that the text of SCMRA presents a formidable barrier to its claim, Oklahoma devotes a significant portion of its brief to arguing that fundamental principles of equity preclude OSMRE from asserting regulatory jurisdiction over land that has long been regulated by Oklahoma under SMCRA. This argument is based on *City of Sherrill, N.Y. v. Oneida Indian Nation of New York*, 544 U.S. 197 (2005), where the Supreme Court held that equitable principles

precluded the Oneida Indian Nation from reviving its sovereignty over land that was formerly part of its historic reservation. This argument is not without appeal, based, as it is, on the justifiable expectations of millions of Oklahomans, expectations which go back over a hundred years and are rooted in the very existence of Oklahoma as a state. But, as will be seen, the court is hard-put to apply the equitable considerations which were decisive in *Sherrill* where, as here, the federal defendants invoke the plain terms of federal statutory law.

In *Sherrill*, the Oneida Indian Nation ("OIN") purchased parcels of land in the City of Sherrill that were once part of its reservation and that were last possessed by the Oneidas in 1805. *Id.* at 202. The OIN then resisted payment of property taxes to the City on the ground that its acquisition of fee title to the parcels revived the OIN's sovereignty over the land. *Id.* The Supreme Court rejected this claim, concluding that the "long lapse of time" and "dramatic changes in the character of the properties" precluded the OIN from gaining "the disruptive remedy it now seeks." *Id.* at 216-217. Referring to the doctrines of laches, acquiescence, and impossibility, the Court held that the "Oneidas' long delay in seeking equitable relief against New York or its local units, and developments in the city of Sherrill spanning several generations," rendered the shift in governance sought by the OIN inequitable. *Id.* at 221.

Other courts have relied on *Sherrill's* equitable defense concept to reject tribal claims that would be disruptive of long-held societal expectations. In *Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d 266, 269 (2d Cir. 2005), the Cayuga Indian Nation filed suit against the State of New York claiming that a flaw in the original transfer of its reservation over 200 years ago violated federal law and it is therefore entitled to present possession of the land. Relying on *Sherrill*, the Second Circuit held that the claim was barred by laches because "this type of possessory land claim—seeking possession of a large swath of central New York State and the ejectment of tens of

thousands of landowners—is indisputably disruptive." *Id.* at 275-277. Similarly, in *Oneida Indian Nation of New York v. Cty. of Oneida*, 617 F.3d 114, 135 (2d Cir. 2010), the Second Circuit rejected the Oneida Indian Nation's ancient land claims because equitable principles bar claims that "are disruptive of significant and justified societal expectations that have arisen as a result of a lapse of time during which the plaintiffs did not seek relief."

Here, like in *Sherrill*, *Cayuga,* and *Oneida*, there can be little argument that *McGirt's* recognition of the ongoing existence of the Creek Reservation will disrupt significant and justified expectations concerning the character of the land. For that reason, *Sherrill* may well be a powerful weapon in Oklahoma's attempts to resist claims that the Creek Nation or inhabitants of the reservation enjoy broad immunity from local regulation. But *Sherrill* provides no help to Oklahoma in this case, which deals not with an Indian tribe's attempt to re-possess land or evade state regulation, but with the application of the plain language of a federal statute which specifically addresses the matters in dispute in this case.

The Second Circuit reached a similar conclusion when asked to interpret and apply the Indian Gaming Regulatory Act ("IGRA"). In *Cayuga Nation v. Tanner*, 6 F.4th 361, 369-370 (2d Cir. 2021), the Cayuga Nation purchased a property and opened a gaming facility within the boundaries of its reservation which (like here) was never disestablished. After the municipality where the property was located attempted to enforce its local zoning ordinances, the Cayuga Nation filed suit, arguing that the IGRA preempted local regulation. *Id.* at 372. Viewing the case as a "straightforward question of statutory interpretation," the Second Circuit held that the IGRA preempted any state or local regulation that purported to regulate gaming on the property. *Id.* at 380. In reaching this conclusion, the Second Circuit rejected the municipality's argument that *Sherrill* precluded enforcement of the IGRA on reservation property. *Id.* at 379.

13

Here, like in *Tanner*, Oklahoma cannot rely on *Sherrill* or equitable principles to avoid the consequences of SMCRA. *McGirt* itself teaches as much. Although recognizing that legal doctrines such as laches may be deployed to protect individuals who have labored under a mistaken understanding of the law, *McGirt* squarely rejected any notion that reliance interests could undermine the enforcement a federal statute. *McGirt*, 140 S.Ct. at 2478 ("So, once more, it seems Oklahoma asks us to defer to its usual practices instead of federal law, something we will not and may never do."). *See also Ute Indian Tribe of the Uintah v. Myton*, 835 F.3d 1255, 1263 (10th Cir. 2016) (applying MCA to Indian land and stating that "[s]urely, too, it is not for this court to override Congress's commands on the basis of claims of equity from either side.").

Oklahoma's first claim for relief seeks a declaratory judgment that the state has jurisdiction over surface coal mining and reclamation activities under SMCRA on the Creek Reservation. But given SMCRA's exclusion of Indian lands from state regulation, and the fact that claims of equity cannot undermine the enforcement of a federal statute, Oklahoma is not likely to succeed on the merits of this claim.

**2. Claims under the Administrative Procedure Act and SMCRA**

For its remaining claims, Oklahoma asserts that OSMRE's decision to disapprove the state program was arbitrary and capricious in violation of the APA and § 1276(a)(1) of SMCRA, OSMRE's grant funding denials were arbitrary and capricious in violation of the APA, and the notice of decision published by OSMRE in the Federal Register failed to comply with the APA's rulemaking requirements.

To succeed on its APA claims, Oklahoma must show that an agency decision "fail[ed] to meet statutory, procedural or constitutional requirements," or was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Sac & Fox Nation of Missouri v. Norton*, 240 F.3d 1250, 1260 (10th Cir. 2001)

14

(citing 5 U.S.C. § 706(2)(A)-(D)). But before getting to the merits of the claims, Oklahoma must show that its claims are timely.

SMCRA significantly limits the time within which a plaintiff may seek judicial review of actions taken pursuant to the Act:

> A petition for review of any action subject to judicial review under this subsection shall be filed in the appropriate Court within sixty days from the date of such action, or after such date if the petition is based solely on grounds arising after the sixtieth day.

30 U.S.C. § 1276(a)(1).[5] This "sixty-day limitation period is jurisdictional." *Coal Corp. Operating Co. of Am. v. Hodel*, 876 F.2d 860, 861 (10th Cir. 1989).

OSMRE notified Oklahoma of its decision to transfer regulatory and reclamation jurisdiction by sending letters to the Oklahoma Department of Mines (ODM) and the Oklahoma Conservation Commission (OCC) on April 2, 2021. OSMRE asserts that Oklahoma's APA claims are untimely because they were not filed within sixty days of these letters. In response, Oklahoma argues that the notice of decision subsequently published in the Federal Register should control because the April 2nd letters were merely "tentative or interlocutory." *See* Pls. Reply Br. 8. But there was nothing tentative about them.

---

[5] Section 1276(a)(1) also provides that the proper venue in which to challenge an action under SCMRA depends on the specific action taken. Here, Oklahoma relies on § 1276(a)(1)'s first sentence, which provides that "[a]ny action of the Secretary to approve or disapprove a State program or to prepare or promulgate a Federal program pursuant to this chapter shall be subject to judicial review by the United States District Court for the District which includes the capital of the State whose program is at issue." OSMRE argues that this venue provision does not control because Oklahoma's state program – which by definition never included Indian lands – is still intact. While it may be true that OSMRE has not formally disapproved Oklahoma's entire state program, the practical effect of OSMRE's decision has been to do just that, because all of the surface mining previously regulated by Oklahoma under SMCRA now takes place on Indian land. Because OSMRE's decision functions as a disapproval of Oklahoma's state program, venue in this court is proper under SMCRA.

15

The letter to ODM states in no uncertain terms that "the State of Oklahoma may no longer administer a SMCRA regulatory program on lands within the exterior boundaries of the Muscogee (Creek) Nation Reservation." Compl., Ex. 1. Lest there be any confusion, the letter further states that "[f]or lands within the exterior boundaries of the Muscogee (Creek) Nation Reservation, OSMRE is now the SMCRA Title V regulatory authority." *Id.* The letter to OCC likewise states that Oklahoma "may no longer administer a SMCRA regulatory program" on the land and that "OSMRE will assume authority over Oklahoma's AML reclamation program." *Id.* at Ex. 2. These letters unambiguously informed Oklahoma that it was no longer authorized to operate a Title V or Title IV program on the Creek Reservation. Because the letters memorialize OSMRE's final decision and affect Oklahoma's rights and obligations,[6] § 1276(a)(1) of SMCRA required Oklahoma to assert any challenges to that decision within sixty days.

This deadline is not altered by OSMRE's publication of a notice of decision in the Federal Register because the notice merely served to convey OSMRE's decision to the public. *See* 86 FR 26941-01 (stating that OSMRE is "notifying the public" of Oklahoma's loss of jurisdiction). Further, the notice itself makes clear that

---

[6] For the same reasons, OSMRE's decision qualifies as a final agency action that is subject to judicial review. *See Kobach v. U.S. Election Assistance Comm'n,* 772 F.3d 1183, 1189 (10th Cir. 2014). OSMRE disagrees, arguing that its actions are not subject to judicial review because they were compelled by *McGirt* and were therefore nondiscretionary. But the presumption in favor of judicial review of agency actions can generally only "be rebutted by a showing that the relevant statute preclude[s] review,…or that the agency action is committed to agency discretion by law.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, __ U.S. __, 140 S.Ct. 1891, 1905 (2020) (internal citations omitted) (alteration in original). Accepting OSMRE's argument would mean that all agency actions, whether discretionary or nondiscretionary, would be insulated from judicial review. This is obviously an absurd result. In any event, Tenth Circuit case law demonstrates that final agency actions are subject to judicial review even when the agency claims its decision was nondiscretionary. *See Sac & Fox Nation of Missouri v. Norton,* 240 F.3d 1250, 1261 (10th Cir. 2001) (reviewing agency decision even though agency argued the action was nondiscretionary).

16

OSMRE's decision took effect "[a]s of April 2, 2021." *Id.* Given this statement, it is not reasonable for Oklahoma to rely on the notice of decision in calculating its time to challenge OSMRE's actions.

Oklahoma's failure to challenge OSMRE's decision within sixty days defeats three of its claims: count two, asserting that OSMRE's decision was arbitrary and capricious under the APA; count four, asserting that the notice of decision was arbitrary and capricious under SMCRA; and count five, asserting that the notice of decision failed to satisfy APA's procedural requirements.[7] All that remains, then, is count three, which asserts that OSMRE's decision to deny Oklahoma federal funding for its regulatory and reclamation program was arbitrary and capricious in violation of the APA.[8]

SMCRA permits OSMRE to fund portions of a Title V state regulatory program or Title IV state reclamation program through federal grants. 30 U.S.C. § 1232(g); 30 C.F.R. § 735.3. Although OSMRE initially approved Oklahoma's grant funding requests and disbursed a portion of the funds, it subsequently informed Oklahoma that it would need to adjust the scope of its funding requests to reflect the change in jurisdiction outlined in the April 2nd letters. *See* Pls. Br. Ex. 3 ¶ 7; Defs. Br., Ex. 8 ¶ 45; Defs. Br., Ex. 9.; Defs. Br. Ex. 10. These funding decisions cannot be described as arbitrary and capricious given that SMCRA does not permit Oklahoma to administer a state program on Indian land. *See* part III(A)(1)(a), *supra.*

---

[7] Oklahoma also faces another hurdle with respect to count 5. To the extent that Oklahoma argues that OSMRE's decision was a "rulemaking" other than a decision to disapprove a state program, SMCRA instructs that the proper venue for such a challenge would be in the United States District Court for the District in which the surface coal mining operation is located, which in this case is the Eastern District of Oklahoma. 30 U.S.C. § 1276(a)(1).

[8] As is so often the case with challenges advanced under the APA, it appears likely, in light of the substantive defects in Oklahoma's legal position (as discussed at length in this order), that success on the merits with respect to counts one, two, four or five would, in any event, be short-lived.

Put another way, it is not arbitrary and capricious to refuse to fund an unauthorized program. The rationale behind these funding decisions was apparent from the June 2nd letters, and OSMRE therefore provided a reasoned explanation for its decision. Further, Oklahoma's suggestion that the funding decisions violated the APA because OSMRE failed to consider Oklahoma's reliance interests is undermined by the thirty-day transition period OSMRE provided for in its April 2nd letters.

Accordingly, Oklahoma is not likely to succeed on the merits of claims one, three or four because they are untimely or on claim two because the decision was not arbitrary and capricious.

## B. Remaining Preliminary Injunction Factors

Principles of judicial restraint instruct that "if it is not necessary to decide more, it is necessary not to decide more." *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004). Having determined that Oklahoma has not shown a likelihood of success on the merits of its claims, it is not necessary to resolve the remaining preliminary injunction factors. *See Warner,* 776 F.3d at 736.

## V. CONCLUSION

The majority opinion in *McGirt* candidly recognized that the Creek "reservation," as an Indian reservation in the commonly accepted sense, has been thoroughly hollowed out by more than a hundred years of legal, extra-legal, economic and demographic events. Thus, the Creek Reservation, even as found by the Supreme Court to exist, is essentially a perimeter, a line zig-zagging around a major swath of eastern Oklahoma (including most of Tulsa), within which Oklahomans of all races are born and live their lives, oblivious to any notion that the lands on which they live their lives are in a category apart from the lands on which their fellow citizens would live their lives in any other state (or in the western half of Oklahoma). The court is nevertheless compelled to conclude that Oklahoma has not shown a likelihood of success on the merits of its claims, and it is therefore not

entitled to a preliminary injunction. In reaching this conclusion, the court is mindful that SMCRA has become one of the federal civil statutes *McGirt* suggested could be "trigger[ed]" by its finding that the Creek Reservation persists today. 140 S.Ct. at 2480. But it bears repeating what was said at the outset: this is a narrow ruling interpreting a single federal statute. The court goes no further in this order than to conclude that Oklahoma has not met its burden of showing that it is entitled to preliminary injunctive relief.

Accordingly, Plaintiffs' Motion for Preliminary Injunction (doc. no. 17) is **DENIED**.

IT IS SO ORDERED this 22nd day of December, 2021.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

21-0719p020.docx