## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

STATE OF OKLAHOMA, et al.,      )
                                    )
       *Plaintiffs,*      )
                                      )
*v.*      )      Case No. CIV-21-719-F
                                      )
UNITED STATES DEPARTMENT      )
OF THE INTERIOR, et al.,      )
                                      )
       *Defendants.*      )

## ORDER

Before the court is Plaintiffs' Motion for Summary Judgment (doc. no. 97) filed on June 13, 2022, and Federal Defendants' Cross-Motion for Summary Judgment (doc. no. 102) filed on July 28, 2022. Both motions are fully briefed and at issue (doc. nos. 103, 104, 105).

## I.    INTRODUCTION

For decades, Oklahoma has regulated surface coal mining and reclamation operations within its borders, including on land that was previously understood–for more than a hundred years–to lie within the former boundaries of disestablished Indian reservations. That understanding was upended when the Supreme Court ruled that the Creek Reservation in eastern Oklahoma had never been disestablished. *McGirt v. Oklahoma*, __, U.S. ___, 140 S.Ct. 2452 (2020). Applying the same reasoning, the Oklahoma Court of Criminal Appeals subsequently recognized the continued existence of the Choctaw Reservation and the Cherokee Reservation. *Hogner v. State*, 500 P.3d 629 (Okla. Crim. App. 2021); *Sizemore v. State*, 485 P.3d 867 (Okla. Crim. App. 2021). The question presented in this case is whether

Oklahoma may continue to regulate surface coal mining and reclamation operations within these reservations. The Office of Surface Mining Reclamation and Enforcement, a subdivision of the Department of Interior, answered that question in the negative, concluding that the Surface Mining Control and Reclamation Act prohibited Oklahoma from regulating surface mining and reclamation operations on Indian land. The consequences of this decision are significant – the land comprising the Creek, Choctaw, and Cherokee Reservations makes up a huge swath of eastern Oklahoma and includes all the surface coal mining and reclamation activities in the state.

Dissatisfied with OSMRE's decision, Oklahoma filed this action, seeking a declaratory judgment that Oklahoma has jurisdiction over surface mining activities within the Reservations and contending that OSMRE violated the Administrative Procedure Act, 5 U.S.C. § 500, *et seq.*, in various ways. OSMRE answered and filed a counterclaim seeking a declaratory judgment that OSMRE is the sole regulatory authority on land comprising the reservations and that Oklahoma's state regulatory program is preempted by federal law as to these lands.

In an order dated December 22, 2021 (doc. no. 75), the court denied Oklahoma's motion seeking to preliminarily enjoin OSMRE from exercising regulatory authority over the lands at issue. The court concluded that Oklahoma was not likely to succeed on the merits of its claims because the Surface Mining Control and Reclamation Act precludes state regulation of surface mining and reclamation operations on Indian lands. The parties[1] have now returned to the court with cross-

---

[1] Plaintiffs include the State of Oklahoma, the Governor of Oklahoma in his official capacity, and two state agencies responsible for administering Oklahoma's SMCRA regulatory programs. Defendants include the Department of the Interior, the Secretary of the Interior in her official capacity, OSMRE, and the Director of OSMRE in her official capacity. For ease of reference, the court refers to plaintiffs as Oklahoma and defendants as OSMRE.

motions for summary judgment on all pending claims. For the reasons explained below, the court again concludes that Oklahoma is not entitled to the relief it seeks.

But one thing must be clearly understood. The result the court reaches today is compelled primarily by a straight-forward application of the federal surface mining legislation to Indian lands–a situation contemplated by the express provisions of that federal law. Because the result here is compelled by the express requirements of federal legislation, this order should not be regarded as relevant to other situations in the realm of civil law, not involving the express command of federal surface mining legislation, in which other courts are required to determine the extent of the fallout of the *McGirt* decision.

## II.    BACKGROUND

### A. The Surface Mining Control and Reclamation Act of 1977

Surface mining operations and reclamation activities are governed by the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§ 1201, *et seq.*, also known as SMCRA. SMCRA "is a comprehensive statute designed to 'establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations.'" *Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc*., 452 U.S. 264, 268 (1981) (quoting 30 U.S.C. § 1202(a)). To that end, SMCRA directs the Secretary of the Interior, acting through OSMRE, to establish minimum national performance standards for surface mining and reclamation operations. 30 U.S.C. §§ 1211, 1251(b).

However, "because of the diversity in terrain, climate, biologic, chemical, and other physical conditions in areas subject to mining operations," SMCRA also provides that the "primary governmental responsibility" for developing and enforcing regulations "should rest with the States." *Id.* at § 1201(f). Accordingly, Title V of SMCRA provides a specific mechanism by which a State may take responsibility for regulation of surface mining and reclamation operations. It works

as so: any state wishing to regulate surface mining operations may prepare a "State program" that is submitted to OSMRE for approval. *Id.* at § 1235(a). The State program must demonstrate that that State has laws which provide for the regulation of surface mining and reclamation operations in accordance with SMCRA's requirements and that the State has the ability to enforce them. *Id.* If OSMRE approves the state program, the State then exercises "exclusive jurisdiction" over surface mining operations, although OSMRE retains enforcement oversight. *Id.* at §§ 1235(a); 1254(b). A state with an approved program may also seek funding for reclamation and restoration of land and water resources adversely affected by past mining operations from a fund established by Title IV of SMCRA. *Id.* at § 1235(c). In the absence of an approved state program, or in the event that a State is not adequately enforcing its program, OSMRE implements a Federal program of regulation for a state. *Id.* at § 1254(a). SMCRA thus "provides for *either* State regulation of surface coal mining within its borders or federal regulation, but not both. The Act expressly provides that one or the other is exclusive[.]" *Bragg v. W. Virginia Coal Ass'n,* 248 F.3d 275, 289 (4th Cir. 2001).

Although SMCRA permits States to assume exclusive regulatory jurisdiction over surface mining and reclamation operations, it also carefully defines the geographic scope of that jurisdiction. A "State program" means an approved program under § 1253 "to regulate surface coal mining and reclamation operations, on lands within such State." 30 U.S.C. § 1291(25). "Lands within such State" is further defined to mean "all lands within a State other than Federal lands and Indian lands." *Id.* at § 1291(11). Accordingly, pursuant to these definitions, a State's regulatory jurisdiction under SMCRA only extends to "non-Federal and non-Indian land within the particular state." *Pennsylvania Fed'n of Sportsmen's Clubs, Inc. v. Hess,* 297 F.3d 310, 315-16 (3d Cir. 2002).

Regulation of surface mining on Indian lands is addressed in § 1300 of SMCRA. This provision provides that "the Secretary shall incorporate the requirements" of SMCRA "in all existing and new leases issued for coal on Indian lands." 30 U.S.C. § 1300(d). SMCRA's implementing regulations also make clear that OSMRE "shall[] [b]e the regulatory authority on Indian lands." 30 C.F.R. § 750.6. "Indian lands" is defined to include "all lands, including mineral interests, within the exterior boundaries of any Federal Indian reservation, notwithstanding the issuance of any patent, and including rights-of-way, and all lands including mineral interests held in trust for or supervised by an Indian tribe." 30 U.S.C. § 1291(9).

Although SMCRA contemplates federal regulation on Indian lands, it also allows an Indian tribe to prepare its own tribal program for the regulation of surface mining and reclamation operations "on reservation land under the jurisdiction of the Indian tribe." 30 U.S.C. § 1300(d), (j). If an Indian tribe chooses to develop a regulatory program, the procedures relating to submission of a state program after implementation of a Federal program govern the process. *Id.* at § 1300(j)(1)(A). SMCRA further provides that, for purposes of preparing a tribal regulatory program under Title V, any reference to a State shall also be considered to be a reference to an Indian tribe. *Id.* at § 1300(j)(1)(B). Similarly, Title IV authorizes Indian tribes to seek funding for reclamation projects and provides that an Indian tribe shall be considered to be a State for purposes of Title IV. *Id.* at § 1235(k).

Finally, SMCRA expressly prohibits inconsistent regulations, but not those that are more stringent than its minimum standards. Section 1255 provides that "[n]o State law or regulation…shall be superseded by any provision of this chapter or any regulation issued pursuant thereto, except insofar as such State law or regulation is inconsistent with the provisions of this chapter," 30 U.S.C. § 1255(a), but state laws

that provide for "more stringent" regulation or for which SMCRA contains no provision "shall not be construed to be inconsistent." *Id.* at § 1255(b).

With that statutory framework in mind, the court now turns to the facts giving rise to the present controversy.

### B. The Present Controversy

On July 9, 2020, the Supreme Court issued its decision in *McGirt,* 140 S.Ct. at 2452. *McGirt* held that the Muscogee (Creek) Nation's Reservation in eastern Oklahoma had not been disestablished and therefore met the definition of "Indian country" under the Major Crimes Act. *Id.* at 2478. The Supreme Court acknowledged that its decision could potentially impact state jurisdiction under a variety of civil laws. *Id.* at 2482. This is such a case.

As contemplated by SMCRA, Oklahoma has administered both a state program under Title V to regulate surface mining operations and a reclamation plan under Title IV to oversee abandoned mine reclamation activities. Both programs were approved by OSMRE in 1982. *See* 47 Fed. Reg. 14,152 (April 2, 1982); 30 C.F.R. § 936.20. The legislation creating Oklahoma's state program is codified at Okla. Admin. Code 460:20-1-1, *et seq.* Consistent with SMCRA, these state laws recognize that Oklahoma's regulatory program does not extend to Indian lands. Okla. Admin. Code §§ 460:20-3-5; 460:20-3-6(a)

On April 2, 2021, nearly a year after the *McGirt* decision, OSMRE sent two letters to the state agencies that administer Oklahoma's SMCRA programs. *See* Administrative Record ("AR") 0638-42. The letters summarized *McGirt's* holding and explained that SMCRA precludes application of a state regulatory program on Indian lands, which is defined to include land within the exterior boundaries of a Federal Indian reservation. The letters then stated that Oklahoma could no longer administer its state program on the Creek Reservation and that OSMRE was now the regulatory authority on the land. The letters requested that the agencies assist in

transferring regulatory authority over the land during a 30-day transition period and instructed Oklahoma to not take any action with irreversible consequences for OSMRE's ability to administer SMCRA within the boundaries of the Creek Reservation.

Oklahoma's response to this decision was swift and clear. The Oklahoma Attorney General sent OSMRE a letter on April 16, 2021, arguing that SMCRA did not entirely prohibit the enforcement of state law on reservation land and contending that equitable defenses would bar the transfer of authority from the State to OSMRE. *See* AR 0660-62. The Attorney General's letter concluded by advising OSMRE that he was instructing state agencies to not comply with OSMRE's demands.

Undeterred, OSMRE proceeded to publish a "Notice of Decision" in the Federal Register on May 18, 2021, purporting to inform the public of its decision regarding the effect of *McGirt* and the transfer of regulatory authority over surface mining and reclamation activities within the Creek Reservation. 86 Fed. Reg. 26941-01 (May 18, 2021). OSMRE subsequently denied or (to use OSMRE's preferred terms) "disapproved" or "suspended" two requests submitted by Oklahoma for federal funding for its SMCRA programs.

From Oklahoma's perspective, things only got worse from there. On March 11, 2021, the Oklahoma Court of Criminal Appeals, applying *McGirt's* reasoning, recognized the continued existence of the Cherokee Reservation in eastern Oklahoma for purposes of the Major Crimes Act in *Hogner*, 500 P.3d at 629. On April 1, 2021, the Oklahoma Court of Criminal Appeals reached the same conclusion in *Sizemore*, 485 P.3d at 867, regarding the Choctaw Reservation.

On June 17, 2021, OSMRE informed Oklahoma that, for the same reasons articulated in its April 2, 2021 letters, it could no longer administer its SMCRA programs on the Choctaw Reservation or the Cherokee Reservation and that OSMRE was now the regulatory authority on these lands. A Notice of Decision

reflecting this action was published in the Federal Register on October 19, 2021. 86 Fed. Reg. 57,854 (Oct. 19, 2021). Because all of the surface mining and related reclamation taking place in Oklahoma appears to occur on lands within the borders of the Creek, Choctaw, or Cherokee Reservations, OSMRE's decision regarding the proper regulatory authority on these lands effectively revoked Oklahoma's authority to regulate surface mining within the state.

Perhaps not surprisingly, then, Oklahoma filed this action regarding the land within the Creek Reservation and a companion lawsuit regarding the land within the Choctaw Reservation and Cherokee Reservation. *See State of Oklahoma, et al. v. Dept. of the Interior, et al.,* CIV-21-805-F (W.D. Okla.).[2] Both actions seek judicial review of OSMRE's actions under the Administrative Procedure Act and a declaration regarding Oklahoma's authority to continue enforcing its state regulatory programs under SCMRA. After Oklahoma's request for a preliminary injunction to enjoin OSMRE's exercise of regulatory authority over the Creek Reservation was denied, Oklahoma shut down its Title V regulatory program. *See* Pl.s' Br. ¶ 35. Oklahoma also contends that it was forced to stop operating its Title IV reclamation program without access to federal funding and that it is using state funds to pay contractors to complete ongoing projects. *Id.* at ¶ 36. OSMRE contends, and Oklahoma does not dispute, that the funding requests were eventually approved after they were amended to reflect the change in regulatory authority. Def.s' Br. ¶ 33. OSMRE further asserts that it is currently acting as the sole regulatory authority on the Reservations under SMCRA and that the parties are working to effectuate the transfer of performance bonds and forfeited bond funds. *Id.* at ¶ 37.

---

[2] Because these two cases share the same factual background and raise identical legal issues, they were consolidated for the purposes of summary judgment briefing (doc. no. 89).

### C. Summary of the Claims

Oklahoma asserts six claims in its Amended Complaint (doc. no. 77): Count one seeks a declaratory judgment that Oklahoma has jurisdiction over surface coal mining and reclamation operations under Title IV and Title V of SMCRA within the Creek Reservation; counts two through five contend that OSMRE's actions violated the APA because they were arbitrary and capricious and failed to comply with procedural requirements; and count six asserts that OSMRE's actions violated Oklahoma's right to fundamental fairness and due process.

OSMRE has asserted two counterclaims (doc. no. 80) in response. First, it seeks a declaratory judgment that OSMRE is the sole regulatory authority within the boundaries of the Creek, Cherokee, and Choctaw Reservations and that Oklahoma does not have jurisdiction over surface mining or reclamation operations on these lands. Second, it seeks a declaratory judgment that application of Oklahoma's state regulatory program under Title V and its reclamation program under Title IV to land within the Reservations is preempted by SMCRA. Each party seeks to enjoin the other from exercising regulatory authority over surface mining and reclamation operations on the Reservations.

The parties agree that these claims raise questions of law that are appropriately resolved at the summary judgment stage.

### III.   STANDARD OF DECISION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is genuine if the facts and evidence are such that a reasonable juror could return a verdict for either party. *Id*. All facts and reasonable inferences must be viewed in the light most favorable to the nonmovant. *Id*.

"Cross-motions for summary judgment are treated as two individual motions for summary judgment and held to the same standard, with each motion viewed in the light most favorable to its nonmoving party." *Banner Bank v. First Am. Title Ins. Co*., 916 F.3d 1323, 1326 (10th Cir. 2019). When the parties file cross motions for summary judgment, the court is entitled to assume "'no evidence needs to be considered other than that filed by the parties.'" *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (citation omitted).

As for challenges to agency action under the APA, the court "acts as an appellate court" and "employs summary judgment to decid[e], as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *New Mexico Health Connections v. United States Dep't of Health & Hum. Servs.*, 946 F.3d 1138, 1161 (10th Cir. 2019) (quotation marks and citation omitted).

## IV.   DISCUSSION

### A. Declaratory Judgment Claims

The parties raise opposing requests for a declaratory judgment as to Oklahoma's ability to regulate surface mining and reclamation operations within the Reservations under SMCRA. To resolve these claims, the court will first address whether SMCRA precludes and preempts Oklahoma's regulatory authority over surface mining and reclamation operations on the land. The court will then address Oklahoma's claim that equitable principles bar OSMRE from stripping Oklahoma of its long-exercised regulatory authority.

### 1.   State Regulatory Authority Under SMCRA

OSMRE argues that SMCRA precludes states from administering a state program on Indian land and that, under the decisions in *McGirt, Hogner*, and *Sizemore*, the lands involved here are Indian lands. Oklahoma does not seriously

dispute either of these contentions, and for good reason. SMCRA's plain language compels both conclusions.

First, the land at issue is Indian land under SMCRA's definition of that term. In *McGirt*, the Supreme Court held that the Creek Reservation qualified as "Indian country" under the MCA, which is defined as "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation." *McGirt,* 140 S.Ct. at 2459 (quoting 18 U.S.C.A. § 1151(a)). SMCRA's definition of "Indian land" is similar – it includes "all lands…within the exterior boundaries of any Federal Indian reservation, notwithstanding the issuance of any patent, and including rights-of-way." 30 U.S.C. § 1291(9). Because the Creek, Choctaw, and Cherokee Reservations were not disestablished and qualify as "Indian reservation[s] under the jurisdiction of the United States," each of them is also a "Federal Indian reservation" under SMCRA.

Second, because the reservations are Indian land, SMCRA plainly precludes a State from administering its state program on the land. As previously explained, SMCRA establishes minimum national standards for the regulation of surface coal mining and reclamation operations but allows States to assume responsibility for enforcement of these standards through operation of approved state programs. 30 U.S.C. § 1253. But crucially, a state program is defined to exclude Indian land. *Id.* at 1291. *See Hess*, 297 F.3d at 315-16 (explaining that SMCRA enables states to assume exclusive jurisdiction "on non-Federal and non-Indian lands within the particular state"); *New Mexico ex rel. Energy & Mins. Dep't, Min. & Mins. Div. v. U.S. Dep't of Interior*, 820 F.2d 441, 445 (D.C. Cir. 1987) (explaining that if a particular reservation was not dissolved then the state "may not exercise authority over these lands under the Surface Mining Act" and the lands would "be off limits" to the state); *State of Mont. v. Clark*, 749 F.2d 740, 747-49 (D.C. Cir. 1984)

(explaining that SMCRA "unambiguously denies the state the power to administer funds on any Indian lands, on or off the reservation" because a state program is defined to exclude Indian lands).

In addition to specifically excluding states from regulating surface mining on Indian lands, SMCRA also designates the appropriate regulatory authority for these areas. Section 1300 provides that the Secretary shall incorporate SMCRA's standards in all existing and new leases on Indian lands but also gives tribes the option to administer their own tribal regulatory programs. 30 U.S.C. § 1300(d), (j). To the extent these provisions leave any doubt as to regulatory authority on Indian land, SMCRA's implementing regulations clearly state that OSMRE "shall be the regulatory authority on Indian land." 30 C.F.R. § 750.6(a). Oklahoma does not challenge the validity of this regulation.

SMCRA therefore unambiguously precludes application of Oklahoma's state program on the Reservations. Given this conclusion, OSMRE asserts that it is entitled to a declaratory judgment that Oklahoma's exercise of regulatory jurisdiction over surface coal mining and reclamation operations within the Reservations is preempted by SMCRA and that OSMRE is the sole regulatory authority on these lands. In response, Oklahoma asserts that even if it cannot apply its state program on Indian land, SMCRA does not entirely prohibit states from regulating surface coal mining and reclamation operations outside of this program and that Oklahoma therefore retains some regulatory authority over the Reservations.[3]

---

[3] OSMRE asserts that Oklahoma waived this argument by not asserting it in the Amended Complaint and that it raises a hypothetical legal question that is not ripe for adjudication because Oklahoma has not identified any state law that it seeks to enforce outside of those contained in its State program. The court disagrees – the argument responds to OSMRE's assertion that it should be declared the sole regulator on the Reservations and is fairly encompassed by the claims asserted in the pleadings. Further, "[f]ederal regulatory action that preempts state law creates a sufficient

The Supreme Court recently reiterated that although a State generally has jurisdiction over all its territory, its jurisdiction in Indian country may be preempted "by federal law under ordinary principles of federal preemption." *Oklahoma v. Castro-Huerta*, ___ U.S. ___, 142 S.Ct. 2486, 2494 (2022). The preemptive effect of a federal law "may be either expressed or implied, and 'is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (citation omitted). There are "at least two types of implied pre-emption: field pre-emption, where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, and conflict pre-emption, where compliance with both federal and state regulations is a physical impossibility or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress[.]" *Id.* (internal quotation marks and citations omitted). Ultimately, the "task in any pre-emption case is to determine whether state regulation is consistent with the structure and purpose of the statute as a whole." *Id*. at 98.

Here, SMCRA's text and structure indicate Congress' intent to preempt state regulation of surface coal mining and reclamation activities that occurs outside of an approved state program. SMCRA defines surface coal mining and reclamation operations expansively, 30 U.S.C. § 1291(27) and (28), and includes provisions governing all activities conducted in connection with these operations. *See, e.g.,* 30 U.S.C. §§ 1256, 1258, 1262, 1265. SMCRA is therefore accurately described as "a comprehensive statute that regulates *all* surface coal mining operations." *United States v. Navajo Nation*, 556 U.S. 287, 300 (2009) (emphasis added). Its primary

---

injury-in-fact" with respect to a State's ability to pursue declaratory and injunctive relief. *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008).

purpose is to "establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." 30 U.S.C. § 1202(a). With respect to State involvement in surface mining regulation, SMCRA is designed to "assist the States in developing and implementing a program to achieve *the purposes of this chapter*." *Id.* at § 1202(g) (emphasis added). To that end, SMCRA allows States to assume a regulatory role, but only via approved state programs.[4]

SMCRA provides that a State "which wishes to assume exclusive jurisdiction" over surface coal mining and reclamation operations "shall" submit a state program to the Secretary for approval. 30 U.S.C. § 1253(a). This is the only mechanism by which a State may assume regulatory jurisdiction; the procedures are mandatory. *See Gade*, 505 U.S. at 99 (1992) (holding that the "unavoidable implication" of a provision in the OSH Act stating that a State "shall" submit a plan if it wishes to "assume responsibility" over occupation safety health standards "is that a State may not enforce its own occupational safety and health standards without obtaining the Secretary's approval"). Absent an approved state program, the federal government exercises "exclusive jurisdiction." 30 U.S.C. § 1254(a).  A state therefore does not retain any regulatory authority over surface mining and reclamation operations unless it has an approved state program.

Further, state regulation on Indian land outside of an approved state program would undermine the authority granted to OSMRE and Indian tribes. SMCRA permits an Indian tribe to administer its own regulatory program but otherwise

---

[4] The state laws comprising Oklahoma's regulatory program recognize this point. *See* Okla. Admin. Code §§ 460:20-1-4 (providing that the Oklahoma Department of Mines "is responsible for the regulation of surface coal mining and reclamation operations under an approved State program"); 460:20-3-4 (providing that the Oklahoma Department of Mines shall assume primary responsibility for the regulation of surface mining and reclamation operations "upon submission to and approval by the Secretary of a State program"); 460:20-3-6(a) (providing that "[a]ny person who conducts surface coal mining and reclamation operations on non-Indian or non-Federal lands…shall have a permit issued pursuant to the applicable State or Federal program").

designates OSMRE as the regulatory authority on Indian lands. State regulation of surface coal mining and reclamation operations on Indian land would conflict with the authority granted and allocated by Congress and is therefore preempted by SMCRA.

Finally, SMCRA contemplates an "either-or arrangement" where there is either state regulation or federal regulation, but not both. *Hess*, 297 F.3d at 318. Jurisdiction is therefore "never shared" and cannot be exercised concurrently. *Id.*; *see also Bragg,* 248 F.3d at 289 ("In sum, because the regulation is mutually exclusive, either federal law or State law regulates coal mining activity in a State, but not both simultaneously."). Because SMCRA provides for federal regulation on Indian land in the absence of a tribal regulatory program, the enforcement of state laws – whether as part of a state program or not – would violate the exclusive jurisdiction envisioned by SMCRA.

In an attempt to navigate around the preemptive effect of SMCRA's provisions, Oklahoma argues that § 1255 preserves its authority to implement "other state laws" outside of its state program so long as they are more stringent than SMCRA's minimum standards. But § 1255 says nothing about "other" state laws. What it *does* say is that "any" state laws providing for more stringent regulations are not inconsistent with SMCRA and therefore not superseded. 30 U.S.C. § 1255. However, because SMCRA only permits a state to regulate surface mining via an approved state program, the state laws § 1255 addresses are those that comprise the state program. *See Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 238 (3d Cir. 1995) (interpreting § 1255 and explaining that federal regulations "serve only as the base rather than the ceiling for the state program"); *Bragg,* 248 F.3d at 288 (explaining that SMCRA "encouraged the States, through an offer of exclusive regulatory jurisdiction, to enact their own laws incorporating these minimum standards, as well as any more stringent, but not inconsistent, standards that they

might choose"). Section 1255 merely reflects that States may incorporate more extensive and more stringent regulations into their state programs. It does not, however, change the jurisdictional limits of a state program or authorize states to regulate surface mining via a set of state laws that operate independent of SMCRA. In any event, § 1255 provides that inconsistent state laws are superseded by SMCRA. Applying state surface mining and reclamation laws to Indian land – even those that are more stringent than SMCRA's minimum standards – would be inconsistent with the exclusive authority granted to OSMRE and Indian tribes on Indian land.

In sum, SMCRA carefully allocates regulatory authority over all surface coal mining and reclamation operations depending on the type of land at issue and leaves no room for state regulation outside of this scheme. Application of Oklahoma's state surface coal mining and reclamation laws to the land comprising the Creek, Cherokee, or Choctaw Reservations is inconsistent with this scheme and is therefore preempted by SMCRA

### 2.  Equitable Principles

Despite the plain meaning of SMCRA, Oklahoma argues that fundamental principles of equity foreclose OSMRE's ability to strip Oklahoma of regulatory jurisdiction over surface mining and reclamation operations within the reservations. Broadly speaking, Oklahoma's equitable arguments are understandable.  After all, for well over a century, millions of Oklahomans (including tribal leaders and their constituents) lived their lives and conducted their public and private business with the understanding that the State of Oklahoma, acting through its elected leaders and the agencies they created, had plenary regulatory authority within the boundaries of the state.  But the issue now is whether the court is at liberty to ignore SMCRA's unambiguous command and, as a matter of equity, authorize an ongoing violation of federal law. The court appreciates Oklahoma's concerns regarding the displacement

of state and local authority over a huge portion of its territory following *McGirt*, but a "district court cannot…override Congress' policy choice, articulated in a statute, as to what behavior should be prohibited." *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001). Rather, when "the statute's language is plain," as it is here, "the sole function of the courts is to enforce it according to its terms." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989) (internal quotation marks and citation omitted). As explained above, SMCRA's plain language precludes implementation of a state regulatory program on Indian land, which includes the reservations of the Creek Nation, Choctaw Nation, and Cherokee Nation. OSMRE seeks to enforce these provisions. Although, for decades, Oklahoma regulated mining and reclamation operations on these lands because the parties quite understandably believed that the State had the authority to do just that, the court is now obligated to enforce the statute's plain terms.

The Supreme Court's decision in *City of Sherrill, N.Y. v. Oneida Indian Nation of New York*, 544 U.S. 197 (2005) does not compel a different result. In *Sherill*, the Oneida Indian Nation sought to revive its ancient sovereignty over parcels located on its historic reservation. *Id.* at 202. The reservation land had been purchased by New York in the late 1700s and early 1800s in violation of the Nonintercourse Act, which bars sales of tribal land without the acquiescence of the Federal Government. *Id.* at 204-05. In the late 1990s, the Tribe purchased parcels of the historic reservation land on the open market. *Id.* at 211. The Tribe then resisted payment of municipal property taxes on the ground that "acquisition of fee title to discrete parcels of historic reservation land revived the Oneidas' ancient sovereignty piecemeal over each parcel." *Id.* at 202.

The Supreme Court rejected this theory and held that the "disruptive remedy" sought by the Tribe was barred by equitable principles. *Id.* at 217. Specifically, the Court held that "the Oneidas' long delay in seeking equitable relief against New

York or its local units, and developments in the city of Sherrill spanning several generations, evoke the doctrines of laches, acquiescence, and impossibility, and render inequitable the piecemeal shift in governance this suit seeks unilaterally to initiate." *Id.* at 221. The Second Circuit has twice applied *Sherrill's* equitable principles to bar similar ancient Indian land claims seeking possession, ejectment, or damages as a means to remedy the centuries-old transfer of reservation land that occurred in violation of the Nonintercourse Act. *See Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d 266, 275 (2d Cir. 2005); *Oneida Indian Nation of New York v. Cnty. of Oneida*, 617 F.3d 114, 121 (2d Cir. 2010).

Oklahoma contends that, given its long-exercised regulatory authority over surface mining on the reservations, these same equitable principles should preclude OSMRE from stripping Oklahoma of its regulatory control over the lands involved here. The court is not the least bit critical of the State for advancing this argument, given that the ancient land transfers underlying the claims in *Sherrill*, *Cayuga*, and *Oneida* violated the Nonintercourse Act and equity still worked to bar those claims. But the relief sought in those cases was different than the relief requested here. *Sherrill* and its progeny concerned attempts to rekindle tribal sovereignty or obtain relief based on a tribe's right to possess the land. This case does not involve those types of disruptive remedies but is instead about the interpretation and application of a federal statute.

The Second Circuit's decision in *Cayuga Nation v. Tanner*, 6 F.4th 361 (2d Cir. 2021), cert. denied, 142 S.Ct. 775 (2022), is instructive in this regard. There, the Cayuga Nation purchased a tract within the boundaries of its historic reservation. *Id.* at 369. The land had originally been sold in violation of the Nonintercourse Act and had been subject to local regulation for generations, but the reservation had never been disestablished. *Id.* at 365. After the Cayuga Nation opened a gaming establishment on the property, the Village of Union Springs attempted to enforce an

ordinance requiring a license for the operation of gaming facilities. *Id.* at 371-72. The Cayuga Nation filed suit to preclude enforcement of the ordinance, arguing that it was preempted by the Indian Gaming Regulatory Act. *Id.* at 372. In evaluating whether this claim was barred by claim preclusion due to a previous lawsuit involving the parcel, the Second Circuit noted that the Cayuga Nation was not seeking to assert broad immunity from local regulation – an assertion that would have been undermined by *Sherrill* – but was instead seeking a declaration "that the specific sliver of local law that the Village was attempting to enforce is preempted by a specific federal statute." *Id.* at 376. That issue, the Second Circuit explained, "turns on a straightforward question of statutory interpretation" regarding whether the land involved "sits on Indian lands within the meaning of the IGRA." *Id.* at 377-78. Because the land qualified as Indian lands under the IGRA's definition, and the IGRA preempts local laws regulating gaming on Indian lands, the Second Circuit held that the municipal ordinance was preempted. *Id.* at 380. Thus, although acknowledging that *Sherill* could undermine a tribe's belated assertion of "broad immunity from local regulation," *id.* at 376, the Second Circuit did not apply *Sherrill's* equitable defenses to the Cayuga Nation's federal preemption claim. *Id.* at 380. Rather, the Second Circuit simply applied the "plain language of the IGRA." *Id.* at 378.

Similarly, here, the parties' claims concern whether a "specific sliver" of state regulatory authority is preempted by a federal statute, a question that is answered by SMCRA's plain language.[5] This case does not, as was the case in *Sherrill*, implicate broad claims of tribal immunity from local regulation or an Indian tribe's possessory

---

[5] It is worth emphasizing again that this case involves the regulation of surface mining and reclamation activities under SMCRA; it does not make any determination with respect to Oklahoma's ability to enforce other state laws or regulations on the land at issue.

rights over land that long ago passed into private ownership. *Sherrill* is therefore inapplicable.

Unfortunately for the plaintiffs, the more compelling Supreme Court authority on the facts of this case is not *Sherrill*, but *McGirt*. The "key question" in *McGirt* was whether the land involved qualified as "Indian country" as that term is defined under the Major Crimes Act ("MCA"). *McGirt,* 140 S.Ct. at 2459. Because the land qualified as Indian country, the Supreme Court held that "the MCA applies to Oklahoma according to its usual terms." *Id.* at 2478. Although this conclusion resulted in an avulsive shift in criminal jurisdiction from Oklahoma to the federal government that conflicted with decades of prior practice, the Supreme Court was nevertheless unwilling to ignore the "statutory promise" contained in the MCA. And although *McGirt* acknowledged that certain legal doctrines like laches may be deployed to protect those who have reasonably labored under a mistaken understanding of the law, it did not deploy such doctrines to preclude the future enforcement of the MCA. *Id.* at 2481. Likewise, in the case at bar, the key question is whether the lands in question here qualify as Indian land under SMCRA. They do qualify as Indian land, with the result that state-level regulation of surface mining and reclamation activities within the three reservations is prohibited.

Ultimately, whatever role *Sherrill* or other equitable defenses may have in blocking long-dormant assertions of sovereignty, or in narrowing the remedies available for unlawful land sales, they do not override the clear command of a federal statute. On the contrary, "[o]nce Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is for the Executive to administer the laws and for the courts to enforce them when enforcement is sought." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978). Because SMCRA's plain language precludes state regulation on Indian land, and because the lands at issue are Indian land as defined by SCMRA, the court concludes, unavoidably, that it must enforce

the unambiguous provisions of SMCRA, with the result that Oklahoma may not continue to exercise regulatory jurisdiction over surface mining and reclamation activities on the lands at issue. The fact that Oklahoma has regulated surface mining on these lands for several decades does not lead to a different result.

Moreover, taking *Sherrill's* equitable principles on their own terms, "laches or neglect of duty on the part of officers of the government is no defense to a suit by it to enforce a public right or protect a public interest." *Utah Power & Light Co. v. United States*, 243 U.S. 389, 409 (1917); *United States v. Distefano*, 279 F.3d 1241, 1245, n. 2 (10th Cir. 2002) ("Such a defense would fail, however, because laches may not be asserted against the United States in an action brought to enforce a public right or a public interest."); *Ute Indian Tribe of the Uintah v. Myton,* 835 F.3d 1255, 1263 (10th Cir. 2016) ("[L]aches is a line of defense that usually may not be asserted against the United States."). Here, OSMRE is not seeking to vindicate the interests of a private party but is acting in its sovereign capacity to ensure compliance with a federal statute and to enforce its own regulatory authority. Laches or other delay-based defenses cannot be applied to the federal government when it acts in that capacity. *United States v. Angell*, 292 F.3d 333, 338 (2d Cir. 2002) (rejecting laches defense where federal government sought to enforce the Rivers and Harbors Appropriation Act, 33 U.S.C. §§ 401, *et seq.*).

Accordingly, for the reasons explained above, Oklahoma is not entitled to the declaratory judgment it seeks in count one of its Amended Complaint. OSMRE is entitled to a declaratory judgment that SMCRA preempts application of Oklahoma's regulatory programs on land within the boundaries of the Creek Reservation, Cherokee Reservation, and Choctaw Reservation and that OSMRE is the sole regulatory authority on these lands in the absence of an approved tribal regulatory program.

### B. APA Claims

Oklahoma's remaining claims assert that OSMRE's actions violated the Administrative Procedure Act in two ways: first, the actions were arbitrary, capricious, and not in accordance with law; and second, the actions were not promulgated using the proper procedures. *See* 5 U.S.C. § 706. However, before turning to the merits of these issues, the court will address OSMRE's contention that the court lacks jurisdiction to review these claims because OSMRE did not perform a final agency action, the suit has been brought in the wrong venue, and the action is untimely.

### 1. Jurisdictional Challenges

#### a. Final Agency Action

"The APA authorizes judicial review only of final agency actions." *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1189 (10th Cir. 2014). OSMRE contends that its decision to assume regulatory authority over the reservations was nondiscretionary and therefore not an agency action at all. OSMRE's argument goes like this: *McGirt*, *Hogner*, and *Sizemore* "rendered the decisions that made OSMRE the authority within the reservations," OSMRE therefore had no discretion other than to instruct Oklahoma to cease operating its state program, and nondiscretionary actions such as this are not agency actions.

But OSMRE's initial premise is flawed. *McGirt*, *Hogner*, and *Sizemore* did not render any decision with respect to Oklahoma's regulatory authority under SMCRA. These cases address whether particular reservations qualify as "Indian country" for purposes of the Major Crimes Act. Of course, the conclusions these cases reached regarding the existence of the reservations had significant implications under SMCRA. But it was OSMRE's application of the holdings in *McGirt*, *Hogner*, and *Sizemore* to SMCRA, not the cases themselves, that ultimately caused the shift of authority that Oklahoma now challenges.

SMCRA's decision – which is reflected in letters to Oklahoma's state agencies, Notices of Decision published in the Federal Register, and the refusal to fund certain grant requests – initiated a major change in the status quo and involved at least some interpretation and application of SCMRA's provisions. It therefore qualifies as an agency action under the APA. *See* 5 U.S.C. § 551(13) (defining "agency action" to include the "whole or part of an agency rule, order, license, sanction, relief, or the equivalent thereof"); 5 U.S.C. § 551(4) (defining "rule" as a statement "designed to implement, interpret, or prescribe law or policy"). That OSMRE believed its decision was the only option available to it under the governing law does not render its decision unreviewable or somehow not an agency action. *See Sac & Fox Nation of Missouri v. Norton*, 240 F.3d 1250, 1261 (10th Cir. 2001) (reviewing agency decision that the agency described as nondiscretionary under the governing statutes).

Further, because OSMRE engaged in agency action as defined in the APA, "[t]he APA establishes a basic presumption of judicial review." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, ___ U.S. ___, 140 S.Ct. 1891, 1905 (2020) (alteration in original) (internal quotation marks omitted). This presumption can generally only "be rebutted by a showing that the relevant statute 'preclude[s]' review, or that the 'agency action is committed to agency discretion by law." *Id.* (alteration in original) (internal citations omitted). Neither of these exceptions apply here.

OSMRE additionally argues that, assuming it performed an agency action, its decisions with respect to Oklahoma's funding requests were not final agency actions. An agency action is final if it marks "the consummation of the agency's decisionmaking process" and "either determine[s] rights or obligations or occasion[s] legal consequences." *Kobach*, 772 F.3d at 1189 (quotation marks omitted). OSMRE's decision to disapprove Oklahoma's requests for grant funding

meets these requirements because OSMRE definitively determined that it will not provide funding for state projects occurring on Indian land. OSMRE's conclusion on this point was final. Although OSMRE subsequently approved an amended funding request that reflected the change in jurisdictional authority, OSMRE did not alter its position regarding its inability to approve funding for state projects on Indian land.

### b. SMCRA's Venue Provision

So OSMRE engaged in some sort of final agency action, but what type? The answer is significant because SMCRA includes a provision that limits where certain actions may be brought. Section 1276(a)(1) of SMCRA provides:

> Any action of the Secretary to approve or disapprove a State program or to prepare or promulgate a Federal program pursuant to this chapter shall be subject to judicial review by the United States District Court for the District which includes the capital of the State whose program is at issue. Any action by the Secretary promulgating national rules or regulations including standards pursuant to sections 1251, 1265, 1266, and 1273 of this title shall be subject to judicial review in the United States District Court for the District of Columbia Circuit. Any other action constituting rulemaking by the Secretary shall be subject to judicial review only by the United States District Court for the District in which the surface coal mining operation is located.

30 U.S.C.A. § 1276(a)(1).

Oklahoma contends that OSMRE's actions amount to a disapproval of its state program. Therefore, under the first prong of § 1276(a)(1), jurisdiction to review the actions complained of here is appropriate in this court. OSMRE disagrees. It contends that SMCRA and its implementing regulations make clear that the disapproval of a state program references a specific action that occurs in response to the submission of a state program or an amendment to a state program. But, OSMRE notes, neither a state program nor a program amendment were submitted and rejected in this case. Moreover, OSMRE argues, submission of a program amendment was

unnecessary because Oklahoma's state program already excludes Indian land from its regulatory jurisdiction. OSMRE therefore contends that its action (if an agency action at all) is some other species of rulemaking, with the consequence that judicial review is only appropriate in the Eastern District of Oklahoma, the location where all the surface mining is located.

However, as even OSMRE concedes, SMCRA does not indicate precisely how to proceed when a State's regulatory authority over certain areas is compromised by changes in the law. Def.'s Br. at 43. Here, OSMRE took actions with respect to Oklahoma's state program that effectively terminated Oklahoma's regulatory jurisdiction over all surface coal mining and reclamation operations within its borders. The court concludes quite readily that this scenario most closely resembles the disapproval of a state program. Although Oklahoma's state program has not been formally disapproved, the reality is that Oklahoma is no longer administering a state program because of OSMRE's decision. OSMRE's action is therefore equivalent to the disapproval of a state program and jurisdiction to review the action is appropriate in the court.

### c.  Timeliness

In addition to designating the venue for certain actions, § 1276(a)(1) of SMCRA also provides that a "petition for review of any action subject to judicial review under this subsection shall be filed in the appropriate Court within sixty days from the date of such action." Relying on this provision, OSMRE contends that the APA claims related to regulation of the Creek Reservation are untimely because Oklahoma did not file its Complaint within sixty days of OSMRE's April 2nd letter. Oklahoma counters that SMCRA's limitations period is triggered not by the April 2nd letters, but by the date OSMRE published its Notice of Decision in the Federal Register.

SMCRA provides that OSMRE "shall notify the State in writing" if it "disapproves any proposed State program in whole or in part." 30 U.S.C. § 1253(c). SMCRA's implementing regulations then state that "[a]ll decisions approving or disapproving a program, in whole or in part, shall be published in the Federal Register, indicating, in the event of disapproval, that the State has 60 days to submit a revised program for consideration." 30 C.F.R. § 732.13(e). This regulation suggests that disapproval of a state program – which, again, is what OSMRE's action most closely resembles – is not complete until a notice is published in the Federal Register. Thus, although Oklahoma was informed of OSMRE's decision on April 2nd, the process was not complete until publication of the Notice of Decision. Oklahoma brought its claims within 60 days of the date of this publication and its claims with respect to the lands comprising the Creek Nation are therefore timely.[6]

### 2. Unlawful Agency Action

Oklahoma asserts that OSMRE violated the APA by acting in a manner that was arbitrary and capricious and that failed to comply with required procedures. *See* 5 U.S.C. § 706. More particularly, Oklahoma contends that OSMRE failed to adequately explain its decision, failed to consider important reliance interests before transferring regulatory authority, and failed to engage in notice and comment procedures. OSMRE defends its actions as procedurally and substantively sound, but also asserts that even if it erred, such error was harmless because the conclusion it ultimately reached was the only permissible interpretation of SMCRA.

In reviewing whether an agency action was arbitrary and capricious or made without observance of required procedures, the APA instructs courts to take "due account…of the rule of prejudicial error." 5 U.S.C. § 706. Under this standard, an APA violation does not require reversal "unless a plaintiff demonstrates prejudice

---

[6] OSMRE does not contend that the claims in CIV-21-805-F regarding the lands comprising the Choctaw Reservation and Cherokee Reservation are untimely.

resulting from the error." *Prairie Band Pottawatomie Nation v. Fed. Highway Admin.*, 684 F.3d 1002, 1008 (10th Cir. 2012). The rationale behind this rule is obvious: "If the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration." *PDK Lab'ys Inc. v. U.S. D.E.A.*, 362 F.3d 786, 799 (D.C. Cir. 2004). Thus, the harmless error rule is appropriately applied where the agency reached the correct conclusion and further consideration of the issues would not change the result. *See Lake Carriers' Ass'n v. E.P.A.*, 652 F.3d 1, 10-11 (D.C. Cir. 2011) (finding that "providing notice and an opportunity for comment…would have served no purpose" and that "further consideration or response" to arguments the agency allegedly ignored "was unnecessary" because the agency correctly determined that it lacked the authority to amend the action in the way petitioners' desired); *Nat'l Ass'n of Home Builders v. Defs. of Wildlife,* 551 U.S. 644, 659 (2007) (holding that erroneous statement in Federal Register notice did not require remand to agency because it "had no effect on the underlying agency action being challenged"); *Sheppard v. Sullivan*, 906 F.2d 756, 762 (D.C. Cir. 1990) (holding that petitioner "could not have been harmed" by the failure to provide notice and comment prior to an agency action because the agency's approach was "the only reasonable one" and the agency would likely have been reversed had it reached the opposite conclusion); *Hisp. Info. & Telecommunications Network, Inc. v. F.C.C.*, 865 F.2d 1289, 1294 (D.C. Cir. 1989) (declining to require additional procedures because "it would be a pointless formality in which the result was preordained").

Assuming that OSMRE violated the APA either by failing to follow the proper procedures or by failing to consider certain aspects of the issue, those errors would not require remand to the agency because the errors would be harmless. Once the Supreme Court and the Oklahoma Court of Criminal Appeals determined that the Reservations had not been disestablished, SMCRA's unambiguous language

required OSMRE to assume regulatory authority with respect to operations within the Reservations and to notify Oklahoma that it could no longer administer its state program. SMCRA permits no other interpretation. Although this is not the result Oklahoma would prefer, no amount of administrative process will change the fact that SMCRA precludes state regulation on Indian land.

Further, the transfer of authority required by SMCRA has already taken place – Oklahoma represents that it has shut down its regulatory and reclamation programs and OSMRE asserts that it has assumed jurisdiction over the reservations. This is the only outcome permitted by SMCRA; remanding this action to the agency to consider reliance interests, more fully explain its reasoning, or engage in notice and comment would therefore be a "pointless formality." *Hisp. Info. & Telecommunications Network, Inc*., 865 F.2d at 1294. Because Oklahoma has failed to establish that it can exercise sole or concurrent jurisdiction on the reservations, "the additional agency procedures [it] demand[s] would not have afforded [it] the relief [it] seeks." *Lake Carriers' Ass'n*, 652 F.3d at 12. Under those circumstances, to remand to the agency "would be an exercise in futility—one not in accord with 'the rule of prejudicial error.'" *All Indian Pueblo Council v. United States*, 975 F.2d 1437, 1443 (10th Cir. 1992) (quoting 5 U.S.C. § 706).

In sum, the court may exercise jurisdiction over Oklahoma's APA claims. However, because any of the alleged APA deficiencies asserted by Oklahoma would be harmless (in other words, ultimately of no consequence) under the circumstances presented here, OSMRE is entitled to summary judgment on these claims. Last, Oklahoma has not cited any law or made any separate argument in support of its claim that OSMRE's actions violated its right to fundamental fairness and due process. Accordingly, the court finds that OSMRE is also entitled to summary judgment on this claim.

## V.    CONCLUSION

Oklahoma seeks to continue regulating surface coal mining and reclamation operations on land within the exterior boundaries of the Creek Reservation, Choctaw Reservation and Cherokee Reservation, as it has done for several decades.  However, State regulation of these activities on Indian land is now precluded by SMCRA. Accordingly, Oklahoma's Motion for Summary Judgment (doc. no. 97) is **DENIED** and Federal Defendants' Cross-Motion for Summary Judgment (doc. no. 102) is **GRANTED**.[7] A separate judgment will be entered.

IT IS SO ORDERED this 9th day of November, 2022.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

21-0719p028.docx

---

[7] The court notes the counterclaim plaintiffs' prayer for injunctive relief, doc. no. 80, pp. 59, *et seq*. The injunctive relief sought by counterclaim plaintiffs tracks the declaratory relief they seek.  The court is satisfied that plaintiffs will comply with the determinations the court makes in this order and, consequently, that injunctive relief is not required. In the unlikely event that enforcement of the court's determinations is required, counterclaim plaintiffs may seek supplemental relief as permitted by the Declaratory Judgment Act. 28 U.S.C. § 2202.